IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BONGO PRODUCTIONS, LLC, ROBERT BERNSTEIN, SANCTUARY PERFORMING ARTS LLC, and KYE SAYERS, <br><br>Plaintiffs, <br><br>v. <br><br>CARTER LAWRENCE, Tennessee State Fire Marshal, in his official capacity, CHRISTOPHER BAINBRIDGE, Director of Codes Enforcement, in his official capacity, GLENN R. FUNK, District Attorney General for the 20th Judicial District, in his official capacity, and NEAL PINKSTON, District Attorney General for 11th Judicial District, in his official capacity, <br><br>Defendants. | Civ. Action <br> No. _____ |

**COMPLAINT**

Plaintiffs Bongo Productions, LLC, Robert Bernstein, Sanctuary Performing Arts LLC, and Kye Sayers, on behalf of themselves, by and through their undersigned attorneys, bring this Complaint against the above-named Defendants and allege as follows:

**I. INTRODUCTION**

1. Plaintiffs are Tennessee businesses and service providers and their owners. They serve the public, and provide public access to their restrooms. Plaintiffs welcome transgender customers, clients, and staff, and allow transgender people to use the restrooms or facilities that accord with their gender identity.

2. Under newly enacted H.B. 1182/S.B.1224, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021) ("the Act") (attached as Exhibit A and to be codified at Tenn. Code Ann. § 68-120-

1

101, et seq.), Plaintiffs—and any other business or public entity in Tennessee that allows transgender people to use the appropriate public restroom—will be required to post a controversial and misleading warning notice advising that "THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM." *See* Exh. B.

3. Plaintiffs do not want to display this notice. They do not agree with this characterization of their policies, and they do not want to convey the Tennessee General Assembly's controversial and stigmatizing message to customers, clients, and staff.

4. If H.B. 1182 is allowed to go into effect, Plaintiffs and all other similarly situated businesses and entities open to the public in Tennessee will be forced to either display this government-mandated warning notice, or risk being charged with a Class B misdemeanor for violating the Tennessee building code, with a maximum penalty of six months in prison or $500.

5. By forcing Plaintiffs to display a government-mandated warning notice with which they disagree, the Act violates the Plaintiffs' First Amendment right against compelled speech.

6. Plaintiffs bring this action to challenge the constitutionality of the Act. Unless enjoined by this Court, the Act will take effect on July 1, 2021, irreparably harming Plaintiffs and their customers, clients, and staff, and violating Plaintiffs' constitutional rights.

## II. JURISDICTION AND VENUE

7. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

8. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

2

Case 3:21-cv-00490   Document 1   Filed 06/25/21   Page 2 of 19 PageID #: 2

9. Venue is appropriate under 28 U.S.C § 1391(b) because one or more of the Defendants resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

### III.  PARTIES

**A.  Plaintiffs**

10. Plaintiff Bongo Productions, LLC ("Bongo") owns several restaurants, coffee shops and a coffee roasting company all located in Nashville, Tennessee. *See* Bongo Roasting Co., available at https://bongojava.com/ (last visited Jun. 24, 2021).

11. Plaintiff Robert M. Bernstein is Bongo's founder and chief manager.

12. Mr. Bernstein is responsible for decisions regarding compliance with state and local building codes for Bongo's establishments.

13. Mr. Bernstein opened Fido in 1996. Fido is a restaurant located in the Hillsboro Village neighborhood of Nashville.

14. Fido has 25 employees currently on staff and has employed hundreds of people over the years.

15. In the past, Bongo has employed transgender people. Bongo's and Fido's patrons include members of the transgender community.

16. Bongo and Mr. Bernstein have worked over the years to create a welcoming environment in their business for the LGBTQ community. In reaction to the rash of anti-transgender laws that passed this year and to show their support for transgender people, Fido's staff decorated one of their drink menu signs with transgender and LGBTQ pride flag colors.

3

17. Fido has three restrooms. One is a single-user unisex restroom, which is not subject to the Act. The other two restrooms have multiple stalls and/or urinals and bear sex designations.

18. Prior to the passage of the Act, Fido's management and Mr. Bernstein had never thought about a formal policy as to who could use which restroom. Their informal policy was to allow people to use the sex-designated restroom that best matches their gender identity. Mr. Bernstein has never received any complaints or concerns about their restroom policy.

