# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BONGO PRODUCTIONS, LLC, ROBERT BERNSTEIN, SANCTUARY PERFORMING ARTS LLC, and KYE SAYERS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civ. Action No. 3:32-cv-00490 Judge Trauger |
| CARTER LAWRENCE, Tennessee State Fire Marshal, in his official capacity, CHRISTOPHER BAINBRIDGE, Director of Codes Enforcement, in his official capacity, GLENN R. FUNK, District Attorney General for the 20th Judicial District, in his official capacity, and NEAL PINKSTON, District Attorney General for 11th Judicial District, in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

I. PRELIMINARY STATEMENT ................................................................................. 1

II. STATEMENT OF FACTS ........................................................................................ 3

    A. The Act's Requirements and Legislative History ......................................... 3

    B. "Biological Sex" Is a Contested Term ........................................................ 5

    C. Plaintiffs' Restroom Policies ...................................................................... 9

    D. The Impact of the Act on Plaintiffs ........................................................... 11

III. ARGUMENT ........................................................................................................... 13

    A. Applicable Legal Standards ....................................................................... 13

    B. Plaintiffs Are Likely to Succeed on the Merits .......................................... 13

        1. *The Act unconstitutionally compels controversial speech* ............................. 14

        2. *The Act cannot survive strict scrutiny* ......................................................... 17

    C. Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury ................................. 20

    D. An Injunction Would Not Harm Defendants and Would Serve the Public Interest ... 20

IV. CONCLUSION ......................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Am. C.L. Union Fund of Mich. v. Livingston Cnty.*,
    796 F.3d 636 (6th Cir. 2015) .................................................................. 12, 20

*Am. C.L. Union of Ky. v. McCreary Cnty.*, 354 F.3d 438 (6th Cir. 2003) .................................... 19

*Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*,
    714 F.3d 424 (6th Cir. 2013) .......................................................................... 20

*Chamber of Com. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) ....................................................................... 20

*Discount Tobacco City & Lottery, Inc. v. United States*,
    674 F.3d 509 (6th Cir. 2012) .......................................................................... 15

*Elrod v. Burns*,
    427 U.S. 347 (1976).......................................................................................... 19

*Hamilton's Bogarts, Inc. v. Michigan*,
    501 F.3d 644 (6th Cir. 2007) .......................................................................... 13

*Ibanez v. Fla. Dep't of Bus. and Pro. Regul., Bd. of Acct.*,
    512 U.S. 136 (1994).......................................................................................... 19

*In re R.M.J.*,
    455 U.S. 191 (1982).......................................................................................... 16

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps. Council 31*,
    138 S. Ct. 2448 (2018)............................................................................... 14, 17

*Moltan Co. v. Eagle-Picher Indus., Inc.*,
    55 F.3d 1171 (6th Cir. 1995) .......................................................................... 20

*Nat'l Inst. of Fam. Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018)....................................................................... 14, 16, 19

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986)............................................................................................... 17

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
    822 F.2d 1390 (6th Cir. 1987) ....................................................................... 20

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992)........................................................................................... 15

Case 3:21-cv-00490   Document 7   Filed 06/25/21   Page 3 of 28 PageID #: 46

*Reed v. Town of Gilbert*,
  576 U.S. 155, 163 (2015) ................................................................ 14, 17

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ............................................................................... 13

*Snyder v. Phelps*,
  462 U.S. 443 (2011) ............................................................................... 17

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ............................................................................... 14

*Ward v. Polite*,
  667 F.3d 727 (6th Cir. 2012) ................................................................ 14

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ............................................................................... 13

*Zauderer v. Office of Disciplinary Counsel of the S. Ct. of Ohio*,
  471 U.S. 626 (1985) ........................................................ 15, 16, 17, 19

**Statutes**

2020 Or. Laws 1st Spec. Sess. Ch. 19, § 7a ......................................... 5

H.B. 1274/S.B. 1499, 111th Gen. Assemb., 1st Reg. Sess. (Tenn. 2019) ..................... 6

H.B. 1288/S.B. 1224, 112th Gen. Assemb., 1ˢᵗ Reg. Sess. (Tenn. 2021) ........................ *passim*

H.B. 2, § 1.2, 2015 Gen. Assemb., 2nd Extra Sess. (N.C. 2016) ................... 5

H.B. 2414/S.B. 2387, 109th Gen. Assemb., 2nd Reg. Sess. (Tenn. 2015) ..................... 6

H.B. 2620/S.B. 2480, 110th Gen. Assemb., Reg. Sess. (Tenn. 2018) ........................... 6

H.B. 888/S.B. 771, 110th Gen. Assemb., 1st Reg. Sess. (Tenn. 2017) ..................... 6

Idaho Code Ann. § 33-6203 (West 2020) ............................................... 5

Miss. Code Ann. § 11-62-3 (2016) ......................................................... 6

S.B. 1297/H.B. 1151, 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) ................... 6

S.B. 1367/H.B. 1233, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021) ................... 6

Tenn. Code Ann. § 40-35-111(e)(2) ....................................................... 4

Tenn. Code Ann. § 4-24-303 .................................................................. 5

Tenn. Code Ann. § 68-120-101 *et seq.* ............................................................... 1, 4, 5, 20

W. Va. Code Ann. § 18-2-25d (West 2021) ................................................................ 5

**Other Authorities**

*Debate of H.B. 1182 Before the H. Pub. Serv. Comm.*,
    112th Gen. Assemb. (Mar. 10, 2021) .......................................................... 4, 18

