**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

BONGO PRODUCTIONS, LLC, ROBERT
BEINSTEIN, SANCTUARY PERFORMING
ARTS, LLC, and KYE SAYERS,

Plaintiffs,

v.

CARTER LAWRENCE, Tennessee State Fire
Marshal, in his official capacity,
CHRISTOPHER BAINBRIDGE, Director of
Codes Enforcement, in his official capacity,
GLENN R. FUNK, District Attorney General for
the 20th Judicial District, in his official capacity,
and NEAL PINKSTON, District Attorney
General for the 11th Judicial District, in his
official capacity,

Defendants.

CIVIL ACTION
CASE NO. 3:21-cv-00490
JUDGE TRAUGER

---

## RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

Defendants Carter Lawrence, Christopher Bainbridge, Glenn R. Funk, and Neal Pinkston,

in their official capacities only, oppose Plaintiffs' Motion for a Preliminary Injunction. (DE 6.)

The Motion should be denied because Plaintiffs have not carried their heavy burden to establish

an entitlement to the "extraordinary and drastic remedy" of preliminary relief. *Enchant Christmas*

*Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting *Mazurek v.*

*Armstrong*, 520 U.S. 968, 972 (1977)).

### BACKGROUND

On March 29, 2021, and April 29, 2021, the General Assembly passed House Bill

1182/Senate Bill 1224 by overwhelming majorities in both Houses. Governor Lee signed House

Bill 1182 into law on May 17, 2021, as Public Chapter 453 ("the Act"). The Act furthers the

State's interests in informing persons patronizing buildings open to the public of the building operator's bathroom policy should it deviate from any existing bathroom signage designating a bathroom as available only to persons of a specific biological sex. Plaintiffs seek to enjoin the enforcement of the entire Act, which took effect on July 1, 2021.

### A. The Contested Statute.

As pertinent here, the Act applies to all businesses and entities within the State that are open to the public and, "as a matter of formal or informal policy, allow[] a member of either biological sex to use any public restroom within the building or facility." (DE 1-1, § 1(a).)

"Public restroom," as defined by the Act, includes restrooms, locker rooms, shower facilities, dressing areas, and any similar facility that is "open to the general public," "designated for a specific biological sex," and constitutes a "facility or area where a person would have a reasonable expectation of privacy." (DE 1-1, §§ 1(d)(2)(A)(i)-(iii).) However, the term "[p]ublic restroom" does not include single-occupancy restrooms or family restrooms "intended for use by either biological sex." (DE 1-1, § 1(d)(2)(B).)

Business and entities that are subject to the Act must post signage that is easily visible to people entering the restroom[1] and that informs the public that "THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM." (DE 1-1, § 1(b)(3).)

In short, the Act requires that any entity with multi-user, sex-designated public restrooms— and a policy of allowing all users to use either restroom, regardless of their biological sex—to post signage reflecting that policy on or near the restroom entrances. Qualifying businesses and entities

---

[1] To that end, the Act also specifically describes the dimensions, coloring, and location of the required signage. (Ex. A, §§ 1(b)(1)-(5).)

that do not comply with the Act's requirements must have received notice of their noncompliance at least 30 days before any action is taken against them. (DE 1-1, § 1(c).)

### B. Case History

Plaintiffs—"Tennessee businesses and service providers and their owners"—waited more than a month after the Act's passage to file a Complaint on June 25, 2021, challenging the constitutionality of the Act. (*See generally* DE 1; DE 1, PageID# 1.) Plaintiffs allege that they do not wish to post the signage required by the Act because they perceive that the signage required— which mirrors their bathroom-usage policies—is controversial and stigmatizing. (DE 1, PageID# 2.) They allege that by requiring them to post this signage, the Act compels speech in violation of the First Amendment to the United States Constitution. (DE 1, PageID# 18.) Contemporaneously with the filing of their Complaint, Plaintiffs moved for a preliminary injunction "enjoining enforcement of H.B. 1182/S.B. 1224, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021)." (*See generally* DE 6.)

### ARGUMENT

The preliminary relief Plaintiffs seek is an "'extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Glowco*, 958 F.3d at 539 (emphasis in original) (quoting *Mazurek*, 520 U.S. at 972). To determine whether such extraordinary relief is warranted, courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause a substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015). Because Plaintiffs have not made the requisite clear showing that they are entitled to preliminary

relief, their motion for a temporary restraining order and/or preliminary injunction should be denied.

