BONGO PRODUCTIONS, LLC,                     )
ROBERT BERNSTEIN, SANCTUARY                 )
PERFORMING ARTS LLC, and                    )
KYE SAYERS,                                 )
                                            )
Plaintiffs,                                 )
                                            )
v.                                          )        Case No. 3:21-cv-00490
                                            )        Judge Aleta A. Trauger
CARTER LAWRENCE, Tennessee State            )
Fire Marshall, in his official capacity,    )
CHRISTOPHER BAINBRIDGE, Director            )
of Code Enforcement, in his official capacity, )
GLENN R. FUNK, District Attorney            )
General for the 20th Judicial District, in his )
official capacity, and NEAL PINKSTON,       )
District Attorney General for the 11th      )
Judicial District, in his official capacity, )
                                            )
Defendants.                                 )

## MEMORANDUM

Plaintiffs Bongo Productions, LLC ("Bongo"), Robert Bernstein, Sanctuary Performing

Arts LLC ("Sanctuary"), and Kye Sayers have filed a Motion for Preliminary Injunction (Doc.

No. 6), to which Commissioner/Fire Marshall Carter Lawrence, Director Christopher Bainbridge,

District Attorney General ("DAG") Glenn R. Funk, and DAG Neal Pinkston have filed a

Response (Doc. No. 21). For the reasons set out herein, the motion will be granted.

## I. INTRODUCTION

The State of Tennessee has enacted a law ordering the plaintiffs to say something that

they do not wish to say, in furtherance of a message they do not agree with. The plaintiffs

challenge that law on the basis that the First Amendment typically does not permit such a

mandate unless it is narrowly tailored to satisfy a compelling government purpose. Because the

plaintiffs are likely to succeed on their challenge to that law and because allowing the law to be enforced while this litigation proceeds would harm them irreparably, the court will grant a preliminary injunction against the law's enforcement.

## II. BACKGROUND

### A. The Parties

**1. Plaintiffs.** Bongo is a Nashville-based limited liability company that operates a number of coffeehouses and restaurants, namely Bongo Java, Bongo East, Game Point, Grins Vegetarian Cafe, and—particularly relevant to this case—Fido. Robert Bernstein is Bongo's founder and chief manager. (Doc. No. 7-1 ¶¶ 1–2.) Bernstein states that "Bongo has employed transgender people," "Bongo's and Fido's patrons include members of the transgender community," and Bongo has "worked over the years to create a welcoming environment for members of the LGBTQ community." (*Id.* ¶¶ 6–7.) Recently, "Fido's staff decorated the restaurant's specialty drinks sign with transgender and LGBTQ pride flag colors." (*Id.* ¶ 8.) Like many restaurants, Fido "has multi-user sex-designated restroom facilities." (*Id.* ¶ 3.) Until recently, Fido's management, according to Bernstein, never gave much thought to its rules, if any, about who could use which restroom, but its "informal policy was to never tell any person that they could not use a particular sex-designated restroom, and to allow transgender people to use the restroom that matched their gender identity." (*Id.* ¶ 11.) No one ever complained to Bernstein about that approach. (*Id.* ¶ 12.)

Sanctuary is "a performing arts venue, community center and safe haven located in Chattanooga, Tennessee." (Doc. No. 7-2 ¶ 3.) It was "founded by . . . members of the transgender community in December 2020 to serve the needs of transgender and intersex people of all ages, as well as other LGBTQ people and allies." (*Id.* ¶ 4.) Most of its staff and volunteers

2

are transgender. (*Id.* ¶ 5.) Sanctuary has three restrooms, two of which are multi-user restrooms. None of the restrooms has a sex or gender designation, and anyone is free to use any restroom. (*Id.* ¶ 7.) According to Sanctuary owner and co-founder Kye Sayers, however, "Sanctuary intends [in July of 2021] to begin operating a full-service café and will be required by the local building code to post a sex-designation on its two multi-user restrooms." (*Id.* ¶ 8.) Once those designations are added, Sanctuary's policy will be to "continue to allow transgender people to use the restroom that accords with their gender identity." (*Id.*)

2. **Defendants.** Carter Lawrence is the Commissioner of the Tennessee Department of Commerce and Insurance. Part of his duties, as Commissioner, is serving as the State of Tennessee's Fire Marshal. The State Fire Marshal is one of several officials with concurrent jurisdiction to enforce the State of Tennessee's building code. Tenn. Code Ann. § 68-120-106. Christopher Bainbridge is Commissioner/Marshall Lawrence's Director of Codes Enforcement. *See Heun Kim v. State*, No. W201800762COAR3CV, 2019 WL 921039, at *3 (Tenn. Ct. App. Feb. 26, 2019). Glenn R. Funk and Neal Pinkston are the District Attorneys General of, respectively, Tennessee's 20th and 11th Judicial Districts. They are attorney public officials empowered to represent the State of Tennessee in criminal prosecutions. *See* Tenn. Code Ann. §§ 8-7-103, 40-3-104.

## B. The Act

Tennessee law requires that "[p]ublicly and privately owned facilities where the public congregates shall be equipped with sufficient temporary or permanent restrooms to meet the needs of the public at peak hours." Tenn. Code Ann. § 68-120-503(a). The law also envisions that, generally speaking, there will be restrooms "provided for women" as well as restrooms "provided . . . for men," which must be available in adequate ratios. *Id.*; *see* Tenn. Comp. R. &

3

Regs. 0780-02-18-.03 (discussing "minimum number of water closets"). Outside of those basic requirements, however, the State of Tennessee has, historically, not been much in the business of regulating how private businesses navigate the question of who is permitted to use which restroom.

On April 29, 2021, however, the Tennessee General Assembly passed H.B. 1182/S.B. 1224, which the Governor signed into law on May 17, 2021 and which this court will refer to as "the Act." (*See* Doc. No. 1-1 at 4.) The Act went into effect on July 1, 2021. (*Id.*) Subsection (a) of the Act, in its own words, requires that any

> public or private entity or business that operates a building or facility open to the general public and that, as a matter of formal or informal policy, allows a member of either biological sex to use any public restroom within the building or facility shall post notice of the policy at the entrance of each public restroom in the building or facility.