19. Plaintiff Sanctuary Performing Arts LLC ("Sanctuary") is a performing arts venue, community center and safe haven located in Chattanooga, Tennessee. *See* Sanctuary Performing Arts, available at www.Sanctuaryperformingarts.com (last visited Jun. 24, 2021). Sanctuary was founded by members of the transgender community in December 2020 to serve the needs of transgender and intersex people of all ages, as well as other LGBTQ people and allies.

20. Plaintiff Kye Sayers is Sanctuary's owner and one of its co-founders. She is a Tennessee native.

21. Ms. Sayers makes decisions for Sanctuary regarding compliance with state and local building codes.

22. Sanctuary has two employees on staff, as well as many volunteers. The majority of the people who work and volunteer there and those who participate in Sanctuary's programs are transgender. Since Sanctuary opened its doors in late 2020, approximately 400 people have been involved with Sanctuary as volunteers or participants.

23. Sanctuary has three restrooms. One is a single-user unisex restroom, which is not subject to the Act. The other two restrooms have multiple stalls or urinals and do not have a sex

designation at this time. Next month, Sanctuary intends to begin operating a full-service café and will be required by the local building code to post a sex designation on its two multi-user restrooms. Sanctuary will continue to allow transgender people to use the restroom that best accords with their gender identity.

24. Sanctuary has never received any complaints about their restroom policies.

25. Ms. Sayers and Sanctuary have worked hard to create a safe space for transgender and intersex people and their families in a state that is frequently perceived as unwelcoming to LGBTQ people.

**B. Defendants**

26. Defendant Carter Lawrence is the Commissioner of the Tennessee Department of Commerce and Insurance, and in that capacity, is also the Tennessee Fire Marshal. He has concurrent responsibility for enforcement of the state building code. *See* Tenn. Code Ann. § 68-120-106. Mr. Lawrence is sued in his official capacity.

27. Defendant Christopher Bainbridge is the Director of the Codes Enforcement Section of the Tennessee State Fire Marshal's Office. The Codes Enforcement Section has enforcement authority over statewide building codes and standards, including the Act. *See* Tenn. Comp. R. & Regs. 0780-02-16.01. Mr. Bainbridge is sued in his official capacity.

28. Defendant Glenn R. Funk is the District Attorney General for the 20th Judicial District which covers Metropolitan Davidson County and Nashville, Tennessee. He is responsible for prosecuting all violations of the state criminal statutes occurring in the judicial district. Violations of the Act are Class B misdemeanors, *see* Tenn. Code Ann. § 68-120-108, and are punishable by up to six months' imprisonment and a fine not to exceed $500, *see* Tenn. Code Ann. § 40-35-111(e)(2). General Funk is sued in his official capacity.

29. Defendant Neal Pinkston is the District Attorney General for 11th Judicial District which covers Hamilton County and Chattanooga, Tennessee. He is responsible for prosecuting all violations of the state criminal statutes occurring in the judicial district. Violations of the Act are Class B misdemeanors, *see* Tenn. Code Ann. § 68-120-108 and are punishable by up to six months' imprisonment and fine not to exceed $500, *see* Tenn. Code Ann. § 40-35-111(e)(2). General Pinkston is sued in his official capacity.

## IV. FACTUAL ALLEGATIONS

### A. Legislative History of H.B. 1182

30. As enacted, H.B. 1182 requires "[a] public or private entity or business that operates a building or facility open to the general public and that, as a matter of formal or informal policy, allows a member of either biological sex to use any public restroom within the building or facility" to post a government-prescribed sign at the entrance of each sex-designated public restroom in the building or facility with a red and yellow "NOTICE" text at the top, and boldface black block letters on white background stating that "THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM." *See* Exh. B.

31. The Act defines covered entities to "include" those with facilities that are designated for "a specific biological sex," and to "exclude" "a unisex, single-occupant restroom or family restroom intended for use by either biological sex."

32. The Act does not define "biological sex."

33. The legislative history shows that the Act is intended to apply to entities that allow transgender people[1] to use a restroom facility that accords with their gender identity, rather than the sex they were assigned at birth.