*Debate of H.B. 1182 Before the H. State Gov't Comm.*,
    112th Gen. Assemb. (Mar. 23, 2021) ...................................................... 4, 15, 18

Denise Grady, *Anatomy Does Not Determine Gender, Experts Say*,
    N.Y. Times (Oct. 28, 2018) ........................................................................... 9

*Discussion of H.B. 1182 Before H. Floor Sess., 18th Legis. Day*,
    112th Gen. Assemb. (Mar. 29, 2021) ............................................................ 4

Editorial, *Anatomy Does Not Define Gender*,
    365 Nature 5 (Oct. 30, 2018). ...................................................................... 7

Erica Green, Katie Benner, & Robert Pear, *'Transgender' Could Be Defined Out of
    Existence Under Trump*, N.Y. Times (Oct. 21, 2018) ...................................... 7

InterAct, *Intersex Definition*, https://interactadvocates.org/intersex-definitions/ ......................... 8

Jonathan Mattise, Kimberlee Kruesi, & Lindsay Whitehurst, *Tennessee Moves to
    the Forefront with Anti-Transgender Laws*, Associated Press (May 23, 2021). ............... 7

Joshua D. Safer & Vin Tangpricha, *Care of the Transgender Patient*,
    171 Annals of Internal Med. 171:ITC1 (July 2, 2019) ...................................... 8

Katrina Kazarkis, *The Misuses of 'Biological Sex,'*
    394 The Lancet 1898 (Nov. 23, 2019) ........................................................... 5

Lou Chibbaro Jr., *Predictions of Trans Bathroom Harassment Unfounded*,
    Washington Blade (Mar. 31, 2016) .............................................................. 18

Open Letter from Over 2600 Scientists Opposing Proposed
    Legal Definition of Gender (Oct. 26, 2018), https://not-binary.org/statement/ ............... 7

Sarah Mervosh & Christine Hauser, *At Rallies and Online, Transgender People
    Say They #Won't Be Erased*, N.Y. Times (Oct. 22, 2018) ................................ 7

Timothy Wang, et al., *State Anti-Transgender Bathroom Bills Threaten Transgender
    People's Health and Participation in Public Life*, The Fenway Inst. (2016),
    https://fenwayhealth.org/wp-content/uploads/2015/12/COM-2485-Transgender-
    Bathroom-Bill-Brief_v8-pages.pdf ............................................................... 19

iv

Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender
      Incongruent Persons: An Endocrine Society Clinical Practice Guideline*
      102 J. of Clinical Endocrinology & Metabolism 3869 ....................................................... 8

v

# I. PRELIMINARY STATEMENT

H.B. 1182 ("the Act"), enacted by the Tennessee General Assembly this spring in the middle of a global pandemic, is a solution in search of a problem. There is no evidence of safety or security issues posed by transgender people using public restrooms that accord with the sex they live as every day in Tennessee and other states throughout the country. Yet, the Tennessee legislature last month chose to enact a law requiring businesses and other entities with public restrooms to parrot the legislature's viewpoint on controversial issues regarding the nature of sex. Plaintiffs are Tennessee businesses and service providers with formal or informal policies allowing their transgender employees, customers, or clients to use the restrooms that accord with their identity. H.B. 1182 forces them to post a government-mandated warning sign with large red and yellow "NOTICE" text at the top, and boldface black block letters on a white background stating that "THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM." *See* Compl. Exh. B. The proffered justification for this mandate? That the federal government issued an executive order indicating that it will follow binding Supreme Court precedent recognizing that discrimination based on transgender status is sex discrimination. The Act compels Plaintiffs to engage in unwanted controversial speech or risk six months' imprisonment and/or a fine of up to $500, as well as other enforcement actions or civil penalties under Title 68, Chapter 120.

In addition to requiring Plaintiffs to communicate the legislature's controversial viewpoint about sex, H.B. 1182 will create confusion and presents fundamental problems of enforceability. The only way to avoid H.B. 1182's notice requirement would be for Plaintiffs to prohibit transgender people from using the appropriate facilities—but Plaintiffs have no way to verify anyone's "biological sex," nor do they wish to invade their customers', employees' or

1

clients' privacy by attempting to do so. It is impossible to determine whether any person is or is not transgender just by looking at them. Therefore, *any* business or entity in Tennessee with public restrooms or other facilities that does not verify people's sex before they enter the restroom has an "informal policy" allowing transgender people to use the appropriate restroom, and will consequently be required to display this warning notice, or face enforcement of the Act and a criminal penalty. Many entities, including, currently, one of the Plaintiffs in the instant case, do not have all-gender restrooms—they simply allow transgender people to use the appropriate sex-designated restroom. By forcing those entities to communicate that anyone can use the restrooms designated for men or women, the Act's required notice is also factually inaccurate and will create the very confusion that H.B. 1182 purports to address.

Plaintiffs recognize that as businesses open to the public, they are subject to regulation, and that such regulation may sometimes require them to post specific notices. Indeed, existing Tennessee law requires them to post signs in their restrooms regarding sanitation, *see* Tenn. Code Ann. § 68-15-301 (requiring entities with restrooms open to the public to post a sign saying "FOR GOOD HEALTH, PLEASE WASH YOUR HANDS!" to advance state interest in public health). Federal law requires certain businesses to post notices regarding workplace safety (Occupational Safety and Health Act), labor rights (National Labor Relations Act), and equal opportunities (Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act). Unlike the warning notice required by the Act, those notices communicate purely factual and non-controversial speech that does not offend the First Amendment. Here, by contrast, the Act requires Plaintiffs and all other similarly situated businesses to communicate a hotly contested, controversial, and misleading message on issues of sex and transgender rights—and to characterize it as their own policy.