## I. Plaintiffs Are Unlikely to Succeed on the Merits.

### A. The Court Lacks Jurisdiction to Issue a Preliminary Injunction

#### 1. The Plaintiffs Lack Standing Because their Alleged Injury-in-Fact is not Imminent.

Article III of the United States Constitution limits the jurisdiction of federal courts to cases and controversies.  U.S. Const. art. 3, § 2.  The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement," and defines the boundaries of jurisdiction under Article III by "identifying those disputes which are appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Thus, as a threshold matter, federal courts are "under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines" that a plaintiff must satisfy.  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations and citation omitted); *see Copas v. Lee*, 396 F.Supp.3d 777, 786 (M.D. Tenn. 2019) ("Standing is a 'threshold determinant[ ] of the propriety of judicial intervention.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

In determining whether a plaintiff has standing, courts consider whether the plaintiff has alleged "an 'injury in fact' that is 'fairly traceable to the challenged action of the defendant' and is capable of being 'redressed' by the court." *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Lujan*, 504 U.S. at 560-61).  And the plaintiff bears the burden of establishing the presence of all three elements. *Id*.  To establish "injury-in-fact," the plaintiff must show he suffered a *concrete* injury that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.  Moreover, the injury alleged must be particularized to the plaintiff—"not a generalized grievance." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

4

Here, Plaintiffs challenge the Act under the First Amendment, yet they do not allege that the Defendants have actually enforced or will enforce any provisions of the Act against them. "In a pre-enforcement challenge, whether the plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact' before the state has actually commenced an enforcement proceeding against him." *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014). Although Plaintiffs are not required to subject themselves to actual arrest or prosecution as a prerequisite, pre-enforcement challenges typically require "the threatened injury [to be] certainly impending or [that] there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, n. 5 (2013)). Specifically, the Supreme Court has permitted satisfaction of the "injury-in-fact" requirement in the pre-enforcement context when plaintiffs allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979).

Under the Act, "[i]f an entity or business is notified that it is not in compliance with this section, the entity or business has thirty (30) days in which to comply before any action is taken against the entity or business." (DE 1-1, § 1(c).) Plaintiffs in this case "do not want to display the government-mandated warning notice required by the Act." (DE 1, PageID# 2.) They allege that their refusal to comply with the Act could result in imprisonment or fines if they "do not erect the Act's required warning notice after notification that they are not in compliance." *Id*. In other words, Plaintiffs allege that, if they refuse to erect the sign, they *risk* being notified that they are not in compliance with the Act, and, 30 days later, they *could* face penalties. But this abstract risk does not amount to "a credible threat of prosecution" under the Act.

In *McKay*, the plaintiff brought a Section 1983 claim against public officials charged with

enforcing a state court's administrative order prohibiting recording devices in the courtroom. 823 F.3d at 864-65. There, the plaintiff did not allege that he requested or was denied permission to use a recording device, nor that he attempted to enter the courthouse with such a device. Instead, he merely alleged that he did not wish to be subject to contempt, confiscation of a device, a fine, or jail time pursuant to the order. *Id*. at 865-66. In holding that the plaintiff lacked standing, the Sixth Circuit considered a series of factors that, in conjunction with a plaintiff's allegation of a subjective First Amendment chill, could establish injury-in-fact:

> (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; and/or (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action…[and] a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.

*Id*. at 869 (internal citations omitted). Indeed, courts considering credible threats of prosecution in the context of a pre-enforcement First Amendment challenge consistently look to some indication of a threat beyond the simple possibility of enforcement. *Id*; *see also Kiser*, 765 F.3d at 609 (finding a credible threat where the plaintiff received two letters from the defendant warning him that he was in violation of the regulation at issue); *Susan B. Anthony List*, 573 U.S. at 164 (2014) (noting that the plaintiff was previously prosecuted by the defendant for the same sort of speech); *Plunderbund Media, L.L.C v. DeWine*, 753 Fed. App'x. 362, 366-72 (6th Cir. 2018) (finding no credible threat where there was no history of enforcement against defendants or the kind of speech at issue, nothing making the statute easier or more likely to enforce, and no evidence of an intention to enforce).

Here, Plaintiffs do not allege facts that satisfy any of the *McKay* factors, and therefore do not allege a credible threat of prosecution. (*See generally*, DE 1.) Indeed, they do not allege receipt of any warning letters, any attribute of the Act that would make enforcement easier or more

likely,[2] or that Defendants have refused to disavow enforcement against them. Just the opposite is true in Plaintiff Bongo's case: Defendant District Attorney General Funk has made public statements expressing his intention to disavow enforcement of the Act in Davidson County, where Bongo's business is located. Kimberlee Kruesi, *Nashville DA won't enforce new bathroom sign law*, Associated Press (May 24, 2021), https://apnews.com/article/nashville-laws-government-and-politics-50412b91ca33cc45c426a9b5a89b1133 (Ex. A).