Act § 1(a). The Act defines "policy" to mean "the internal policy of a public or private entity or such policy as the result of a rule, ordinance, or resolution adopted by an agency or political subdivision of this state." Act § 1(d)(1). It defines "public restroom" as any "locker room, shower facility, dressing area, or other facility or area that is . . . [o]pen to the general public; [d]esignated for a specific biological sex; and [a] facility or area where a person would have a reasonable expectation of privacy." Act § 1(d)(2).[1] That definition "[e]xcludes a unisex, single-

---

[1] The language stating that the Act applies only to restrooms "[d]esignated for a specific biological sex" is somewhat confusing. The court doubts that many, if any, restrooms in the state used the phrase "biological sex" on their signage prior to the enactment of the Act. However, the legislative history of the Act, which the court will discuss *infra*, makes clear that the General Assembly intended the Act to reach any restroom with a verbal designation such as "men" or, by extension, a visual designation such as an icon appearing to wear gendered clothing. Tennessee caselaw is clear that, "[w]hen construing a statute, the intent of the legislature must prevail," at least as long as the legislature's intent can be reconciled with the "natural and ordinary meaning of the language in the statute, within the context of the entire statute." *Young v. Frist Cardiology, PLLC*, 599 S.W.3d 568, 571 (Tenn. 2020) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526–27 (Tenn. 2010)). This court, moreover, is constitutionally bound to interpret the Act in the manner that it believes that the Tennessee Supreme Court would. *In re Fair Fin. Co*., 834 F.3d 651, 671 (6th Cir. 2016) (discussing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938)).The court, accordingly, construes the statute to apply to restrooms that, in addition to meeting the other

4

occupant restroom or family restroom intended for use by either biological sex." Act § 1(d)(2)(B).

Although subsection (a) of the Act, on its face, requires only a posted "notice," subsection (b) mandates, in detail, the form that that notice must take:

> Signage of the notice must be posted in a manner that is easily visible to a person entering the public restroom and must meet the following requirements:
>
> > (1) Be at least eight inches (8") wide and six inches (6") tall;
> >
> > (2) The top one-third (1/3) of the sign must have a background color of red and state "NOTICE" in yellow text, centered in that portion of the sign;
> >
> > (3) The bottom two-thirds (2/3) of the sign must contain in boldface, block letters the following statement centered on that portion of the sign:
> >
> > > THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM
> >
> > (4) Except as provided in subdivision (b)(2), have a background color of white with type in black; and
> >
> > (5) Be located on a door to which the sign must be affixed or have its leading edge located not more than one foot (1') from the outside edge of the frame of a door to which the sign must be affixed.

Act § 1(b). The Act gives any entity or business that is in violation of the Act thirty days from being "notified that it is not in compliance" to post the required signage, after which "action" may be "taken against the entity or business." Act § 1(c). Because the Act is situated in the state's building code, a violation of the Act—that is, not placing a sign and then refusing, after thirty days, to do so—is a Class B misdemeanor. Tenn. Code Ann. § 68-120-108(a). Violations of the building code may also lead to a "stop work" order from the State Fire Marshal directed at

---

requirements of the statute, are designated for use by any specific sex or gender in the ordinary manner in which such designations are typically made in Tennessee, such as, for example, with a sign reading "Men" or "Women."

any "erection, construction or alteration, execution or repair" of the regulated building. Tenn. Code Ann. § 68-120-107(a).

Why did the General Assembly adopt the Act, more than two centuries into the State's existence and after seemingly many decades of public restrooms being commonplace in Tennessee, and in America, without the need for such signage? The court, of course, cannot purport to know all of the dynamics that go into each legislator's individual decision to support a bill. However, the Act's sponsor, Representative Tim Rudd, explained that he introduced the Act because he was concerned about "[n]ew executive orders . . . and new legislation proposed in Congress giving transgenders [sic] rights and extending those rights." He explained, though, that the law was "not aimed at transgenders [sic]."[2] Rather, he was concerned, he said, about the possibility of hypothetical sexual predators who would "take advantage of" some public restroom policies to "assault[] or rape[]" other restroom users.[3] Shortly before that declaration, Rudd was asked by Tennessee House Speaker Pro Tempore Pat Marsh whether the State was "having a problem with this now, that you know of . . . anywhere." Rudd was unable to provide any examples or evidence of such a problem. Instead, he explained that "[w]e shouldn't wait for people's rights to be abused" in order to act and potentially prevent "an attack."[4] At another hearing a few weeks later, Representative Rudd offered an alternative explanation for the law: that it is "shocking and a danger to people when they walk into a restroom marked 'men' or

---

[2] Debate of H.B. 1182 Before the H. Pub. Serv. Comm. at 31:49, 112th Gen. Assemb. (Mar. 10, 2021), at https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24150.

[3] *Id.*

[4] *Id.* at 31:17.

'women' and [someone of] the opposite sex is standing there. It could scare them. It could provoke violence."[5]

## C. Issues Related to the Act

**1. Medical Background.** The plaintiffs have filed a Declaration by Dr. Shayne Sebold Taylor, M.D., to provide some medical background regarding issues related to the Act. (Doc. No. 7-3.) Dr. Taylor is an Assistant Professor of Internal Medicine and Pediatrics at Vanderbilt University Medical Center and the Monroe Carrell Jr. Children's Hospital, both in Nashville. (*Id.* ¶ 2.) Dr. Taylor explains that, from a medical perspective, the category of "sex" is "far more complex than what is seen on genital exam"—the mechanism through which individuals are typically assigned a sex designation at birth. (*Id.* ¶ 13.) Rather, the concept of sex implicates

> a complex compilation of multiple factors including one's chromosomal make up (XX for those assigned female at birth, XY for those assigned male at birth), gonadal sex (presence of ovaries or testes), fetal hormonal sex (production of sex hormones by the fetus or exogenous exposure of sex hormones to the developing fetus), pubertal hormonal sex (the change in hormonal milieu that results in the development of secondary sexual characteristics—facial hair and deep voice for those assigned male at birth, breasts and menstrual cycles for those assigned female), hypothalamic sex (variations in brain structure and function as a result of embryonal exposure of sex hormones), and gender identity.