34. During the legislative debates on H.B. 1182, the sole justification offered by its sponsor, Representative Tim Rudd, was that the bill was necessary to "protect[] women and children against" people who could "tak[e] advantage of policies, executive orders, or legislation[] that [] allow the 'opposite biological sex' to enter a [multi-occupancy] restroom, shower, or locker room."[2] He explained, with "new [laws] . . . giving transgenders [sic] [more] rights . . . I don't want women . . . or children calling me next year [about] how they have been raped or molested [while using the bathroom facility]."[3]

35. During a subsequent committee meeting, Representative Rudd stated that "a woman has the right to know whether a man is going to be in her bathroom and vice versa for a man."[4] This too was a reference to transgender people using the restrooms that accord with their gender identity.

36. When questioned by other representatives about the need for this bill, Representative Rudd responded that the bill was suggested by a constituent at a fundraiser, and

---

[1] Transgender people are people whose gender identity—their deeply held internal understanding of who they are—differs from the sex they were assigned at birth. *See* Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. of Clinical Endocrinology & Metabolism 3869 (Sept. 13, 2017), available at https://doi.org/10.1210/jc.2017-01658.

[2] *Debate of H.B. 1182 Before the H. Pub. Serv. Comm.* at 19:50, 112th Gen. Assemb. (Mar. 10, 2021), available at https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24150.

[3] *Id.* at 31:49

[4] *Debate of H.B. 1182 Before the H. State Gov't Comm.* at 1:04:40, 112th Assemb. (Mar. 23, 2021), available at http://tnga.granicus.com/MediaPlayer.phpview_id=610&clip_id=24337&meta_id=575940.

7

he felt that the bill was needed because of the executive orders regarding rights for transgender people "coming out of Washington."[5]

37. There was no testimony offered in support of the bill. The committee nonetheless voted to move the bill forward.[6]

38. During House floor debates on March 29, Representative Mike Stewart asked about the public policy underlying H.B. 1182. Representative Rudd once more responded that with the new executive orders and policies from Washington, it would be "good to put on notice."[7] He also stated that it is "shocking and a danger to people that enter a bathroom marked 'men' or 'women' and someone of the opposite sex is standing there, which could scare people and provoke violence."[8]

39. The bill passed the House and moved to the Senate, where it passed on April 29, 2021.

40. Governor Bill Lee signed H.B. 1182 into law on May 17, 2021.

41. H.B. 1182 will go into effect on **July 1, 2021**.

**B.     Application of H.B. 1182 to Plaintiffs**

42. While transgender people long have been part of our communities—attending schools, working, and using public restrooms without incident—rights for transgender people are nonetheless a subject of hotly contested debate in this state, and across the country. This is especially true around the right to access restrooms that match people's gender identity. In just

---

[5] *Id.* at 1:14:40.

[6] *Id.* at 1:24:00.

[7] *Discussion of H.B. 1182 Before H. Floor Sess., 18th Legis. Day* at 1:49:40, 112th Gen. Assemb. (Mar. 29, 2021), available at http://tnga.granicus.com/MediaPlayer.php?view_id=610& clip_id=24423&meta_id=579987.

[8] *Id.*

2021, the Tennessee General Assembly has passed, and Governor Lee has signed into law, five bills targeting transgender people in Tennessee. Over a hundred anti-transgender bills were introduced nationwide in 2021 alone. *See* Am. Civil Liberties Union, *Legislation Affecting LGBT Rights Across the Country*, https://www.aclu.org/legislation-affecting-lgbt-rights-across-country (last updated May 28, 2021).

43. Transgender people are frequent targets of harassment and face widespread discrimination in all facets of life. Being forced to use restrooms that do not align with their gender puts transgender people at greater risk of harassment or violence, and also causes psychological and physical harm.[9]

44. Policies that allow transgender people to use the correct sex-designated restroom—the restroom that best matches their identity—do not legalize harassment, stalking, violence, or sexual assault. Nor do these policies change the sex-segregated nature of these facilities. In other words, allowing transgender people to use restrooms and other facilities that align with their gender identity simply ensures that everyone has access to spaces that match who they are. These policies do not permit unfettered access for anyone, regardless of sex, to spaces restricted to one sex.