2

Plaintiffs seek a preliminary injunction to preserve the status quo and prevent irreparable harm to themselves and their employees, customers, and clients. Unless enjoined by this Court, the Act will go into effect on **July 1, 2021**.

## II. STATEMENT OF FACTS

### A. The Act's Requirements and Legislative History

H.B. 1182 requires "[a] public or private entity or business that operates a building or facility open to the general public and that, as a matter of formal or informal policy, allows a member of either biological sex to use any public restroom within the building or facility" to post a government-prescribed sign at the entrance of public restrooms in the building or facility with a red and yellow "NOTICE" text at the top, and boldface black block letters on white background stating that "THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM." *See* Compl., Exh. B.

The Act defines covered entities to "include" those with facilities that are designated for "a specific biological sex," and to "exclude" "a unisex, single-occupant restroom or family restroom intended for use by either biological sex." While the Act does not define "biological sex," the legislative history shows that the Act uses that term to reference a person's sex assigned a birth, and is intended to apply to entities that allow transgender people[1] to use a restroom facility that accords with their gender identity, rather than with the sex they were assigned at birth.

---

[1] Transgender people are people whose gender identity—their deeply held internal understanding of who they are – differs from the sex they were assigned at birth. *See* Exh. C, Decl. of Shayne Sebold Taylor, MD ("Taylor Decl.") ¶¶ 15, 18.

3

During the legislative debates on H.B. 1182, bill sponsor Representative Tim Rudd stated that the bill was a response to "new laws giving transgenders [sic] more rights."[2] Representative Rudd also stated that it is "shocking and a danger to people that enter a bathroom marked 'men' or 'women' and someone of the opposite sex is standing there, which could scare people and provoke violence,"[3] in a context that again makes clear he is referring to transgender people using the appropriate sex-designated restroom.

There was no testimony offered in support of the bill, nor any safety or security issues cited in Tennessee or elsewhere that might possibly have warranted the Act's mandated warning notice. Nonetheless, it was passed by the House on March 29, 2021 and the Senate on April 29, 2021. Governor Bill Lee signed H.B. 1182 into law on May 17, 2021. It has an effective date of July 1, 2021.

A violation of the Act is a Class B misdemeanor, *see* Tenn. Code Ann. § 68-120-108, which carries a penalty of up to six months' imprisonment and/or a fine of $500, *see* Tenn. Code Ann. § 40-35-111(e)(2). Under the Act, "[i]f an entity or business is notified that it is not in compliance with this section, the entity or business has thirty (30) days in which to comply before any action is taken against the entity or business." A violation of the Act might also result

---

[2] *Debate of H.B. 1182 Before the H. Pub. Serv. Comm.* at 31:49, 112th Gen. Assemb. (Mar. 10, 2021), available at https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24150; *see also Debate of H.B. 1182 Before the H. State Gov't Comm.* at 1:14:50, 112th Gen. Assemb. (Mar. 23, 2021), available at http://tnga.granicus.com/MediaPlayer.phpview_id=610&clip_id= 24337&meta_id=575940 (claiming that the bill was necessary because of the executive orders regarding rights for transgender people "coming out of Washington"); *id.* at 1:04:40 ("a woman has the right to know whether a man is going to be in her bathroom and vice versa for a man," with reference to transgender people using the restrooms that accord with their gender identity).

[3] *Discussion of H.B. 1182 Before H. Floor Sess., 18th Legis. Day* at 1:49:40, 112th Gen. Assemb. (Mar. 29, 2021), available at http://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24423&meta_id=579987

4

in other enforcement actions or civil penalties under Title 68, Chapter 120. Defendants have

concurrent responsibility for enforcement of the Act. *See* Tenn. Code Ann. § 68-120-106.

**B. "Biological Sex" Is a Contested Term**

Before H.B. 1182 was enacted, no Tennessee laws referenced "biological sex." When

Tennessee law referenced sex-designated restrooms, it used the terms "men" and "women,"

"male" or "female," or simply "sex." *See, e.g.*, Tenn. Code Ann. § 68-120-503 (requiring

equitable restrooms in public spaces); Tenn. Code Ann. § 4-24-303 (addressing restrooms and

other sex segregated spaces in fire houses). In fact, the phrase "biological sex" is a relatively

recent one without a fixed or uniform definition, and is not typically used in science or medicine.

*See* Exh. C, Decl. of Shayne Sebold Taylor, MD ("Taylor Decl.") ¶ 28; *see also* Att'y Decl. Exh.

A, Katrina Kazarkis, *The Misuses of 'Biological Sex*,' 394 The Lancet 1898 (Nov. 23, 2019),

https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(19)32764-3/fulltext.