Moreover, as Plaintiffs acknowledge, the Act provides a 30-day cure period for businesses before any action can be taken. (DE 1, PageID# 18.) Yet Plaintiffs do not allege receipt of such notice. In other words, despite Plaintiffs' express desire not to comply with the Act, they cannot be subject to any action for at least 30 days, starting from notice of noncompliance. Thus, because Plaintiffs fail to allege a credible threat of prosecution under the Act, they fail to properly allege injury-in-fact and lack standing to bring this claim.

Attempting to circumvent the normal requirements of standing, Plaintiffs allege that enforcement of the Act "will chill Plaintiffs' speech." (DE 1, PageID# 82.) That is still insufficient to demonstrate standing. *See McKay*, 823 F.3d at 868-69 ("mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes.") (quoting *Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012)). But even accepting Plaintiffs' arguments at face value, the Act does not deter speech, it requires it. Thus, no chilling effect is present here and the ordinary requirements of Article III apply.

Lastly, because Plaintiffs do not allege enforcement of the challenged statute by Defendants, there is no injury for the court to redress in this case. In *California v. Texas*, 593 U.S.

---

[2] The Act's 30-day notice requirement before Defendants could subject Plaintiffs to penalties under the Act make its enforcement *more* difficult and *less* likely.

___, No. 19-840, 2021 WL 2459255 (June 17, 2021), the Supreme Court considered the standing of several individual plaintiffs to challenge the Affordable Care Act's minimum-coverage requirement. The Court held that those plaintiffs lacked standing because "no unlawful Government action "fairly traceable" to [the challenged statute] caused the plaintiffs'… harm." *Id*. at \*5. As the Court pointed out, it has consistently required plaintiffs "to assert an injury that is the result of a statute's actual or threatened enforcement, whether today or in the future." *Id*. The Court further noted that issuing an injunction in a case where plaintiffs were not harmed by actual or threatened injury would ultimately amount to "an advisory opinion without the possibility of any judicial relief." *Id*. at \*6 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 129, (1983) (Marshall, J., dissenting)); *see also Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (Article III "require[s] that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions"). Here, Plaintiffs simply cannot show a relationship between the judicial relief requested and the "injury" they allege because they have not suffered an injury. In effect, Plaintiffs are requesting an advisory opinion under the guise of injunctive relief.

### 2. Plaintiffs' Claim is Not Ripe.

Like the doctrine of standing, the ripeness doctrine is rooted in Article III limitations on federal-court jurisdiction. However, ripeness distinctly aims at ensuring cases or controversies filed in federal court are timely to help the court "avoid[]…premature adjudication." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). To show that the claim is ripe for review, a plaintiff must allege more than some future acts or events that "may not occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997).

Determining whether a claim is ripe for review requires a court to consider both "the fitness

of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs*, 387, U.S. at 149. Specifically, the Sixth Circuit considers three factors in determining whether a claim is ripe: "(1) the likelihood that the harm alleged will ever come to pass; (2) whether the factual record is sufficiently developed to allow for adjudication; and (3) hardship to the parties if judicial review is denied." *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002); *see also Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003). In the context of a claim that relies on the threat of injury, instead of an actual one, the standing and ripeness doctrines can be difficult to distinguish. *Airline Pros. Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332 F.3d 983, 988 (6th Cir. 2003). For example, "[a] threatened or imminent injury may satisfy standing's injury-in-fact requirement, yet the claim may still be unripe if the issues are not fit for judicial review, perhaps because future events may greatly affect the outcome of the litigation and the cost of waiting is not particularly severe." *Id.*

Here, as discussed above at I.A.2., Plaintiffs fail to allege an injury beyond potential future events that may not occur as they expect or may not occur at all. Plaintiffs do not know that the Act will be enforced against them, and even assuming it were enforced against them, they can predict neither how it would be enforced nor the effect of its enforcement. This case therefore lacks the factual development necessary for this Court to properly adjudicate Plaintiffs' claim.

Furthermore, Plaintiff Sanctuary Performing Arts LLC, admits that its multi-use bathrooms "do[] not have a sex designation at this time." (DE 1, PageID# 4-5.) Under the Act, "public restroom" is defined, in part, as being "[d]esignated for a specific biological sex." (DE 1-1, § 1(d)(2).) Thus, the Act currently does not apply to Sanctuary's bathrooms. And while Sanctuary alleges that it plans to open a café, which will require sex designation pursuant to local building codes, (DE 1, PageID# 5), Sanctuary must do more than rely on future events that may not occur

as anticipated or not occur at all. A general statement of plans to open a business that would presumably be subject to the Act is insufficient to demonstrate ripeness.