(*Id.*) Unsurprisingly, given the general diversity of human minds and bodies, there "can be variations" among the many potential combinations of those factors. (*Id.* ¶ 14.) Dr. Taylor explains that, "[f]or example, many children are born with ambiguous genitalia," a sexual presentation generally described as being "intersex." (*Id.*)

Such variations are not limited to outward characteristics. Dr. Taylor explains that, while there are two "typical human chromosomal make ups" considered male and female, there are also other chromosomal configurations that naturally occur in the human population. (*Id.*) Male

---

[5] Discussion of H.B. 1182 Before H. Floor Sess., 18th Legis. Day at 1:51:00, 112th Gen. Assemb. (Mar. 29, 2021), at http://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24423&meta_id=579987.

patients with Klinefelter Syndrome, for example, have an extra X chromosome, while female patients with Turner Syndrome are, compared to most individuals assigned female at birth, missing an X chromosome. These chromosomal variations often lead to physical and developmental differences, such as the development of breasts in patients genitally identified as male. (*Id.*) In light of this complexity and variation, Dr. Taylor explains, the term "biological sex" "has no place or meaning in either science or medicine, because experts who study sex and gender understand that the biology and identity of a human being is far more complex than what can be identified on an individual's genital anatomy or chromosomal evaluation." (*Id.* ¶ 28.)

Dr. Taylor explains that "gender identity" is an internal, psychological phenomenon that is conceptually distinct from any particular physical trait. Rather, "[g]ender identity is a person's inner sense of belonging to a particular gender." (*Id.* ¶ 15.) Although there may be disagreement among Americans about the normative question of what role gender identity should play in various situations, the purely descriptive fact that gender identity, as a type of internally experienced phenomenon, *exists* is supported by both medical research and, at least for many people, confirmed by the ordinary experience of being a human. Also beyond reasonable dispute is the fact that many people report experiencing a gender identity that is inconsistent with the sex that they were assigned at birth based on a genital exam. If an individual's gender identity differs from their sex assigned at birth, that person is typically referred to as "transgender." (*Id.* ¶ 17.) According to Dr. Taylor, a 2016 study estimated that about 31,000 transgender people live in Tennessee. (*Id.* ¶ 27.)

As Dr. Taylor explains, the "lack of alignment of assigned sex and gender identity can result in severe distress, depression, [and] anxiety," a "constellation of symptoms . . . termed gender dysphoria." (*Id.* ¶ 19.) As with any psychological condition that has a demonstrated

8

negative effect on individuals' lives, treatments have been developed to address gender dysphoria. In particular, many individuals who have experienced gender dysphoria elect to undergo "gender transition," a "lengthy process with multiple components," including, potentially, "social transition, medical transition,[6] and surgical transition." (*Id.* ¶ 21.) "Social transition can include going by a different name, using different pronouns, or changing one's haircut . . . or clothing to match one's gender identity." (*Id.* ¶ 22.) At least for many individuals, successful social transition means being able to "seamlessly incorporate into their communities with a presentation that matches with their gender identity." (*Id.* ¶ 23.) In order to do so, the individual, if confronted with a situation in which they need to select a restroom designated as for men or for women, may select the restroom that corresponds with their gender identity. (*Id.*) The plaintiffs have provided medical publications establishing that Dr. Taylor's view of these matters is not unique—namely, a piece from *The Lancet* regarding the "misuses of 'biological sex'" and a publication of the *Annals of Internal Medicine* entitled "Care of the Transgender Patient." (Doc. Nos. 7-5 & -6.)

**2. The Plaintiffs' Concerns.** Bernstein and Sayers have both expressed a desire not to post the required signage in their respective businesses. Bernstein states that he believes that "posting the warning notice required by H.B. 1182 will offend [Fido's] staff, customers, friends, and family" and that Bongo "could lose staff and customers if forced to post this sign." (Doc.

_____

[6] Dr. Taylor explains that medical and surgical transition can lead to changes in physical presentation even greater than changes to clothing, hair, makeup, or other non-medical external gender expressions. For example, a transgender man might undergo testosterone treatments that would allow him to grow a full beard and develop a deep voice, although the individual had been designated female at birth and, prior to medical transition, had not had those physical characteristics. (Doc. No. 7-3 ¶ 26.) Accordingly, an individual who has undergone medical transition, but who is then required to use the restroom corresponding to their sex assigned at birth, might, as a practical matter, give other users of the restroom the impression that the individual was disregarding the restroom's gender or sex designation by, for example, having a full beard and deep voice, as well as potentially male-coded clothing, in a restroom designated as for women.

No. 7-1 ¶ 14.) He is also "concerned that the required warning notice could create confusion for [the restaurant's] customers, clients and employees." (*Id.* ¶ 15.) On a personal level, he states that he "find[s] the message communicated by H.B. 1182 offensive, and [he] object[s] to the government requiring [him] to post a controversial warning notice in [his] businesses" that he perceives to be "ideologically motivated and inaccurate." (*Id.* ¶ 16.)

Sayers is "concerned that the warning notice will make transgender and intersex people . . . feel that their presence is viewed as alarming, and that they will be offended by the term 'biological sex' because of the political controversy and anti-transgender animus surrounding that phrase." (Doc. No. 7-2 ¶ 10.) Sayers claims to have "immediately understood the term 'biological sex' to be stigmatizing to transgender people and believe[s] [Sanctuary's] clients will as well." (*Id.* ¶ 11.) Sayers also objects that the Act "will send a message that erases the existence of intersex people by suggesting that there are only two 'biological sexes.'" (*Id.* ¶ 12.) Sayers "fear[s] that Sanctuary will lose staff, community members and supporters if [it] display[s] the warning notice." (*Id.* ¶ 14.)

**D. This Litigation**

On June 25, 2021, the plaintiffs filed their Complaint in this case. (Doc. No. 1.) They state a single count, Count 1, pursuant to 42 U.S.C. § 1983, for "violat[ing] Plaintiffs' rights under the First Amendment to the United States Constitution by compelling them, on pain of criminal penalty, to communicate a misleading and controversial government-mandated message that they would not otherwise display." (*Id.* ¶ 85.) Contemporaneously with the Complaint, they filed a Motion for Preliminary Injunction asking the court to enjoin the enforcement of the Act. (Doc. No. 6 at 1.)