---

[9] *See* Timothy Wang, et al., *State Anti-Transgender Bathroom Bills Threaten Transgender People's Health and Participation in Public Life*, The Fenway Inst. (2016), https://fenwayhealth.org/wp-content/uploads/2015/12/COM-2485-Transgender-Bathroom-Bill-Brief_v8-pages.pdf.

9

45. Law enforcement officials[10] and sexual assault advocates[11] in states and cities with policies that prohibit discrimination based on transgender status, including with respect to use of single-sex facilities, have rejected the contention that these policies cause safety problems.

46. Plaintiffs recognize that people who are transgender may need to use the restroom while out in public, just like everyone else. Plaintiff Bongo has sex-designated restrooms and has informal policies allowing transgender people to use the restrooms that align with their gender identity. Plaintiff Sanctuary does not have sex-designated restrooms at this time, but will shortly, and intends to allow transgender people to use the restrooms that align with the sex they know themselves to be.

47. All Plaintiffs recognize that requiring transgender people to use restrooms associated with the sex they were assigned at birth would mean that their transgender customers, clients, and staff could not use the restroom without significant risk to their safety and dignity.

48. In order to avoid being subject to the Act's compelled speech requirements, Plaintiffs would need to change their policies to bar transgender people from using the restrooms that accord with their gender identity. They do not wish to do so.

49. Plaintiffs do not want to police whether transgender people are using their restrooms or attempt to verify their customers', clients', or employees' "biological sex."

---

[10] Lou Chibbaro Jr., *Predictions of Trans Bathroom Harassment Unfounded*, Washington Blade (Mar. 31, 2016), https://www.washingtonblade.com/2016/03/31/predictions-of-trans-bathroom-harassment-unfounded/.

[11] Press Release, Nat'l Task Force to End Sexual and Domestic Violence Against Women, National Consensus Statement of Anti-Sexual Assault and Domestic Violence Organizations in Support of Full and Equal Access for the Transgender Community (Apr. 21, 2016), https://endsexualviolence.org/wp-content/uploads/2017/09/STATEMENT-OF-ANTI-SEXUAL-ASSAULT-AND-DOMESTIC-VIOLENCE-ORGANIZATIONS-IN-SUPPORT-OF-EQUAL-ACCESS-FOR-THE-TRANSGENDER-COMMUNITY.pdf.

50. It is impossible to ascertain whether or not someone is transgender by looking at them. Many transgender people have a physical appearance that is typical of the sex that matches their gender identity, not the sex they were assigned at birth. And many people who are not transgender may dress or appear in ways that are not stereotypically associated with their sex assigned at birth.

51. Plaintiffs do not have anyone guarding their restroom doors to ask for their birth certificates, inspect anyone's genitals, or interrogate any other aspect of their sex. They do not even know how they would attempt to do so without gross intrusions into the privacy of their employees, customers, and clients. Yet unless they do so, Plaintiffs and indeed all other businesses or other entities with restroom facilities open to the public throughout Tennessee will be required to display the specific sign required by the Act.

52. Fido has sex-designated multi-user restrooms. Mr. Bernstein is concerned that the Act's required warning notice will create confusion for his customers, clients, and employees.

53. Based on the legislative history of the Act, Plaintiffs Bongo and Mr. Bernstein are reasonably concerned that the Act applies to them, because they allow all women, including transgender women, to use the women's restroom, and all men, including transgender men, to use the men's restroom.

54. Plaintiff Sanctuary has two multi-user restrooms that are not presently sex-designated. Anyone is welcome to use any of Sanctuary's restrooms. Sanctuary intends to begin operating a café next month, and will then display a sex designation on its two multi-user restrooms because such a designation will be required by municipal building codes. Sanctuary and Ms. Sayers are reasonably concerned that the Act applies to Sanctuary now because its all-gender multi-user facilities are not "excluded" under the Act's definition of covered entities.

They are also concerned that the Act will apply to Sanctuary in the future once it adds a sex designation on its multi-user restrooms. At that time, Sanctuary will allow all women, including transgender women, to use the women's restroom, and all men, including transgender men, to use the men's restroom.