Nonetheless, those seeking to limit rights for transgender people frequently use the

phrase "biological sex" to contrast with a transgender person's gender identity. Since 2013, state

legislatures across the country have introduced bills to restrict transgender people's ability to

access single-sex spaces such as restrooms or youth sports, many of which use the phrase

"biological sex." For example, North Carolina's House Bill 2 (the "Public Facilities Privacy &

Security Act") restricted access to multiple-occupancy restrooms based on "biological sex,"

which the bill defined as "[t]he physical condition of being male or female, which is stated on a

person's birth certificate." H.B. 2, § 1.2, 2015 Gen. Assemb., 2nd Extra Sess. (N.C. 2016). Some

statutes that use the term "biological sex," like the Act, do not define it. *See, e.g.*, 2020 Or. Laws

1st Spec. Sess. Ch. 19, § 7a(3)(b)(L). Others use different and sometimes conflicting definitions.

*See, e.g.*, W. Va. Code Ann. § 18-2-25d (West 2021) (defining "biological sex" as "an

individual's physical form as male or female based solely on the individual's reproductive

biology and genetics at birth"); Idaho Code Ann. § 33-6203 (West 2020) (providing that "biological sex" may be "verified" relying on "reproductive anatomy, genetic makeup, or normal endogenously produce testosterone levels," or a combination of those factors); Miss. Code Ann. § 11-62-3 (2016) (stating "biological sex" is "immutable" and "objectively determined by anatomy and genetics at time of birth"); *see also* S.B. 1367/H.B. 1233, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021) (providing that "'sex' means a person's immutable biological sex as determined by anatomy and genetics at the time of birth," and that "[e]vidence of a person's biological sex includes, but is not limited to, a government issued document that accurately reflects a person's sex listed on the person's original birth certificate").

Since 2016, the Tennessee General Assembly has introduced, and in some instances passed, multiple bills that would restrict or impair transgender people's access to the restroom that accords with their gender identity in schools or other public spaces. *See, e.g.*, H.B. 2414/S.B. 2387, 109th Gen. Assemb., 2nd Reg. Sess. (Tenn. 2015) (requiring public schools to restrict access to restrooms based on sex assigned on original birth certificates) (did not pass); H.B. 888/S.B. 771, 110th Gen. Assemb., 1st Reg. Sess. (Tenn. 2017) (requiring public schools and higher education institutions to have each student use the restroom and locker room facilities consistent with the student's sex indicated on their original birth certificate) (did not pass); H.B. 2620/S.B. 2480, 110th Gen. Assemb., Reg. Sess. (Tenn. 2018) (requiring the attorney general to defend or pay legal expenses for any school district that restricts access to multiuser restrooms on the basis of "biological sex") (did not pass); S.B. 1297/H.B. 1151, 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) (expanding offense of indecent exposure to apply to restrooms or locker rooms) (passed with amendments); H.B. 1274/S.B. 1499, 111th Gen. Assemb., 1st Reg. Sess. (Tenn. 2019) (similar to H.B. 2620); S.B. 1367/H.B. 1233, 112th Gen. Assemb., 1st Reg. Sess.

6

(Tenn. 2021) (creating a private right of action against a public school or Local Education Agency for a student, teacher, or school employee who encounters "a member of the opposite sex in a multi-occupancy restroom or changing facility"). These bills, and similar bills nationwide, have been hotly contested and the subject of intense legislative and social debate.[4]

In 2018, federal efforts to rescind regulatory protections for transgender people were also framed in terms of exclusions based on "biological sex." *See, e.g.*, Erica Green, Katie Benner, & Robert Pear, *'Transgender' Could Be Defined Out of Existence Under Trump*, N.Y. Times (Oct. 21, 2018), https://www.nytimes.com/2018/10/21/us/politics/transgender-trump-administration-sex-definition.html (citing leaked memo from Trump administration Department of Health and Human Services proposing to define "gender as a biological, immutable condition determined by genitalia at birth"). This draft policy prompted protests, rallies and extensive public debate. *See, e.g.*, Sarah Mervosh & Christine Hauser, *At Rallies and Online, Transgender People Say They #Won't Be Erased*, N.Y. Times (Oct. 22, 2018), https://www.nytimes.com/2018/10/22/us/transgender-reaction-rally.html; Open Letter from Over 2600 Scientists Opposing Proposed Legal Definition of Gender (Oct. 26, 2018), https://not-binary.org/statement/ ("The proposal is in no way 'grounded in science' as the administration claims. The relationship between sex chromosomes, genitalia, and gender identity is complex, and not fully understood. There are no genetic tests that can unambiguously determine gender, or even sex. Furthermore, even if such tests existed, it would be unconscionable to use the pretext of science to enact policies that overrule the lived experience of people's own gender identities.").

---

[4] *See, e.g.*, Jonathan Mattise, Kimberlee Kruesi, & Lindsay Whitehurst, *Tennessee Moves to the Forefront with Anti-Transgender Laws*, Associated Press (May 23, 2021), https://apnews.com/article/tennessee-transgender-laws-b8d81d56287d6ed9d56c5da2203596b0.

7

This politicized understanding of the phrase "biological sex" as contrasted with a transgender person's gender identity is inconsistent with the medical consensus that gender identity itself has a biological basis. *See* Taylor Decl. ¶¶ 15–16; Editorial, *Anatomy Does Not Define Gender*, 365 Nature 5 (Oct. 30, 2018), at https://www.nature.com/articles/d41586-018-07238-8.