Thus, due to a lack of standing and ripeness that deprives this Court of subject matter jurisdiction, Plaintiffs cannot demonstrate a likelihood of success on the merits, and this Court lacks jurisdiction to enter a preliminary injunction.

### B. The Act is Constitutional.

Even if the Court finds that Plaintiffs sufficiently demonstrated standing and ripeness, the Court should decline to enter a preliminary injunction as Plaintiffs are unlikely to succeed in their constitutional challenge.

Plaintiffs raise only one claim challenging the constitutionality of the Act: that the Act violates their First Amendment rights by "compelling them, on pain of criminal penalty, to communicate a misleading and controversial government-mandated message that they would not otherwise display." (DE 1, PageID# 18.) Plaintiffs urge this Court to subject the Act to strict scrutiny. Plaintiffs, though, concede that, as businesses open to the public, they are subject to regulation, including regulations that require them to post certain signage. (DE 7, PageID# 51). Plaintiffs also concede that "notices [that] communicate purely factual and non-controversial speech [] do[] not offend the First Amendment." (DE 7, PageID# 51.)

Plaintiffs' concessions confirm that strict scrutiny is inappropriate. It is well settled, of course, that a State may not "constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and

for the express purpose that it be observed and read by the public." *Wooley v. Maynard*, 430 U.S. 705, 713 (1977).

But while the State has "'no power to restrict expression because of its message, its ideas, its subject matter, or its content,'" "[u]nder the First Amendment," it may still "regulate certain aspects of speech." *Thomas v. Bright*, 937 F.3d 721, 729 (6th Cir. 2019) (quoting *Police Dep't of City of Chi. v. Mosely*, 408 U.S. 92, 95 (1972)). And when a statute does not regulate or compel expressive or ideological speech, strict scrutiny is not the applicable constitutional test. Indeed, the federal appellate courts have repeatedly declined to apply strict scrutiny to non-expressive, non-ideological disclosure requirements in the face of First Amendment challenges. *See, e.g., Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985) (declining to apply strict scrutiny to commercial speech); s*ee also Nat'l Electric Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) (upholding a labeling requirement containing purely factual and uncontroversial speech); *Conn. Bar Ass'n v. United States*, 620 F.3d 81 (2d Cir. 2010) (subjecting disclosure requirements to rational basis review); *N. Y. State Rest. Ass'n v. N. Y. C. Bd. of Health*, 556 F.3d 114 (2d Cir. 2009) (applying rational basis review to government mandated caloric disclosure requirements); *Scope Pictures, of Mo, Inc. v. City of Kan. City*, 140 F.3d 1201 (8th Cir. 1998) (upholding a signage requirement regarding venereal disease where the signage conveyed no political or ideological message); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995)

("First Amendment protection against compelled speech. . . has only been found in the context of governmental compulsion to disseminate a particular political or ideological message.").

Thus, because the Act does not require expressive or ideological speech, the deferential standard of rational-basis review applies.

### 1.     The Act Does Not Require Expressive or Ideological Speech Implicating Strict Scrutiny.

Straining to categorize the Act's signage as expressive speech to invoke strict scrutiny, Plaintiffs allege that "biological sex" is a controversial term (DE 7, PageID# 54) that "carries an anti-transgender connotation" with which Plaintiffs do not wish to align themselves.  (DE 7, PageID# 58.)

Plaintiffs fail to prove this point.  The signage required by the Act is neither ideological nor expressive speech.  Ideological speech is speech which conveys a "point of view."  *Wooley*, 430 U.S. at 715.  An accurate statement of fact—such as the bathroom-usage policy chosen by Plaintiffs—does not communicate an ideological or political message.  *See, e.g.*, *Dutchess/Putnam Rest. & Tavern Ass'n, Inc. v. Putnam Cnty. Dep't of Health*, 178 F.Supp.2d 396, 406 (S.D.N.Y. 2001) (holding that state-mandated signs informing patrons of the risk of smoking did not constitute ideological speech and therefore did not violate the First Amendment).

Plaintiffs' sole argument to the contrary is that "sex assigned at birth" is an appropriate term, but "biological sex" is "stigmatizing and isolating [to] transgender Tennesseans."  (DE 7-3, PageID# 87-88; *see also* DE 7-2, PageID# 79 ("I [Plaintiff Sayers] immediately understood the term 'biological sex' to be stigmatizing to transgender people and believe clients will as well.").)  However, Plaintiffs can only speak for themselves, and fail to demonstrate that their unfounded opinions about the term "biological sex" are widely accepted.