10

### III. LEGAL STANDARD

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Aside from the irreparable harm requirement, "no one factor is controlling, [but] a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

### IV. ANALYSIS

#### A. Likelihood of Success on the Merits

A moving party must establish at least a meaningful "[p]robability of success" in order for a preliminary injunction to issue.[7] *Garlock, Inc. v. United Seal Inc.*, 404 F.2d 256, 257 (6th Cir. 1968); *see also Golf Vill. N. LLC v. City of Powell, Ohio*, 333 F. Supp. 3d 769, 775 (S.D. Ohio 2018). The defendants argue that the plaintiffs are unlikely to succeed for three reasons: (1)

---

[7] "The courts use a bewildering variety of formulations of the need for showing some likelihood of success—the most common being that plaintiff must demonstrate a reasonable probability of success. But the verbal differences do not seem to reflect substantive disagreement. All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.3 (3d ed.) (citations omitted).

11

they lack standing; (2) their claims are not ripe; and (3) they are unlikely to establish that the Act is unconstitutional.

**1. Standing.** Article III of the Constitution grants the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975). A party seeking to invoke the court's jurisdiction must establish the necessary standing to sue before the court may consider the merits of that party's cause of action. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and (b) particularized, as well as (c) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These mandatory minimum constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case. The defendants argue that the plaintiffs cannot meet the first requirement, an injury-in-fact that is imminent, not merely conjectural or hypothetical, because the Act has not yet been enforced against them and they do not know, with certainty, that it will be.

As the plaintiffs note, however, Article III does not require a plaintiff to engage in "costly futile gestures simply to establish standing, particularly when the First Amendment is implicated." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999) (citing *Virginia v. Am. Booksellers Ass'n, Inc.*,

484 U.S. 383, 392–93 (1988); *Clements v. Fashing*, 457 U.S. 957, 962 (1982)). To the contrary, it is well established that "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging" the constitutionality of a law regulating an organization's ongoing and expected future behavior. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Nor is a plaintiff required to "expose himself to liability before bringing suit." *MedImmune*, 549 U.S. at 129. A plaintiff may, for example, establish an injury-in-fact based on its "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979).

A plaintiff can also establish an imminent injury by showing that it was forced to alter its behavior based on a reasonable fear of enforcement. *See Clements*, 457 U.S. at 962 (finding standing where plaintiffs alleged that, "but for the . . . provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision"). Finally, the caselaw recognizes that an injury-in-fact can arise, not merely out of actual or even expected enforcement actions, but also "costly, self-executing compliance burdens" or because the challenged law "chills protected First Amendment activity." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citation omitted); *accord Hyman v. City of Louisville*, 53 F. App'x 740, 743 (6th Cir. 2002); *see also Am. Booksellers*, 484 U.S. at 392 (finding standing because "plaintiffs . . . , if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution") (citing *Craig v. Boren*, 429 U.S. 190, 194 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973)); *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 902 (S.D. Ohio 2016) ("[A]dditional compliance burdens may serve as an

13

injury in fact.") (citing *All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 120–21 (D.D.C. 2011)). A plaintiff can establish standing to challenge a law by showing that the law "is directed at [the plaintiff] in particular[,] . . . requires [the plaintiff] to make significant changes in [its] everyday . . . practices[, and] . . . expose[s the plaintiff] to the imposition of strong sanctions" for noncompliance. *Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).

The plaintiffs' claims fall well within the ordinary, well-established boundaries of pre-enforcement standing in the First Amendment context. The Act is not some obscure provision that might plausibly fall to the wayside, be forgotten and never be enforced. It is part of the state's formal building code, a code with which businesses such as the plaintiffs' have longstanding and well-established expectations that they must comply. Conspicuously, although the defendants attempt to foster a sense of mystery regarding how, whether, and when the Act will be enforced, they do not actually take the position that Tennessee businesses can safely ignore the portions of the building code they disagree with. The legislative history of the Act, moreover, shows an affirmative intent that the Act be enforced immediately, before any supposed risk of harm can materialize, and there is no evidence that the State's executive branch—led by the Governor who promptly signed the Act—disagrees with that position.

The defendants point out that DAG Funk has reportedly voiced an intention not to enforce the Act, but that is little comfort to Sanctuary, which is not in Nashville, where the 20th Judicial District is located. Moreover, the defendants have not identified any reason why a supposed promise of non-enforcement from DAG Funk would prevent the state-level defendants from exercising their own authority to find Bongo in violation of the Act. It would be one thing if DAG Funk had, in effect, the unilateral power to suspend any portion of the state's building

code within the boundaries of his jurisdiction. The defendants, however, make no such claim. Quite to the contrary, the state's building code explicitly envisions "concurrent jurisdiction" that includes the State Fire Marshall, who "is authorized to employ such technicians as [he] may deem necessary for the proper enforcement of" the code. Tenn. Code Ann. § 68-120-106(a); *see also Barry v. Commissioners of Com. & Ins. for State of Tenn.*, No. 01A01-9404-CH-00156, 1994 WL 485588, at *1 (Tenn. Ct. App. Sept. 9, 1994) ("The Commissioner is empowered . . . to serve as the state fire marshall and to enforce the . . . building safety standards.").

This might be quite a different case if each of the defendant officials had given the court a meaningful reason to expect that he will not enforce the Act. The defendants, however, seek to have it both ways—to pretend that no one knows how the Act will be enforced, despite the fact that, of course, *they know*, because they will be among the ones doing the enforcing, and they are simply keeping their plans to themselves. Once the plaintiffs made a sufficient showing of an injury-in-fact based on their reasonable and concrete fear of enforcement (and fear of the harms that would arise if they complied with the Act to *avoid* enforcement), the defendants could have negated that showing by presenting evidence that the plaintiffs' fears were unfounded—that there was nothing to worry about, because the State of Tennessee was going to, or even likely would, use its enforcement discretion to leave the plaintiffs alone. The defendants offered no such assurances and made no such showing.[8] The issue of standing, therefore, does not pose an impediment to the plaintiffs' likelihood of success.