     **C.    HB 1182 requires Plaintiffs to communicate a controversial and ideological viewpoint.**

     55.    The phrase "biological sex" is a relatively recent one with no fixed definition. *See, e.g.*, Katrina Kazarkis, *The Misuses of "Biological Sex,"* 394 The Lancet 1898 (Nov. 23, 2019), available at https://doi.org/10.1016/S0140-6736(19)32764-3.

     56.    The Endocrine Society's guideline explains that the terms "[b]iological sex, biological male or female" "refer to physical aspects of maleness and femaleness. As these may not be in line with each other (*e.g.*, a person with XY chromosomes may have female-appearing genitalia), the terms biological sex and biological male or female are imprecise and should be avoided."[12]

     57.    In fact, a person's sex encompasses a number of different biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and external genitalia, other secondary sex characteristics, and gender identity.[13]

     58.    These components of sex do not all align neatly in every human being. Where they do not, best practice medical care recognizes that for purposes of social and legal recognition, a person's gender identity should be the basis for their sex classification. *See* World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual,*

---

[12] Hembree, et al., *supra* note 1, at 3875 Table 1.

[13] *See id.*; *see also* Joshua D. Safer & Vin Tangpricha, *Care of Transgender Persons*, 381 New Eng. J. Med. 2451, available at https://www.nejm.org/doi/10.1056/NEJMcp1903650.

12

*Transgender, and Gender Nonconforming People* (2012), available at https://www.wpath.org/publications/soc. Although the detailed mechanisms are not fully understood, there is a medical consensus that there is a significant biologic component underlying gender identity.[14]

59. The Act also ignores entirely the existence of intersex people, by suggesting that there are only two possible sexes with the use of the mandated phrase "*either* biological sex."

60. "Intersex" is an umbrella term for unique variations in reproductive or sex anatomy. Variations may appear in a person's chromosomes, genitals, or internal organs like testes or ovaries. Some intersex traits are identified at birth, while others may not be discovered until puberty or later in life. There are over thirty medical terms for specific combinations of intersex traits. *See* InterAct, *Intersex Definitions* (last updated Feb. 19, 2021), available at https://interactadvocates.org/intersex-definitions/.

61. Despite this guidance from medical professionals, the phrase "biological sex" is frequently used by those seeking to limit rights for transgender people in order to not recognize their gender identity.

62. Prior to this year, there was no mention of "biological sex" in Tennessee law. When Tennessee law referenced restrooms, it used the terms "men" and "women," "male" or "female," or simply "sex." *See, e.g.*, Tenn. Code Ann. § 68-120-503 (requiring equitable restrooms in public spaces); Tenn. Code Ann. § 4-24-303 (addressing restrooms and other sex segregated spaces in fire houses).

---

[14] *See* Safer & Tangpricha, *supra* note 13; Joshua D. Safer & Vin Tangpricha, *Care of the Transgender Patient*, 171 Annals of Internal Med. ITC1 (July 2, 2019), available at https://doi.org/10.7326/AITC201907020; Denise Grady, *Anatomy Does Not Determine Gender, Experts Say*, N.Y. Times (Oct. 28, 2018), available at https://www.nytimes.com/2018/10/22/health/transgender-trump-biology.html.

13

63. Since 2013, state legislatures across the country have introduced bills to restrict transgender people's ability to access single-sex spaces such as restrooms. Many of these exclusions use the phrase "biological sex." For example, North Carolina's House Bill 2 (the "Public Facilities Privacy & Security Act"), restricted access to multiple occupancy restrooms based on "biological sex", which the bill defined as "[t]he physical condition of being male or female, which is stated on a person's birth certificate." H.B. 2, § 1.2, 2015 Gen. Assemb., 2nd Extra Sess. (N.C. 2016).

64. Some statutes that use the term "biological sex," like the Act, do not define it. *See, e.g.*, 2020 Or. Laws 1st Spec. Sess. Ch. 19, § 7a(3)(b)(L). Others use different and sometimes conflicting definitions. *See, e.g.*, W. Va. Code Ann. § 18-2-25d (West 2021) (defining "biological sex" as "an individual's physical form as male or female based solely on the individual's reproductive biology and genetics at birth"); Idaho Code Ann. § 33-6203 (West 2020) (providing that "biological sex" may be "verified" relying on "reproductive anatomy, genetic makeup, or normal endogenously produce testosterone levels," or a combination of those factors); Miss. Code Ann. § 11-62-3 (2016) (stating "biological sex" is "immutable" and "objectively determined by anatomy and genetics at time of birth"); *see also* S.B. 1367/H.B. 1233, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021) (providing that "'sex' means a person's immutable biological sex as determined by anatomy and genetics at the time of birth," and that "[e]vidence of a person's biological sex includes, but is not limited to, a government issued document that accurately reflects a person's sex listed on the person's original birth certificate").