As a matter of scientific consensus, the terms "[b]iological sex, biological male or female" "refer to physical aspects of maleness and femaleness. As these may not be in line with each other (*e.g.*, a person with XY chromosomes may have female-appearing genitalia), the terms biological sex and biological male or female are imprecise and should be avoided." Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline* 102 J. of Clinical Endocrinology & Metabolism 3869, 3875 Table 1, https://doi.org/10.1210/jc.2017-01658. A person's sex encompasses a number of different biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and external genitalia, other secondary sex characteristics, and gender identity. *See* Taylor Decl. ¶ 13. These components of sex do not all align neatly in every human being. Where they do not, best practice for medical care recognizes that, for purposes of social and legal recognition, a person's gender identity should be the basis for their sex classification. *See id.* at ¶ 17.

There is a medical consensus that there is a significant biological component underlying gender identity. *See id.* at ¶¶ 15–16; *see also* Att'y Decl. Exh. B., Joshua D. Safer & Vin Tangpricha, *Care of the Transgender Patient*, 171 Annals of Internal Med. 171:ITC1 (July 2, 2019), https://doi.org/10.7326/AITC201907020; Denise Grady, *Anatomy Does Not Determine Gender, Experts Say*, N.Y. Times (Oct. 28, 2018), https://www.nytimes.com/2018/

8

10/22/health/transgender-trump-biology.html. While the Act targets transgender people in public spaces, it also erases entirely the existence of intersex people, by suggesting that there are only two possible sexes with the use of the mandated phrase "*either* biological sex."[5]

The Act takes as a given that the term "biological sex" excludes transgender people, while ignoring that gender identity itself has a biological component. In this political moment, the term carries an anti-transgender connotation that reflects the Tennessee legislature's political viewpoint that transgender people are a different sex than the sex they know themselves to be, and that allowing transgender people to use the restroom is sufficiently controversial to require a special warning notice. The Act further requires Plaintiffs to appear to endorse this statement by characterizing their own policy in the legislature's controversial language ("THIS FACILITY MAINTAINS A POLICY . . ."). Plaintiffs do not want to be forced to communicate this viewpoint on the walls of their businesses.

## C. Plaintiffs' Restroom Policies

Plaintiff Bongo Productions, LLC ("Bongo") owns several restaurants, coffee shops, and a coffee roasting company all located in Nashville, Tennessee. Plaintiff Robert M. Bernstein is Bongo's founder and chief manager. He is responsible for decisions regarding compliance with state and local building codes for Bongo's establishments. *See* Exh. A, Decl. of Robert Bernstein (Bernstein Decl.) ¶¶ 1–2.

---

[5] "Sex related characteristics do not always align as either completely male or completely female. For example, many children are born with ambiguous genitalia, and as a result it is difficult to assign these infants as either male or female at birth." Taylor Decl. ¶ 14. "Intersex is an umbrella term for unique variations in reproductive or sex anatomy." InterAct, *Intersex Definition*, https://interactadvocates.org/intersex-definitions/ (last visited Jun. 24, 2021).

9

Mr. Bernstein opened Fido, one of the Bongo businesses, in 1996. Fido is a restaurant located in the Hillsboro Village neighborhood of Nashville. Fido has twenty-five employees currently on staff and has employed hundreds of people over the years. *Id.* at ¶¶ 3–5.

Bongo and Mr. Bernstein have worked over the years to create a welcoming environment in their businesses for the LGBTQ community. Bongo has employed transgender individuals in the past, and its patrons include members of the transgender community. *Id.* at ¶¶ 6–7. In reaction to the rash of anti-transgender laws that passed this year and to show their support for transgender people, Fido's staff decorated one of their drink menu blackboards with transgender and LGBTQ pride flag colors. *Id.* at ¶ 8.

Fido has three restrooms. One is a single-user unisex restroom, which is not subject to the Act. *Id.* at ¶ 9. The other two restrooms have multiple stalls and/or urinals and bear sex designations. *Id.* Prior to the passage of the Act, Fido's management and Mr. Bernstein had never thought about a formal policy as to who could use which restroom. *Id.* at ¶ 11. Their informal policy was to allow people to use the sex-designated restroom that aligned with their gender identity. *Id.* Mr. Bernstein has never received any complaints or concerns about their restroom policy. *Id.* at 12.

Plaintiff Sanctuary Performing Arts LLC ("Sanctuary") is a performing arts venue, community center, and safe haven located in Chattanooga, Tennessee. Exh. B, Decl. of Kye Sayers (Sayers Decl.) Decl. ¶ 3. Sanctuary was founded by members of the transgender community in December 2020 to serve the needs of transgender and intersex people of all ages, as well as other LGBTQ people and allies. *Id.* at ¶ 4.

Sanctuary has two employees on staff, as well as many volunteers. The majority of the people working there and who attend their programs are transgender. Since Sanctuary opened its

doors in late 2020, approximately 400 people have been involved with Sanctuary as volunteers or participants. *Id.* at ¶ 5.

Sanctuary has three restrooms. One is a single user unisex restroom, which is not subject to the Act. *Id.* at ¶ 7. Its other two restrooms both have multiple stalls and do not have a sex designation at this time. *Id.* Next month, Sanctuary intends to begin operating a full-service café and will post a sex designation on each restroom as required by local building codes. *Id.* at ¶ 8. It will allow transgender people to use the restroom that accords with their gender identity. Sanctuary has never received any complaints about its restroom policies. *Id.*

### D. The Impact of the Act on Plaintiffs

Robert Bernstein, Bongo, and Bongo's staff are supportive of the LGBTQ community and have transgender patrons. They are concerned that the warning notice mandated by the Act is offensive and will alienate or offend their customers and employees. Bernstein Decl. ¶ 14. The Act will also mischaracterize their policy by suggesting they do not have sex-designated restrooms despite the designation on the restrooms. *Id.* at ¶¶ 10–11, 15.