Plaintiffs' evidence in support of their argument is similarly lacking; they do not cite

sufficient evidence that the Act's terminology is widely considered harmful. They instead rely on

two articles that discuss the issues surrounding gender identification and the use of terms that target

biology versus identity. (*See generally* DE 7-5, 7-6.) Defendants disagree that the use of the term

"biological sex" necessarily transforms any reference into political, expressive speech. Ample

evidence demonstrates that the term "biological sex" is regularly used in a neutral, objective

context.

The academic community, for example, has not adopted Plaintiffs' ill-founded belief that

the term "biological sex" is inherently loaded political speech. The Diagnostic and Statistical

Manual of Mental Disorders (DSM-5) contrasts sex differences from gender differences,

explaining that:

> *Gender differences* are variations that result from biological sex as well as an
> individual's self-representation that includes the psychological, behavioral, and
> social consequences of one's perceived gender. The term *gender differences* is
> used in DSM-5 because, more commonly, the differences between men and women
> are a result of both biological sex and individual self-representation. However,
> some of the differences are based on only biological sex.

Am. Psychiatric Assoc., *The Diagnostic and Statistical Manual of Mental Disorders* 15 (5th ed.

2013) (Ex. B).

Other academic publications also recognize a distinction between biology and identity. In

discussing gender dysphoria in adolescence, Kaltiala-Heino, et al. use the term "biological sex" in

the same way as the Act—as a scientific characterization separate and apart from gender identity:

"The [DSM-5] defines gender dysphoria (GD) as a condition in which a person has marked

incongruence between the expressed or experienced gender and the biological sex at birth."

Riittakerttu Kaltiala-Heino et al., *Gender dysphoria in adolescence: current perspectives*,

ADOLESCENT HEALTH, MEDICINE AND THERAPEUTICS 2018:9, 31, 31 (2018) (Ex. C). And in

analyzing the implications of COVID-19 from a gender perspective, Walter and McGregor explain

that "[s]ex- and gender-based medicine (SGBM) incorporates how biological *sex* and the sociocultural aspects of *gender* affect health and illness." L.A. Walter and A.J. McGregor., *Sex- and Gender-specific Observations and Implications for COVID-19*, WEST J EMERG MED. 21(3):507-509 (2020) (emphasis in original) (Ex. D); *see also* E.P. Scully et al., *Considering how biological sex impacts immune responses and COVID-19 outcomes*, NAT REV IMMUNOL 20, 442–447 (2020) ("Human biological sex plays a fundamental role in heterogeneous COVID-19 outcomes.") (Ex. E); S.L. Klein et al., *Biological sex impacts COVID-19 outcomes*, PLOS PATHOG 16:6 (2020) (Ex. F).

Nor does judicial precedent align with Plaintiffs' value-laden perception of the term "biological sex." For example, the D.C., Second, Third, Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth Circuit Courts of Appeal have all used the term "biological sex." *See, e.g.*, *Doe 2 v. Shanahan*, 917 F.3d 694, 698 (D.C. Cir. 2019); *Able v. United States*, 88 F.3d 1280, 1286 (2d Cir. 1996); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 614 (4th Cir. 2020); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020); *Doe by and through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 347 (7th Cir. 2017); *Cruzan v. Special Sch. Dist, No. 1*, 294 F.3d 981, 983 (8th Cir. 2002); *Jackson v. Valdez*, --- Fed.App'x ---, 2021 WL 1990788, at *5 (5th Cir. 2021); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1225 (10th Cir. 2007).

The Sixth Circuit has used the term in its opinions as well. *See, e.g.*, *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 578 (6th Cir. 2018) (affirmed by *Bostock v. Clayton Cnty., Ga.*, 140 S.Ct. 1731 (2020)). So too have Tennessee's federal courts. *See, e.g.*, *Doe v. Hamilton Cnty. Bd. of Educ.*, 329 F.Supp.3d 543, 580 (E.D. Tenn. 2018). Indeed, the Supreme Court itself has used the term "biological sex" in its recent opinions. *See, e.g.*, *Farmer*

*v. Brennan*, 511 U.S. 825, 829 (1994); *Bostock*, 140 S.Ct. at 1752.

If Plaintiffs are correct, then these courts and academics have chosen a "controversial political term, one that has no value or meaning in medicine or science" and one that carries "an anti-transgender connotation." (DE 7-3, PageID 87; DE 7, PageID 58.) Yet, to the contrary, the term "biological sex" in each of these scientific articles and judicial opinions was used objectively and neutrally as a descriptive term to aid the reader's understanding, just as the term is used in the Act. Plaintiffs cannot twist the Act into a requirement that they engage in ideological speech by adopting an idiosyncratic understanding of a term with another widely accepted and commonly understood meaning. Indeed, on Plaintiffs' view, businesses could not even be required to post sex-designations outside their restrooms, because use of the terms "male" and "female" allegedly "ignores entirely the existence of intersex people, by suggesting that there are only two possible sexes." (DE 1, PageID 13.)