---

[8] Indeed, even DAG Funk himself filed no declaration stating that he will decline to enforce the Act, and members of the General Assembly have begun to take steps to attempt to force or pressure DAG Funk to enforce the Act, because nonenforcement would be a "transgression" of DAG Funk's duty to enforce the State's criminal laws in the 20th Judicial District. *See* Mariah Timms*, Nashville DA maintains opposition to law; Won't apply transgender bathroom usage measure*, Tennessean, June 10, 2021, at A5. And Representative John D. Ragan, the Chair of the House Government Operations Committee, is seeking an opinion from the State's Attorney General and Reporter regarding whether DAG Funk could be subjected

15

**2. Ripeness.** "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). The ripeness requirement exists, in part, to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.*, 387 U.S. at 148. The Supreme Court has suggested that the analysis of whether a case is ripe for review is best conducted "in a twofold aspect, requiring the Court 'to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Magaw*, 132 F.3d at 285 (quoting *Abbott Labs.*, 387 U.S. at 149).

"The ripeness doctrine," as it has traditionally been understood, "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Beech v. City of Franklin, Tenn.*, 687 F. App'x 454, 457 (6th Cir. 2017) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). Recent cases have raised some doubt with regard to whether the latter, purely prudential aspects of ripeness continue to provide an independent basis for dismissing a case. *See Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 503 n.2 (6th Cir. 2017) (discussing questionable vitality of prudential ripeness in the wake of *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28 (2014)); *see also Driehaus*, 573 U.S. at 167 (same); *Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th Cir. 2018) (same); *but see Wyoming v. Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017) (treating prudential ripeness as an exception to *Lexmark*). As a practical matter, however, even if the

---

to "disciplinary action or removal" for his apparent disinclination to enforce the Act. *See* Mariah Timms, *Nashville DA maintains opposition to law; Lawmaker asks attorney general if Nashville DA not enforcing anti-trans law is grounds for removal*, June 17, 2021, at https://www.tennessean.com/story/news/politics/2021/06/17/tennessee-attorney-general-review-nashville-da-decision-enforce-anti-trans-bathroom-law/7733386002/.

16

prudential foundations of ripeness have been undermined, no party to this case has identified any substantive change in the law of ripeness corresponding to such developments.

As the Sixth Circuit has observed, "[t]he line between Article III standing and ripeness in preenforcement First Amendment challenges" is so slim that it has, in effect, "evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (citing *Driehaus*, 573 U.S. at 165–67). Even if there were some fine distinction between the two, moreover, the defendants have not identified any basis for the court's analysis on the constitutional aspects of ripeness to differ from its analysis regarding standing. Insofar as there are any prudential considerations that might bear on the issue of ripeness, they similarly provide no obstacle to the court's consideration of the plaintiffs' claims. Although the defendants make general gestures in the direction of the need for more "factual development" of the plaintiffs' claims, it is not clear to the court why such development would be necessary, let alone required. (Doc. No. 21 at 9.) This is a fairly straightforward, single-count First Amendment challenge to a fairly straightforward, single-purpose statute. The plaintiffs chose to go forward without waiting to develop more of a record, and, because all of the constitutional requirements for considering the case have been met, that was their choice to make. The issue of ripeness, like the issue of standing, does not stand in the way of the plaintiffs' demonstrating a likelihood of success on the merits, if that is what the substantive law supports.

**3. Merits of First Amendment Challenge.** "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Moreover, when a law not only requires an individual to speak but mandates *what* he will say, then courts must treat the law as "target[ing] speech based on its communicative content" and therefore

"presumptively unconstitutional," only to be upheld "if the government proves that [the law is] narrowly tailored to serve compelling state interests." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018)). In short, "[c]ompelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command" unless justified by the strongest of rationales. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018).

The caselaw on this subject does not mince words. For example, the Sixth Circuit has recognized that "compelling an individual 'to utter what is not in [her] mind' and indeed what she might find deeply offensive" is "the most aggressive form of viewpoint discrimination." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012). Particularly repugnant to the First Amendment is when the government forces a private party to voice the government's compelled message, not merely in private or in direct dealings with government itself, but "in public," as an involuntary "instrument for fostering public adherence to an ideological point of view." *Wooley*, 430 U.S. at 715. The Supreme Court has even suggested that "such compulsion so plainly violates the Constitution" that it is rare for the courts to even have to step in to enforce the prohibition against it. *Janus*, 138 S. Ct. at 2464. On its face, the Act unambiguously mandates that the plaintiffs and other regulated parties speak a particular message, in public, that they have shown, with evidence, that they earnestly consider to be anathema to their beliefs and values. It even tells them what colors to use: red and yellow, like a hazard sign. That the First Amendment would look askance at such a practice, therefore, should surprise no one.

The requirement that a law, due to its encroachment on core constitutional protections, can only be reconciled with the Constitution if it is narrowly tailored to serve compelling state

18

interests is typically referred to as the law's being subject to "strict scrutiny." *Ams. for Prosperity Found. v. Bonta*, No. 19-251, 2021 WL 2690268, at *7 (U.S. July 1, 2021). The defendants do not expressly argue that the Act would survive strict scrutiny, although they do passingly suggest that it is "narrowly tailored" to serve a "compelling interest," which is effectively the same thing. (Doc. No. 21 at 17.) In any event, the defendants were wise not to put too many of their eggs in the "surviving strict scrutiny" basket, because there is simply no basis whatsoever for concluding that the Act is narrowly tailored to serve any compelling governmental purpose. Although at least one key supporter of the Act in the General Assembly justified its requirements in relation to supposed risks of sexual assault and rape, there is (1) no evidence, in either the legislative record or the record of this case, that there is any problem of individuals' abusing private bathroom policies intended to accommodate transgender and intersex individuals for that purpose and (2) no reason to think that, if such a problem existed, the mandated signs would address it. Indeed, the defendants do not even attempt to argue that such fears are well-founded, let alone compelling. *See Janus*, 138 S. Ct. at 2465 (holding that, even assuming a compelling purpose, the law at issue would fail judicial review because there was "no evidence that the pandemonium . . . imagined would result if [the law] were not allowed").

Even if one were to assume, more modestly, that there is a compelling interest in allowing patrons of a business to know its bathroom policies—which the court finds doubtful—then that purpose could still be served by simply requiring businesses to disclose that information when asked or to keep it filed away somewhere accessible. There would certainly be no need to dictate the precise language required for the notice, the precise size and location of the disclosure, or that the sign have a red-and-yellow, warning-sign color scheme, as if to say, "Look Out: Dangerous Gender Expressions Ahead." There is, in short, no plausible argument that this

law would come anywhere close to surviving strict scrutiny. If, therefore, the plaintiffs are able to demonstrate that strict scrutiny applies, they will also demonstrate a likelihood of success on the merits.