65. Since 2016, the Tennessee General Assembly has introduced multiple bills that would restrict transgender people's access to the restroom that accords with their gender identity in schools or other public spaces. *See, e.g.*, H.B. 2414/S.B. 2387, 109th Gen. Assemb., 2nd Reg.

14

Sess. (Tenn. 2015) (requiring public schools to restrict access to restrooms based on sex assigned on original birth certificates) (did not pass); H.B. 888/S.B. 771, 110th Gen. Assemb., 1st Reg. Sess. (Tenn. 2017) (requiring public schools and higher education institutions to have each student use the restroom and locker room facilities consistent with the student's sex indicated on their original birth certificate) (did not pass); H.B. 2620/S.B. 2480, 110th Gen. Assemb., Reg. Sess. (Tenn. 2018) (requiring the attorney general to defend or pay legal expenses for any school district that restricts access to multiuser restrooms on the basis of "biological sex") (did not pass); S.B. 1297/H.B. 1151, 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) (expanding offense of indecent exposure to apply to restrooms or locker rooms) (passed with amendments); H.B. 1274/S.B. 1499, 111th Gen. Assemb., 1st Reg. Sess. (Tenn. 2019) (similar to H.B. 2620); S.B. 1367/H.B. 1233, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021) (creating a private right of action for a student, teacher, or school employee who encounters "a member of the opposite sex in a multi-occupancy restroom or changing facility"). These bills, and similar bills nationwide, have been hotly contested and the subject of intense legislative and social debate.[15]

66. In 2018, federal efforts to rescind regulatory protections for transgender people were also framed in terms of exclusions based on "biological sex." *See, e.g.*, Erica Green, Katie Benner, & Robert Pear, *'Transgender' Could Be Defined Out of Existence Under Trump*, N.Y. Times (Oct. 21, 2018), https://www.nytimes.com/2018/10/21/us/politics/transgender-trump-administration-sex-definition.html (citing leaked memo from Trump administration Department of Health and Human Services proposing to define "gender as a biological, immutable condition determined by genitalia at birth"). This draft policy prompted protests, rallies and extensive

---

[15] *See, e.g.*, Jonathan Mattise, Kimberlee Kruesi, & Lindsay Whitehurst, *Tennessee Moves to the Forefront with Anti-Transgender Laws*, Associated Press (May 23, 2021), https://apnews.com/article/tennessee-transgender-laws-b8d81d56287d6ed9d56c5da2203596b0.

15

public debate. *See, e.g.*, Sarah Mervosh & Christine Hauser, *At Rallies and Online, Transgender People Say They #Won't Be Erased*, N.Y. Times (Oct. 22, 2018), available at https://www.nytimes.com/2018/10/22/us/transgender-reaction-rally.html; Open Letter from Over 2600 Scientists Opposing Proposed Legal Definition of Gender (Oct. 26, 2018), available at https://not-binary.org/statement/ ("The proposal is in no way 'grounded in science' as the administration claims. The relationship between sex chromosomes, genitalia, and gender identity is complex, and not fully understood. There are no genetic tests that can unambiguously determine gender, or even sex. Furthermore, even if such tests existed, it would be unconscionable to use the pretext of science to enact policies that overrule the lived experience of people's own gender identities.").

67. This politicized usage of the phrase "biological sex," as contrasted with a transgender person's gender identity, is at odds with the medical consensus that gender identity itself has a biological basis. *See, e.g.*, Editorial, *Anatomy Does Not Define Gender*, 365 Nature 5 (Oct. 30, 2018), available at https://www.nature.com/articles/d41586-018-07238-8.

68. As used in the Act, the term "biological sex" carries an anti-transgender connotation that reflects the General Assembly's viewpoint regarding sex and gender.