Sanctuary and its staff have worked hard to create a safe space for transgender and intersex people and their families in a state that is frequently perceived as unwelcoming to LGBTQ people. Sanctuary recognizes that the phrase "either biological sex" on the Act's required warning notice is offensive to transgender and intersex people, Sayers Decl. ¶ 11, because it suggests that transgender people are not the sex they know themselves to be, and ignores the existence of intersex people by suggesting that there are only two distinct "biological" sexes, *id.* at 12. Sanctuary believes that posting the warning notice required by H.B. 1182 would communicate to transgender and intersex people that they are not welcome, thereby directly contradicting the message Sanctuary tries to cultivate in everything it does. *Id.* at ¶ 13.

11

Sanctuary believes that it will lose the customers and supporters it has worked hard to bring to Sanctuary if it displays the warning notice. *Id.* at ¶ 14.

Accordingly, the Act requires Plaintiffs to communicate the legislature's controversial viewpoint on sex and transgender people for the following reasons:

*First*, the Act requires Plaintiffs to post the required warning notice solely because they allow transgender people to use the appropriate restroom—yet the Act does not even allow Plaintiffs to describe their restroom policies in their own words. Instead, it requires them to use the legislature's controversial and politically loaded terminology of "biological sex" to imply that transgender people are a different "biological sex" than their deeply held gender identity, and to characterize this fraught message as their own policy ("THIS FACILITY HAS A POLICY ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX . . .").

*Second*, the Act forces Plaintiffs Bongo and Mr. Bernstein to communicate an inaccurate description of their restroom policies for an additional reason. Fido does not have all-gender multi-user restrooms. Allowing transgender people to use the restrooms that accord with their identity does not invalidate the sex-segregated nature of Fido's sex-designated restrooms. Yet the Act requires them to post a notice saying that anyone can use their restrooms regardless of "biological sex." Plaintiffs Bongo and Mr. Bernstein are concerned this will cause confusion for their staff, customers, or clients. *See* Bernstein Decl. ¶ 15.

*Third*, the Act forces all Plaintiffs to communicate the legislature's viewpoint that allowing transgender people to use the restrooms that accord with their identity is so troubling as to require a red and yellow "NOTICE" sign in large block letters. All Plaintiffs object to this message because it is contrary to the welcoming culture they seek to create in their businesses.

### III. ARGUMENT

#### A. Applicable Legal Standards

Plaintiffs seek a preliminary injunction to prevent the enforcement of H.B. 1182 from compelling them to speak a government-mandated, controversial, and confusing message that will harm Plaintiffs and their staff, customers, and clients. In ruling on this motion, this Court must balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. C.L. Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015) (internal quotation marks and citation omitted).

The Sixth Circuit has recognized that "in [] First Amendment case[s], 'the crucial inquiry is usually whether the Plaintiff has demonstrated a likelihood of success on the merits.'" *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (citation and internal quotations omitted). This is because the public interest and harm to the parties will "largely depend on the constitutionality of the statute." *Id.*

#### B. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail on their First Amendment claims. The Act infringes on Plaintiffs' First Amendment rights by requiring them to post a specific controversial message within their private establishments. This kind of compelled ideological speech is presumptively unconstitutional and subject to strict scrutiny. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988). H.B. 1182 fails strict scrutiny because it is not rationally related to any legitimate government interest, let alone narrowly tailored to advance a compelling government interest.

13

### 1.  The Act unconstitutionally compels controversial speech

H.B. 1182 requires Plaintiffs, and likely thousands of other similarly situated entities throughout Tennessee, to post a highly politicized notice on their premises, but the First Amendment prohibits such a requirement. It is long settled that the government may not require private entities "to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public." *Wooley v. Maynard*, 430 U.S. 705, 713 (1977). The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all," *id.* at 714, and requires the presumption "that speakers, not the government, know best both what they want to say and how to say it," *Riley*, 487 U.S. at 791. In recent years, the Supreme Court has further emphasized the "damage" done when "individuals are coerced into betraying their convictions" through compelled speech. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps. Council 31*, 138 S. Ct. 2448, 2464 (2018).

A statute that compels private entities "to speak a particular message" is considered a content-based regulation of speech. *Nat'l Inst. of Fam. Life Advocs. v. Becerra* (*NIFLA*)*,* 138 S. Ct. 2361, 2371 (2018). Such content-based restrictions are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). H.B. 1182's compelled speech requirement is also viewpoint based, because it requires private actors to convey an idea they abhor. *See* Sayers Decl. ¶¶ 11–13; Bernstein Decl. ¶ 16. The Sixth Circuit has held that "the most aggressive form of viewpoint discrimination [is] compelling an individual 'to utter what is not in [her] mind' and indeed what she might find deeply offensive." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943) (second alteration in original)).

14

The legislature cannot force Plaintiffs or any other private entity to convey an anti-transgender viewpoint. There is no mistaking H.B. 1182 for a basic, factual notice requirement; Plaintiffs and their communities instantly recognized the viewpoint expressed in the notice language. *See* Sayers Decl. ¶ 11; Bernstein Decl. ¶ 14. The specific language dictated by the General Assembly was designed to distinguish between "biological sex," a loaded term with anti-transgender connotations rejected by the medical and scientific community, and transgender people's gender identity. As the sponsor himself stated on the record, the objective of the bill is to push back against advances in civil rights for transgender people at the Supreme Court and in society at large. Legislators may disagree with policies and decisions "coming out of Washington,"[6] but they cannot require members of the public to disseminate the legislators' view.