As a second try, Plaintiffs assert that they are forced by the Act "to display a government-mandated warning notice with which they disagree." (DE 1, PageID# 2.). But by the Act's plain language, Plaintiffs need only post the required signage if they *agree* with the language set forth by the Act—that "this facility maintains a policy of allowing the use of restrooms by either biological sex, regardless of the designation on the restroom." (DE 1-1, § 1(a) & (b)(3) (capitalization omitted)). Plaintiffs also complain that unless they "guard[] their restroom doors to ask for their birth certificates, inspect anyone's genitals, or interrogate any other aspect of [their patrons'] sex," they would be required to display the signage required by the Act. (DE 1, PageID# 11.). Plaintiffs' characterization of the Act is wrong again. The Act does not require signage where, due to a patron's disregard of sex-designating signs outside a bathroom, the business's implementation of their chosen bathroom-usage policy is imperfect. Instead, the Act merely

applies where the business's bathroom-usage policy mirrors the language of Section (b)(3). (*See* DE 1-1, § 1(a) & (b)(3).)

This distinction is critical. Because Plaintiffs need only comply with the Act if the signage language matches their bathroom-usage policy, the Act can only compel speech that is necessarily accurate. Accordingly, as the Act only requires the disclosure of accurate, non-ideological, and non-expressive speech, strict scrutiny does not apply and the statute need only satisfy the requirements of rational-basis review.

### 2. The Act Satisfies Rational-Basis Review.

Here, it is evident that the informed-consent provision easily satisfies rational-basis review. Under rational-basis review, a law is presumed constitutional, and "[t]he burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotations omitted); *see also Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001) (stating that a statute is subject to a "strong presumption of validity" under rational-basis review and will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis").

A court conducting a rational-basis review does not sit "as a super legislature to judge the wisdom or desirability of legislative policy determinations" but asks only whether there is some conceivable rational basis for the challenged statute. *Heller*, 509 U.S. at 319. This means that under rational-basis review, it is "'constitutionally irrelevant [what] reasoning in fact underlays the legislative decision.'" *R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603, 612 (1960)).

In enacting the informed-consent provision, the General Assembly and the citizens of Tennessee had "absolutely no obligation to select the scheme" that a court might later conclude

was best. *Nat'l R.R. Passenger Corp. v. A.T. & S.F.R. Co.*, 470 U.S. 451, 477 (1985); *see McGowan v. Maryland*, 366 U.S. 420, 425-426 (1961) ("State legislatures are presumed to have acted within their constitutional power despite the fact that in practice, their laws result in some inequality."). And Tennessee "has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).

Here, the rational basis for the Act is readily apparent. Tennessee certainly has a compelling interest in ensuring that patrons are informed of the bathroom-use policy at businesses they frequent—especially when the bathroom-usage policy differs in practice from the existing bathroom signage used by business owners. Many Tennesseans would agree that being "forced to share changing, shower, and bathroom space with members of the opposite sex" does not provide the same "level of privacy and comfort that" a patron could "expect" in facilities separated based on biological sex. *Stuart v. Metro. Gov't of Nashville & Davidson Cnty.*, 679 F. Supp. 2d 851, 854, 859 (M.D. Tenn. 2009) (Trauger, J.), *vacated after settlement*.

And, although not required by rational-basis review, the statute is also narrowly tailored. The Act simply ensures that Tennesseans are informed of a company's policy before they enter a locker room or bathroom. It does not require Plaintiffs to adopt any specific bathroom-usage policy, nor does it blanketly prohibit patrons from using the bathroom contrary to their biological sex. And the Act does not prohibit Plaintiffs from posting additional signs expressing their particular political or social views. Put another way, the law *does* allow Plaintiffs to permit any individual to use whatever restroom they choose, and it *does not* require using only the restroom that corresponds to biological sex. All that is required is that Plaintiffs inform their patrons of their

bathroom-usage policy in the event that Plaintiffs use bathroom signage inconsistent with their chosen usage policy.

As the Act does not require—or inhibit—expressive, untruthful, or ideological speech, it easily satisfies the applicable constitutional standard. Plaintiffs cannot therefore demonstrate a likelihood of success on the merits, and the Court should decline to grant a preliminary injunction.

## II. Plaintiffs are Unlikely to Suffer Irreparable Injury Absent an Injunction.

A preliminary injunction is likewise inappropriate as Plaintiffs have failed to make the requisite showing of irreparable harm.