Unable to defend the Act under a strict scrutiny standard, the defendants argue that that standard should not apply based on, essentially, a single premise: that the signs required by the Act are merely value-neutral, helpful statements of fact and that the plaintiffs are "[s]training" to see some message they object to when none is actually there. (Doc. No. 21 at 12.) The defendants are right that, as the Supreme Court has held, strict scrutiny typically does not apply to laws compelling commercial actors to disclose "purely factual and uncontroversial information about the terms under which [their] services will be available." *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985). That is why, for example, the government can require truthful warning labels on dangerous products, *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 527 (6th Cir. 2012), or require businesses to disclose their fee structures to prevent hidden costs, *Zauderer*, 471 U.S. at 653. The plaintiffs, however, protest that the message required by the Act is neither truthful nor uncontroversial. In particular, the plaintiffs object to the compelled use of the contested term "BIOLOGICAL SEX" and the suggestion that individuals using the bathroom that corresponds to their gender identity are doing so "REGARDLESS OF THE DESIGNATION ON THE RESTROOM," when, in fact, the plaintiffs believe that such an individual would, if anything, actually be complying with the designation of the restroom, not ignoring it.

The Supreme Court has expressly recognized that "sexual orientation and gender identity" are, generally speaking, "controversial subjects." *Janus*, 138 S. Ct. at 2476. The plaintiffs have provided ample evidence that the signs mandated by the Act do, in fact, address

20

the issue of gender identity by making certain assumptions about the nature of biological sex and the standard social practices surrounding what it means to use a particular restroom "regardless" of its "designation." In order for the defendants to prevail on their argument that the mandated message is, nevertheless, merely factual and uncontroversial, then, they must offer some reason why, despite that evidence and despite the controversial nature of the subject matter implicated, the mandated statement itself is simply an innocent factual disclaimer. To do so, the defendants have primarily relied on adopting a tone of incredulity while pointing out that the language of the required message does not expressly include any overt statement about transgender individuals, intersex individuals, or gender identity.

There are at least two big, foundational problems with the defendants' argument. First is that the governing caselaw is clear that courts, when considering First Amendment challenges, are permitted to exercise ordinary common sense to evaluate the content of a message in context to consider its full meaning, rather than simply robotically reading the message's text for plausible deniability. For example, the Supreme Court has recognized that compelling a student to salute the flag, in context, sends a message about "nationalism" and "national unity" that "is likely to include what some disapprove or to omit what others think essential." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). There is nothing inherent in the act of a person's holding his body in a particular pose toward a particular patterned cloth that conveys such a message in any objective sense. But we all have an idea of what saluting the flag means. That meaning is rooted in a shared contextual understanding of the society and message at issue, and the court, like an ordinary person, can consider that context.

By way of further example, the Sixth Circuit has recognized, in the First Amendment context, that the phrase "Choose Life," at least when presented in some ways, "is highly

21

controversial," with "large numbers of participants in the public discourse" holding "an opposing view." *ACLU of Tenn. v. Bredesen*, 441 F.3d 370, 379 (6th Cir. 2006). That widely held opposing view, suffice it to say, is not that people should "choose death." The Sixth Circuit recognized that, despite the apparent positivity and harmlessness of the phrase "choose life," that message was, in context and against the existing cultural backdrop, really a statement about abortion. Of course it was. And of course the signs required by the Act are statements about the nature of sex and gender and the role of transgender individuals in society.[9] Justice is blind, but the court does not have to play dumb.

The second big, foundational problem with the defendants' argument is that, to state the obvious, the people on one side of a disagreement do not get to unilaterally declare their position to be uncontroversial, because that is not how the concept of "controversy" works. Put another way, the defendants might be wise to accept that, once you are in a heated argument with multiple folks about whether your position is uncontroversial, there is a good chance that you may have already lost. "The First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 790–91 (1988) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 224 (1987)). As such, the best way to determine whether a topic is a controversial matter of public concern is simply to observe whether members of the public and

---

[9] The defendants appear to have scoured the world (or at least searched some databases) for examples in which speakers have used the phrase "biological sex" in plausibly inoffensive ways. (Doc. No. 21 at 13–15.) None of these examples involves mandatory restroom warning signs or the suggestion that transgender individuals who use the restroom of their choice are doing so "REGARDLESS OF THE DESIGNATION ON THE RESTROOM." The defendants' argument, in this respect, highlights the degree to which the case for the Act's constitutionality hinges on a disregard of context unsupported by precedent and contrary to any reasonable understanding of how human beings communicate.

other relevant actors "disagree sharply about" it. *Janus*, 138 S. Ct. at 2475. To ignore such disagreement merely because it is constitutionally inconvenient "is to deny reality." *Id.*

Supporters of the Act may look at some of the plaintiffs' contentions—such as that there are not two objective "biological sexes" and that it is offensive to them to be forced to say otherwise—and react in disbelief. But that does not make the plaintiffs' earnestly held viewpoints go away, and, when the court performs its analysis of whether a message is controversial, the key question is whether the alleged societal disagreement exists, not who is right. On the current record, the only way to argue that the message mandated by the Act is uncontroversial is to argue that the plaintiffs are *simply lying* about both the social realities they have observed and their own disagreement with the required message.[10] But the court sees no evidence whatsoever that the plaintiffs have failed to tell the truth about that or anything else. To the contrary, the legislative history of the Act shows that it was devised, quite consciously and explicitly, as a direct response to social and political trends involving transgender people. It is only now, in the context of litigation, that officials of the State suggest otherwise.

The record, moreover, confirms that the plaintiffs are not simply inventing a controversy. The plaintiffs' account is supported by the Declaration of Dr. Foster, whose relevant expertise the defendants have not undermined in the slightest, as well as publications from credible sources echoing Dr. Foster's and the plaintiffs' position. It is hard to see how the plaintiffs could be "straining," when there are so many others pulling in the same direction. The only way to

---

[10] It is particularly baffling that the defendants accuse the plaintiffs of having "unfounded opinions." (Doc. No. 21 at 12.) This court has no idea what an "unfounded opinion" is in this context, but apparently the defendants mean to suggest that the First Amendment protection against compelled speech only recognizes the need to protect points of view that are "widely accepted." (*Id.*) The version of the First Amendment envisioned by the defendants—one reserved for "widely accepted" opinions—is certainly new to this court. *See Bonta*, 2021 WL 2690268, at *6 (noting that it is "especially important" for the First Amendment to "shield[] dissident[s] . . . from suppression by the majority"). In any event, however, the plaintiffs have, in fact, introduced a good deal of evidence that their positions are not idiosyncratic to them, and are, in fact, embraced by many individuals in Tennessee and elsewhere.