69. The Act also implies that allowing transgender people to use the restroom is sufficiently alarming to require a sign bearing a large red and yellow "NOTICE" warning.

70. The Act further requires Plaintiffs to appear to endorse the General Assembly's viewpoint about "biological sex" by characterizing their own policy in the General Assembly's controversial language ("THIS FACILITY MAINTAINS A POLICY . . .").

71. Plaintiffs do not want to communicate these messages on the walls of their businesses.

16

72. The speech compelled by the Act also requires Plaintiffs with sex-designated restrooms to misrepresent their restroom policies by suggesting that they do not have sex-designated restrooms.

73. Plaintiffs understand that the Act's mandated phrase "either biological sex" in the political context of H.B. 1182 is offensive to transgender and intersex people because it asserts that transgender people are not the sex they know themselves to be and ignores the existence of intersex people.

74. Bongo and Mr. Bernstein believe that posting the warning notice required by H.B. 1182 will offend their staff, customers, friends, and family. Mr. Bernstein worries he would lose staff and customers if he is forced to post this sign.

75. Mr. Bernstein is uncomfortable with the government telling him to post a sign that he believes is ideologically motivated and inaccurate. He believes that the warning notice mandated by the Act is offensive and inaccurate because it uses the loaded phrase "biological sex" in a way that does not align with current scientific understandings of sex and gender.

76. Sanctuary and Ms. Sayers believe that posting the warning notice required by H.B. 1182 would send a message to transgender and intersex people that they are not welcome—which would undermine Sanctuary's mission and is the exact opposite of the message Sanctuary tries to cultivate in everything it does.

77. Sanctuary and Ms. Sayers believe that Sanctuary will lose community members and supporters they have worked hard to bring to Sanctuary since its doors opened last December if Sanctuary displays the warning notice.

78. Sanctuary and Ms. Sayers object to the General Assembly's use of the term "biological sex" as communicated by the Act and do not want to be forced to use that phrase.

## V. IRREPARABLE HARM AND INJUNCTIVE RELIEF

79. Under the Act, "[i]f an entity or business is notified that it is not in compliance with this section, the entity or business has thirty (30) days in which to comply before any action is taken against the entity or business."

80. If Plaintiffs do not erect the Act's required warning notice after notification that they are not in compliance, they face up to six months imprisonment and/or a fine of up to $500, as well as other enforcement actions or civil penalties under Title 68, Chapter 120.

81. Plaintiffs do not want to display the government-mandated warning notice required by the Act. They also do not want to risk criminal penalties for exercising their right to avoid unwanted speech.

82. Enforcement of the Act will chill Plaintiffs' speech, subjecting them to irreparable harm.

83. Plaintiffs have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT 1

### (First Amendment—Compelled Speech)

84. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 83.

85. The Act violates Plaintiffs' rights under the First Amendment to the United States Constitution by compelling them, on pain of criminal penalty, to communicate a misleading and controversial government-mandated message that they would not otherwise display.

86. The Act is not rationally related to any legitimate government interest, let alone narrowly tailored to advance a compelling government interest.

**REQUEST FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

    A.    Issue a preliminary injunction, later to be made permanent, restraining Defendants, their employees, agents, and successors in office from enforcing the Act;

    B.    Enter a judgment declaring that the Act is unconstitutional under the First Amendment to the United States Constitution;

    C.    Award Plaintiffs their reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

    D.    Grant such other or further relief as the Court deems just, proper, and equitable.

Dated: June 25, 2021

        Respectfully submitted,

        /s/ Thomas H. Castelli
        Thomas H. Castelli (No. 24849)
        Stella Yarbrough (No. 33637)
        American Civil Liberties Union Foundation of Tennessee
        P.O. Box 120160
        Nashville, TN 37212
        Tel: (615) 320-7142
        tcastelli@aclu-tn.org
        syarbrough@aclu-tn.org

        Rose Saxe*
        Emerson Sykes*
        American Civil Liberties Union Foundation
        125 Broad Street, 17th Floor
        New York, NY 10004
        Tel: (212) 549-2500
        rsaxe@aclu.org
        esykes@aclu.org

        *Attorneys for Plaintiffs*

        *Pro hac vice* motions forthcoming