The Supreme Court has recognized narrow exceptions to this prohibition on compelled speech where a notice is limited to "purely factual and uncontroversial information about the terms under which [] services will be available." *Zauderer v. Office of Disciplinary Counsel of the S. Ct. of Ohio*, 471 U.S. 626, 651 (1985). Likewise, in *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012), the Sixth Circuit distinguished between different elements of required warning labels on cigarettes, holding that provisions that require the disclosure of "factual information" not "in dispute within the scientific or medical community" were subjected to a lower level of scrutiny than provisions that required "subjective" and "highly controversial" warnings, *id.* at 526. "While it is permissible for the government to require a product manufacturer to provide truthful information, even if perhaps frightening, to the public

---

[6] *Debate of H.B. 1182 Before the H. State Gov't Comm.* at 1:04:40, 112th Gen. Assemb. (Mar. 23, 2021), available at http://tnga.granicus.com/MediaPlayer.phpview_id=610&clip_id=24337&meta_id=575940.

in an effort to warn it of potential harms, it is less clearly permissible for the government to simply frighten consumers or to otherwise attempt to flagrantly manipulate the emotions of consumers as it seeks to do here." *Id.* at 529. The notice required by H.B. 1182 is neither factual nor uncontroversial. It is not an attorney fees disclosure requirement like the one considered in *Zauderer*, nor is it like the abortion informed consent requirement contemplated in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), or the "mere health disclosure warnings" at issue in *Discount Tobacco City*, 674 F.3d at 526. Instead, the notice carries an inaccurate and highly controversial message at odds with the prevailing medical and scientific understanding of the nature of sex.

As described above in Section II.C, Plaintiffs have an informal policy of allowing people to use the restroom that accords with their gender identity. Since they make no inquiry into a person's "biological sex" before allowing them to access the sex-designated restroom, they are undoubtedly covered by the statute and required to post the notice. Indeed, because it is hard to imagine any business or organization having a policy that requires confirming someone's "biological sex" before they enter the restroom, it is likely that most businesses in Tennessee would be required to post the State's notice, even if they do not in fact have a policy of letting people use any public restroom "regardless of the designation on the restroom." H.B. 1182 § 1(b)(3). The language in the notice describes all-gender or unisex restrooms, but Fido maintains sex-designated restrooms.

The fact that transgender people are allowed to use the restroom that corresponds with who they know themselves to be does not eliminate the sex-designated nature of restrooms. To the contrary, having a policy based solely on a person's sex assigned at birth, one possible definition of "biological sex," would undermine a facility's sex designation by forcing, for example, a

16

transgender man who lives and identifies as a man—and who may have had medical interventions such as hormone therapy that produce typically masculine physical features—to use the women's restroom. "Warning[s] and disclaimer[s] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception," *Zauderer*, 471 U.S. at 651 (quoting *In re R.M.J.*, 455 U.S. 191 (1982)), but H.B. 1182 will only *create* confusion for Plaintiffs' staff, customers, and clients.

The Act is also far from non-controversial. *Cf. NIFLA*, 138 S. Ct. at 2372 (more deferential *Zauderer* standard applies only to compelled disclosures of non-controversial information). To the contrary, H.B. 1182 is squarely aimed not at providing factual information, but at stigmatizing transgender people. It requires Plaintiffs to use a phrase that lacks scientific support, and perpetuates the misleading viewpoint that transgender people are not the sex they know themselves to be. Gender identity today is a political topic that is "undoubtedly [a] matter[] of profound 'value and concern to the public.'" *Janus*, 138 S. Ct. at 2476 (quoting *Snyder v. Phelps*, 462 U.S. 443, 453 (2011)). "We have often recognized that such speech occupies the highest rung of the hierarchy of First Amendment values and merits special protection." *Id.* In the current political context, Plaintiffs justifiably fear the notice will alienate their transgender staff and clientele by calling into question their identity and core being, and will further create confusion among people who had previously been using public restrooms without incident. Sayers Decl. ¶¶ 7, 10, 12–14; Berstein Decl. ¶¶ 12, 14–15; *see also* Taylor Decl. ¶¶ 28–29.

### 2. *The Act cannot survive strict scrutiny*

Where the government compels private actors to display an ideological message with which they disagree, strict scrutiny applies. *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 18 (1986). Content-based restrictions are "presumptively unconstitutional and may

be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. While less stringent review is appropriate when the government compels non-controversial commercial speech such as factual disclosures in advertisements, *see Zauderer*, 471 U.S. 626, strict scrutiny applies when, as here, the government seeks to conscript a business into affirming ideological positions.

H.B. 1182 does not state a government interest it is designed to advance, but the bill's sponsor offered three: public safety,[7] clear restroom signage,[8] and pushing back against expanding federal civil rights protections for transgender people.[9] The third stated interest can be dispatched with quickly. Expressing frustration with federal policy is not a legitimate government interest that would justify infringing on Plaintiffs' First Amendment rights, never mind a compelling one. And while public safety and clear restroom signage might be compelling state interests in certain circumstances, the notice requirement does nothing to advance those interests—and indeed would cut against them. As noted above, the required notice is factually inaccurate and will create confusion about what Plaintiffs' restroom policy actually is. It applies to sex-designated restrooms, and then requires Plaintiffs to declare they have a policy of allowing anyone to use any restroom (which they do not), simply because they allow transgender people to use the restroom that aligns with their gender identity. Moreover, it does so with

---

[7] *See Debate of H.B. 1182 Before the H. Pub. Serv. Comm.* at 21:00, 112th Gen. Assemb. (Mar. 10, 2021), available at https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id =24150.