A plaintiff seeking preliminary injunctive relief must demonstrate that irreparable harm is likely in the absence of the requested injunction. *Lyons*, 461 U.S. at 103; *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). The showing of likely irreparable harm is the single most important prerequisite for issuance of a preliminary injunction. *See* 11A C. Wright, A. Miller, & M. Kane, Fed. Practice and Procedure § 2948.1 (3d ed.). Speculative injury, then, is not sufficient. *Id.* And a preliminary injunction is not warranted to prevent the possibility of some remote future injury— a presently existing actual threat must be shown. *Id.* "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Mazurek*, 520 U.S. at 972.

### A. Issuance of a Notice Does Not Constitute Harm.

At this time, Plaintiffs face only the possibility of a notice of non-compliance with the law, but that alone does not constitute harm. Plaintiffs allege that, without immediate relief, they will be required to post a bathroom sign "within thirty days of a citation, or risk the threat of six months' imprisonment and/or a civil penalty of up to $500 . . . ." (DE 7, PageID# 69.) The necessary

condition that must occur before Plaintiffs suffer any injury is that Plaintiffs be "notified that [they] are not in compliance with [the Act]," in which case, they have "thirty (30) days to comply before any action can even possibly be taken against the entity or business." (DE 1-1, PageID# 21.)

Here, there is no irreparable harm if Plaintiffs do as they wish and choose not to post the signage identified by the Act—the only possible action the government could take is issuance of a notice. The receipt of a notice does not constitute harm. Indeed, it does not even rise to the level of "serious or substantial" harm, much less the higher standard of "irreparable" harm that is necessary for injunctive relief. *See, e.g.*, *A. O. Smith Corp. v. F. T. C.*, 530 F.2d 515, 525 (3d Cir. 1976) ("[T]he requisite is that the feared injury or harm be irreparable—not merely serious or substantial."); *Becton v. Thomas*, 48 F. Supp. 2d 747, 762 (W.D. Tenn. 1999) ("A plaintiff's harm is not considered irreparable if "it is fully compensable by money damages.") Plaintiffs have not identified any irreparable injury they will suffer from the mere receipt of a notice.

The Supreme Court's description of the injury-in-fact necessary for standing purposes is also instructive in determining whether Plaintiffs actually face harm at this pre-enforcement juncture: "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending' or there is a 'substantial risk' the harm will occur." *Driehaus*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 409, 414, n. 5). Plaintiffs have not demonstrated that any notice has issued, much less that prosecution of a violation following issuance of a notice is imminent. In fact, Defendant Glenn Funk, the Nashville District Attorney General, has publicly taken the position that *he categorically will not enforce the law*, and Tennessee District Attorneys General Conference President Amy Weirich stated that the law "doesn't speak to anything having to do with enforcement" and "[t]he way [the law] is written, I don't see anything that *allows or provides the responsibility or right* to go to civil court and ask a judge to enforce it." Kimberlee Kruesi,

*Nashville DA won't enforce new bathroom sign law*, Associated Press, (May 24, 2021) https://apnews.com/article/nashville-laws-government-and-politics-50412b91ca33cc45c426a9b5 a89b1133.  (Ex. A)

Illuminating the lack of an imminent, irreparable injury is the delay between the Act's passage into law and the filing of Plaintiffs' complaint.  Knowing that the law would become effective on July 1, 2021, Plaintiffs waited nearly a month before filing this lawsuit—only seeking judicial intervention a mere six days before it took effect. .  And what could explain their dilatoriness?  The 30-day cure period that insulates them from any conceivable harm.  In light of the evidence that Plaintiffs do not face actual harm—only the possibility of a notice—and the fact that actual enforcement of the law's penalties is not only attenuated but also apparently uncertain, Plaintiffs' allegation of irreparable harm is at best speculative at this point.  "Issuing a preliminary injunction" here "based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Mazurek*, 520 U.S. at 972.

Finally, the inquiry into irreparable harm necessarily asks whether the Plaintiffs have an adequate legal remedy absent injunctive relief.  *Russell v. Ohio, Dep't of Admin. Servs.*, 302 F. App'x 386, 394 (6th Cir. 2008) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.").  Plaintiffs do have adequate legal remedies: if Plaintiffs do receive a notice and face some actual threat of enforcement, they can seek preliminary-injunctive relief from this Court at a later date during the pendency of this litigation.  Accordingly, Plaintiffs have failed to demonstrate the immediate, irreparable harm necessary for a preliminary injunction.

**B.     The Term "Biological Sex" Does Not Constitute Harm.**

Plaintiffs also imply that posting the notice will cause them some form of "reputational

harm" or stigma: "Sanctuary believes that it will lose the customers and supporters it has worked hard to bring to Sanctuary if it displays the warning notice." (DE 7, PageID# 61; *see also* DE 7-1, PageID# 75 ("I believe that posing the warning notice required by [the Act] will offend [Bongo Productions'] staff, customers, friends, and family.").