23

reach the defendants' position that, despite all this evidence, the message of the required signs is uncontroversial is to assume that positions contrary to the government's simply do not exist—or at least do not count. That kind of disregarding of one position to favor another is precisely what the First Amendment, in cases such as this, exists to prevent.

Finally, for the sake of efficiency, the court will also consider the possibility that the defendants may be correct about the governing standard here and that the Act is subject only to rational basis review. "Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government purpose. There is a strong presumption of constitutionality and the regulation will be upheld so long as its goal is permissible and the means by which it is designed to achieve that goal are rational." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 694 (6th Cir. 2014) (citing *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1050 (9th Cir. 2000)). The Supreme Court has made clear, however, that, "even in the ordinary . . . case calling for the most deferential of standards," a law may be struck down if its substance is "so discontinuous with the reasons offered for it" that any pretense of rationality cannot be sustained. *Romer v. Evans*, 517 U.S. 620, 632 (1996). That review includes considering whether, "in practical effect, the challenged [provision] simply does not operate so as rationally to further" the legitimate purpose professed. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973). The court may also consider whether the challenged policy is "either counterproductive or irrationally overinclusive." *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 653 (1974) (Powell, J., concurring in the result).

As the Supreme Court has recognized, applying rational basis review with at least some teeth is particularly appropriate when necessary to constrain the government from improperly singling out and punishing a "politically unpopular group" that, though vulnerable, has never

24

been recognized by the Supreme Court's jurisprudence as a suspect class. *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (citing *Moreno*, 413 U.S. at 534). Rational basis review has, for example, been used to invalidate laws unfairly and irrationally targeting the intellectually disabled, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985), people forced by poverty to live in group housing arrangements, *Moreno*, 413 U.S. at 537–38, and, perhaps most prominently in recent years, gays and lesbians, *Romer*, 517 U.S. at 635. The court sees little reason to doubt that a law affecting particularly transgender and intersex people would raise similar red flags, even under rational basis review.

The defendants argue that the Act is rationally related to Tennessee's "interest in ensuring that patrons are informed of the bathroom-use policy at businesses they frequent—especially when the bathroom-usage policy differs in practice from the existing bathroom signage used by business owners." (Doc. No. 21 at 17.) It may be true that rational basis review would support some kind of law furthering the interest of transparency in private bathroom policies. But the plaintiffs' challenge is not to a hypothetical law, but to *this* law. The Act contains provisions that do far more than further transparency and may, in fact, be deleterious to it. For example, mandating this precise formulation for the language of the sign, despite the fact that the language itself is, if anything, unnecessarily confusing, has no rational basis. Similarly, there is no rational basis for adopting a color scheme that any reasonable, contemporary American viewer will know to convey a sense of warning and alarm. Finally, there is certainly no rational, transparency-based reason to require disclosure signage by businesses that allow individuals to use restrooms based on their gender identity, but *not* requiring disclosure by businesses that require individuals to use the restroom corresponding to their gender assigned at birth or their genitals. A rational, content-neutral signage law would not use a business's

25

viewpoint on this issue to determine whether transparency and disclosure should be required. Accordingly, while the court holds that strict scrutiny applies in this case, it also holds that the plaintiffs would have at least a meaningful likelihood of success under a lesser standard of First Amendment review.

## B. Remaining Preliminary Injunction Factors

**1. Irreparable Injury to the Plaintiffs.** The caselaw of this circuit has long recognized that a violation of a person's constitutional rights is, in and of itself, an irreparable harm. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). In addition to that general rule, the Supreme Court has recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373–74 (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)). The court's conclusion that the Act very likely violates the plaintiffs' First Amendment rights therefore mandates a finding that the plaintiffs will suffer an irreparable harm if the Act is not enjoined from enforcement.

The irreparable harm posed by the Act, however, does not end with the abstract question of constitutionality. Restaurants and performing spaces are businesses, but that is not all they are; they are also among the most important physical locations in which communities—so often consigned, in this era, to electronic space—can gather and grow together in a manner rooted in a particular neighborhood, in a particular city, in a particular state. The plaintiffs have presented evidence that they have strived to be welcoming spaces for communities that include transgender individuals and that the signage required by the Act would disrupt the welcoming environments that they wish to provide. That harm would be real, and it is not a harm that could simply be remedied by some award at the end of litigation.

The defendants may think that the plaintiffs should not mind displaying the required signs, but that is not their call to make. For all the plenary power that state governments have in our constitutional system, they do not have the authority to tell the plaintiffs what to feel or to tell communities of private individuals what attitudes they should shun or embrace. Just as, for example, the government cannot simply unilaterally reject the professions of earnest religious faith raised by an individual bringing a challenge based on his religious liberty, *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 & n.28 (2014), so is the government bound to accept the plaintiffs' accounts of what they do not want to say, why they do not want to say it, and how important that preference is to them and the people with whom they associate. Because the plaintiffs' evidence shows that the Act would be an invasion on private communities' power to define themselves and their norms in accordance with their own consciences, the plaintiffs have more than carried their burden of showing that irreparable harm would occur absent an injunction.[11]

**2. Harm to the Defendants/Public Interest.** The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiffs point out that, as always, "the public interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363

---

[11] That harm, moreover, could not be avoided by issuing a narrowly crafted injunction applying, for example, only to enforcement of the Act against the plaintiffs themselves. If every other comparable business in the State of Tennessee that allows individuals to use the restroom of their choice is required to display a warning sign, but these businesses are not, the natural impression given to customers will be that these businesses require their patrons to use only the restroom that has been designated for them based on their sex assigned at birth. The only way to prevent the plaintiffs' being harmed by the Act, therefore, is to prevent the State from imposing a regime of forced signage altogether. The court finds no meaningful risk of significant harm from such an injunction, because the defendants have not identified any constitutionally permissible action that would be enjoined—and, of course, any business that wishes to post a sign about its restroom policies would remain free to do so.