[8] *See Debate of H.B. 1182 Before the H. State Gov't Comm.* at 1:10:30, 112th Gen. Assemb. (Mar. 23, 2021), available at https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id =24337.

[9] *See Debate of H.B. 1182 Before the H. State Gov't Comm.* at 1:04:40, 112th Gen. Assemb. (Mar. 23, 2021), available at http://tnga.granicus.com/MediaPlayer.phpview_id=610&clip _id=24337&meta_id=575940.

18

reference to the controversial and misleading term "biological sex." Finally, the myth of transgender inclusion as a public safety issue has been thoroughly debunked, and the legislature did not consider a scintilla of evidence—nor could it have, because such evidence does not exist—supporting the specious safety concern.[10]

The Act further undermines public safety by stigmatizing transgender people, *see* Taylor Decl. ¶¶ 28–29, and by incentivizing businesses to attempt to exclude transgender individuals from the bathrooms that match their gender identity.[11] Anti-transgender dog-whistling signs do not protect public safety and instead create great harm.

H.B. 1182 is so untethered from advancing any legitimate government interest that it would fail even rational basis review, let alone the strict scrutiny that applies. Even under the relaxed standard from *Zauderer*, "a disclosure requirement cannot be 'unjustified or unduly burdensome.'" *NIFLA,* 138 S. Ct. at 2377 (quoting *Zauderer*, 471 U.S. at 651). In considering a Florida mandatory disclosure requirement for accounting professionals in *Ibanez v. Florida Department of Business and Professional Regulation, Board of Accountancy*, 512 U.S. 136 (1994), the Supreme Court applied *Zauderer*, but found that based on "the failure of the [state] to point to any harm that is potentially real, not purely hypothetical—we are satisfied that the [state]'s action is unjustified," *id.* at 146.

---

[10] *See, e.g.*, Lou Chibbaro Jr., *Predictions of Trans Bathroom Harassment Unfounded*, Washington Blade (Mar. 31, 2016), https://www.washingtonblade.com/2016/03/31/predictions-of-trans-bathroom-harassment-unfounded/.

[11] *Cf.* Timothy Wang, et al., *State Anti-Transgender Bathroom Bills Threaten Transgender People's Health and Participation in Public Life*, The Fenway Inst. (2016), https://fenwayhealth.org/wp-content/uploads/2015/12/COM-2485-Transgender-Bathroom-Bill-Brief_v8-pages.pdf (describing medical and psychological harms that result from barring transgender people from accessing restrooms that match who they are).

19

### C. Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Sixth Circuit has made clear that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Am. C.L. Union of Ky. v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003). Without prompt relief, Plaintiffs will be required to post the notice on July 1, or within thirty days of a citation, or risk the threat of six months' imprisonment and/or a civil penalty of up to $500, as well as other enforcement actions or civil penalties under Title 68, Chapter 120.

### D. An Injunction Would Not Harm Defendants and Would Serve the Public Interest

The balance of equities weighs heavily in favor of Plaintiffs. As set forth above, Plaintiffs will suffer significant harm without an injunction, whereas Defendants only stand to temporarily lose the ability to enforce a new law that does not advance any legitimate state interest and is likely to be held unconstitutional. *See Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (finding it "questionable" whether state "has any 'valid' interest in enforcing" an unconstitutional law); *see also Chamber of Com. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) (noting that defendant "does not have an interest in enforcing a law that is likely constitutionally infirm").

Finally, granting an injunction in this case will undoubtedly serve the public interest. As the Sixth Circuit has made clear, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Am. C.L. Union Fund of Mich.*, 796 F.3d at 649 (alteration in original) (internal quotation marks omitted); *see also Planned Parenthood Ass'n of*

*Cincinnati*, 822 F.2d at 1400 ("[T]he public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional.").

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted. Defendants should be enjoined from enforcing the Act pending the final determination of Plaintiffs' claims.[12]

Dated: June 25, 2021

Respectfully submitted,

*/s/ Thomas H. Castelli*
Thomas H. Castelli (No. 24849)
Stella Yarbrough (No. 33637)
American Civil Liberties Union
   Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org
syarbrough@aclu-tn.org

Rose Saxe*
Emerson Sykes*
American Civil Liberties
   Union Foundation
125 Broad Street, 17th Floor
New York, NY 10004
rsaxe@aclu.org
esykes@aclu.org

*Attorneys for Plaintiffs*

**Pro hac vice* motions forthcoming

---

[12] Because Plaintiffs face a loss of constitutional rights, and Defendants are not faced with any monetary injury if a preliminary injunction is issued, this Court should exercise its discretion to waive the Fed. R. Civ. P. 65(c) bond requirement. *See Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013); *see also Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (affirming district court decision to require no bond "because of the strength of [the plaintiff's] case and the strong public interest involved").

21

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on June 25, 2021, a true and correct copy of the foregoing has been served by e-mail according to the agreement and instructions from the Attorney General's Office to tnattygen@ag.tn.gov.

*/s/ Thomas H. Castelli*
Thomas H. Castelli (No. 24849)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

*Attorney for Plaintiffs*