Again, if Plaintiffs do not post the signage, the only risk at this point is a notice, which as explained above, does not constitute irreparable injury. And upon receipt of a notice, Plaintiffs would still possess meaningful access to the Court to seek preliminary injunctive relief. But *accepting arguendo* that Plaintiffs do post the sign and fear harm, the harm they identify is that the law "requires Plaintiffs to use a phrase that lacks scientific support, and perpetuates the viewpoint that transgender people are not the sex they know themselves to be." (DE 7, PageID# 66.) As described *supra* in I.B.1, the term "biological sex" is hardly the value-laden scarlet letter Plaintiffs imagine. And nothing in the Act prohibits disassociation or disagreement. If Plaintiffs' unfounded fears about using the term "biological sex" truly disturb them, they are free to publicly attribute the required signage to the State and openly disagree with it—perhaps even with a second sign presenting their protected expressive, ideological speech. But even so, an exaggerated parade of horribles about how third parties may perceive their compliance with the Act is a speculative and insufficient showing of harm.

Apart from the terminology of the law, Plaintiffs also suggest that limiting transgender access to the bathroom of choice is harmful. According to Dr. Taylor, "[a] transgender patron should not have to effectively disclose their transgender status by using the designated restroom that matches their sex assigned at birth," and "[a] transgender person should be able to use the restroom that matches their gender identity." (DE 7-3, PageID# 87.) But Dr. Taylor fundamentally misapprehends the Act, rendering her declaration irrelevant here. The Act *does not* require a

patron to use only the restroom that corresponds to biological sex. (*See* DE 1-1.) Plaintiffs, as operators of their businesses, get to decide their own bathroom-usage policy. The Act only requires that Plaintiffs provide notice to patrons when their bathroom-usage policy differs from their existing signage. Nothing in the Act requires that Plaintiffs inquire into the identity of its patrons or force them to use a specific restroom.

Plaintiffs cannot show that the terminology of the Act causes harm. Plaintiffs also cannot demonstrate the Act requires them to limit an individual's access to the bathroom of that individual's choice. Plaintiffs therefore have not demonstrated a concrete and irreparable injury sufficient to justify issuance of an injunction.

## III. Issuance of an Injunction Would Harm the State and the Public Interest.

An injunction that prevents a State from upholding a duly enacted law necessarily irreparably harms the State. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *Detroit Newspaper Publisher Ass'n v. Detroit Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972), *cert. denied*, 411 U.S. 967 (1973); *MLZ, Inc. v. Fourco Glass Co.*, 470 F. Supp. 273, 278 (M.D. Tenn. 1978). And where the party opposing equitable relief is the government, consideration of the public interest "merge[s]" with irreparable harm to the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The public has a strong interest in laws duly passed by its representative branch of government, and thus the public interest and harm to the State militate against injunctive relief. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). Due to Plaintiffs' delay in seeking a preliminary injunction, the Act is now in effect, so their argument that the equities weigh more in their favor when "a law . . . is not currently in effect," now points in the Defendants' favor. (DE 6, PageID# 41.)

In practice, the Act is designed as a statute of public notice. It performs a limited purpose: informing the patrons of the bathroom-usage policy at Plaintiffs' business locations. It does not require Plaintiffs to adopt any specific bathroom-usage policy, but it does allow patrons to understand Plaintiffs' bathroom-usage policy to the extent it differs from the expectations conferred by Plaintiffs' existing sex-specific bathroom signage. Just as Tennesseans have a strong interest in the effectiveness of their democratically-passed laws, they also have an interest in being accurately informed of the rules adopted by the businesses they patronize.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

/s/*Alexander S. Rieger*
ALEXANDER S. RIEGER
Assistant Attorney General
Public Interest Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-2408
BPR No. 029362
Alex.rieger@ag.tn.gov

/s/*Rainey A. Lankford*
RAINEY A. LANKFORD
Assistant Attorney General
Civil Law Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 253-5808
BPR No. 036854
Rainey.Lankford@ag.tn.gov

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Response has been served on the following counsel of record through the Electronic Filing System on this 7th day of July, 2021:

Thomas H. Castelli
Stella Yarbrough
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org
syarbrough@aclu-tn.org

Rose Saxe
Emerson Sykes
American Civil Liberties Union Foundation
125 Broad Street, 17th Floor
New York, NY 10004
Tel: (212) 549-2500
rsaxe@aclu.org
esykes@aclu.org

/s/*Alexander S. Rieger*
ALEXANDER S. RIEGER