27

F.3d 427, 436 (6th Cir. 2004). The defendants, however, appeal to another, frequently cited principle: that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers[12]) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). Those two rules seem, at least superficially, to be in tension. That apparent tension, however, is based on two closely related misunderstandings: first, that unconstitutional laws are nevertheless duly "enacted" as long as they receive enough legislators' votes (and, if required, the signature of a governor); and, second, that, when the State of Tennessee is constrained by the U.S. Constitution, those constraints have been foisted upon the state by some outside authority contrary to the state's sovereignty and its accountability to its people. But neither of those assumptions is true. No legislature can enact a law it lacks the power to enact, and the constraints on Tennessee's power that come along with the U.S. Constitution were voluntarily assumed by the State of Tennessee by virtue of its entry into the federal system.

"When a State enters the Union, it surrenders certain sovereign prerogatives." *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007). The State of Tennessee was admitted to the Union by Act of Congress in 1791—after the overwhelming victory of a referendum seeking statehood. 4 Cong. Ch. 47, June 1, 1796, 1 Stat. 491; Stanley J. Folmsbee et al., History of Tennessee 209 (1960) (detailing referendum vote of "6,504 in favor of statehood . . . and 2,562 against"; *see also* U.S. Const. art. IV, § 3, cl. 1 ("New States may be admitted by the Congress into this

---

[12] An "in chambers" opinion is an opinion written and issued by a single judge of a multi-judge court, pursuant to a court rule allowing a lone judge to address certain secondary matters without obtaining concurrence from the full court or a panel thereof. The Supreme Court allows a single justice, serving in his or her capacity as Circuit Justice, to deny requests for interim relief, such as stays, in chambers. *See* Daniel M. Gonen, *Judging in Chambers: The Powers of A Single Justice of the Supreme Court*, 76 U. Cin. L. Rev. 1159, 1173 (2008). In *Maryland v. King*, Chief Justice Roberts, writing in chambers, denied an application for a stay of judgment. 133 S.Ct. at 3.

Union . . . ."). There was, at the time, no doubt that, by accepting statehood, Tennessee was also affirmatively agreeing to abide by the U.S. Constitution. Indeed, Tennessee's own first Constitution, propounded the same year, asserted the territory's "right of admission into the General Government as a member State thereof, *consistent with the Constitution of the United States* and the act of Cession of the State of North Carolina." Tenn. Const. of 1796, prmbl. (emphasis added). The U.S. Constitution to which Tennessee assented specifically provided, as it still provides, that it would be the "supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Several decades after Tennessee first accepted that limitation, moreover, the state's political leadership reaffirmed the state's constitutional obligations by ratifying the Fourteenth Amendment and obtaining recognition, from Congress, of Tennessee's renewed commitment to the Union. 39 Res. No. 73, July 24, 1866, 14 Stat. 364.

When this court is faced with a seemingly unconstitutional Tennessee policy, then, the issue is not merely whether state or federal prerogatives should prevail; it is whether Tennessee's current government should be allowed to contravene the valid and binding foundational decisions of previous generations of state leaders—indeed, the very leaders who made the existence and continuation of a state called "Tennessee" possible. The choices of those earlier Tennessee leaders are no less worthy of constitutional solicitude than the choices Tennessee's General Assembly makes today. In this respect, enforcing the United States Constitution against a state government is a vindication, not a derogation, of the enduring importance of state autonomy. Because the court finds a high likelihood of success with regard to the plaintiffs' constitutional challenges, it finds a low likelihood that the injunctive relief would intrude on any

powers legitimately retained by the State of Tennessee. Ultimately, then, these factors weigh strongly in favor of granting the injunction.

**3. Balancing of Factors.** As the court has held, each of the factors guiding the decision to grant a preliminary injunction favors granting such an injunction here. The plaintiffs are likely to succeed on the merits; if they are not granted a preliminary injunction now, they will be harmed in a way that cannot be repaired; and requiring the State of Tennessee to abide by the U.S. Constitution, sooner rather than later, vindicates the public interest in rule by law and the acceptance, by States, of constitutional government. The court, therefore, has little difficulty concluding that the preliminary injunction should issue.

Some messages do not have to be compelled to be repeated; they surface, time and again, by dint of their persuasiveness and their importance. More than a dozen times, the Supreme Court, or a Justice of that Court writing separately, has repeated the classic declaration, originally set forth by the Court in *West Virginia State Board of Education v. Barnette*, that, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. at 642.[13] That rule is not founded simply on an abstract love of unfettered and uncompelled speech. The First Amendment holds its privileged place in our constitutional system because, "[w]henever the Federal Government or a State prevents individuals from saying what they think on important matters or

---

[13] *See Janus*, 138 S. Ct. at 2463; *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 220 (2013); *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 572 n.17 (1989) (Stevens, J., concurring); *Texas v. Johnson*, 491 U.S. 397, 415 (1989); *Wallace v. Jaffree*, 472 U.S. 38, 55 (1985); *Branti v. Finkel*, 445 U.S. 507, 514 n.9 (1980); *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 235 (1977); *Elrod*, 427 U.S. at 356; *Street v. New York*, 394 U.S. 576, 593 (1969); *Scales v. United States*, 367 U.S. 203, 268 (1961) (Douglas, J., dissenting); *Barenblatt v. United States*, 360 U.S. 109, 148 (1959) (Black, J., dissenting); *First Unitarian Church of Los Angeles v. Cnty. of Los Angeles*, 357 U.S. 545, 548 (1958) (Douglas, J., concurring); *Lerner v. Casey*, 357 U.S. 399, 413 (1958) (Douglas, J., dissenting); *Schware v. Bd. of Bar Exam. of State of N.M.*, 353 U.S. 232, 244 (1957).

compels them to voice ideas with which they disagree, it undermines" both "our democratic form of government" and the very "search for truth" necessary for a thriving society to persist. *Janus*, 138 S. Ct. at 2464. Because that principle retains its vitality today, and because the law at issue in this case is a brazen violation of it, the court will grant the plaintiffs' motion for a preliminary injunction.

## V. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Preliminary Injunction (Doc. No. 7) will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge