# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| BONGO PRODUCTIONS, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action |
| | ) | No. 3:21-cv-490 |
| | ) | Judge Trauger |
| CARTER LAWRENCE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

---

Pursuant to Fed. R. Civ. P. 56, Plaintiffs Bongo Productions, LLC, and Robert Bernstein respectfully submit the following memorandum of law in support of their Motion for Summary Judgement against Defendants Carter Lawrence, Christopher Bainbridge, Glenn R. Funk, and Neal Pinkston ("Defendants").

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................................... 3

LEGAL STANDARD................................................................................................................... 8

ARGUMENT ................................................................................................................................. 9

    I.    Plaintiffs Have Standing to Challenge the Act............................................................... 9

    II.    The Act Unconstitutionally Compels Plaintiffs to Speak a Controversial Message that they Oppose ....................................................................................................... 10

        A.    The message that Plaintiffs are compelled by the Act to speak is controversial and offensive to the Plaintiffs........................................................................... 11

        B.    The Act fails strict scrutiny review. ........................................................ 13

    III.    The Act Is Also Unconstitutional Under the Scrutiny Applied to Commercial Speech .......................................................................................................... 17

    IV.    The Act Cannot Survive Even Rational Basis Review ................................................. 19

CONCLUSION........................................................................................................................... 21

Case 3:21-cv-00490   Document 36   Filed 01/31/22   Page 2 of 27 PageID #: 279

TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................... 8, 19

*Berger v. City of Mayfield Heights*,
    154 F.3d 621 (6th Cir. 1998) ..................................................................................... 20

*Cleveland Bd. of Educ. v. LaFleur*,
    414 U.S. 632 (1974) ..................................................................................................... 20

*Discount Tobacco City & Lottery, Inc. v. United States*,
    674 F.3d 509 (6th Cir. 2012) ............................................................................... 12, 18

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
    920 F.3d 421 (6th Cir. 2019) ..................................................................................... 11

*Fieger v. Michigan Sup. Ct.*,
    553 F.3d 955 (6th Cir. 2009) ....................................................................................... 9

*Ibanez v. Florida Dep't of Bus. and Prof'l Regulation, Bd. of Accountancy*,
    512 U.S. 136 (1994) ..................................................................................................... 17

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    138 S. Ct. 2448 (2018) ................................................................................... 11, 13, 14, 16

*Laird v. Tatum*,
    408 U.S. 1 (1972) ..................................................................................................... 9, 10

*Mathews v. Lucas*,
    427 U.S. 495 (1976) ..................................................................................................... 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ....................................................................................................... 8

*MedImmune, Inc. v. Genetech, Inc.*,
    549 U.S. 118 (2007) ....................................................................................................... 9

*Moldowan v. City of Warren*,
    578 F.3d 351 (6th Cir. 2009) ......................................................................................... 8

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ..................................................................................... 11, 13, 18

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986) ......................................................................................................... 13

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..................................................................................................... 13

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ........................................................................................ 13

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ........................................................................................ 10

*Rodgers v. Banks*,
    344 F.3d 587 (6th Cir. 2003) ............................................................................ 8

*Romer v. Evans*,
    517 U.S. 620 (1996) .................................................................................. 19, 20

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) ....................................................................... 9, 10

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) ........................................................................................ 19

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ........................................................................................ 11

*Ward v. Polite*,
    667 F.3d 727 (6th Cir. 2012) .......................................................................... 11

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .................................................................................. 10, 11

*Zauderer v. Office of Disciplinary Counsel of the S. Ct. of Ohio*,
    471 U.S. 626 (1985) ...................................................................... 12, 17, 19

**STATUTES**

H.B. 1182/S.B.1224, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021) ...................... 7, 10, 11

H.B. 2, § 1.2(a)(1), 2015 Gen. Assemb., 2nd Extra Sess. (N.C. 2016) ........................... 3

Idaho Code Ann. § 33-6203(3) (West 2020) ................................................................ 3

S.B. 1367/H.B. 1233, § 3.4, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021) ............... 4

Tenn. Code Ann. § 40-35-111(e)(2) .......................................................................... 7

Tenn. Code Ann. § 68-120-120 .................................................................................. 1

W. Va. Code Ann. § 18-2-25d(b)(1) (West 2021) ........................................................ 3

**OTHER AUTHORITIES**

Erica L. Green, Katie Benner & Robert Pear, *'Transgender' Could Be Defined Out of Existence Under Trump Administration*, N.Y. Times (Oct. 21, 2018) ...................................... 4

Katrina Karkazis, *The Misuses of 'Biological Sex'*, 394 The Lancet 1898 (Nov. 23, 2019).. 12, 13

Open Letter from Over 2600 Scientists Opposing Proposed Legal Definition of Gender (Oct. 26, 2018) ......................................................................................................... 4

iii

Sarah Mervosh & Christine Hauser, *At Rallies and Online, Transgender People Say They #Won't Be Erased*, N.Y. Times (Oct. 22, 2018) ...................................................................................... 4

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................................ 8

iv

## PRELIMINARY STATEMENT

In April 2021, the state of Tennessee enacted a law to compel businesses to adopt the state's ideological message by posting signs that are controversial, confusing, and designed to incite fear and anti-transgender animosity. Tennessee Code Annotated § 68-120-120 (2021) ("the Act" or "H.B. 1182"). In support of the Act, the Tennessee General Assembly offered no evidence of any safety or security issues posed by transgender people using public restrooms that accord with the sex they live as every day in Tennessee and other states throughout the country. Despite this lack of evidence, the state of Tennessee now requires businesses and other entities with public restrooms to parrot the legislature's viewpoint on controversial issues regarding the nature of sex by displaying a state-mandated warning notice.

Plaintiffs are a Tennessee business and the founder and owner of that business, and operate a facility with an informal policy allowing transgender people to use the restrooms that accord with their identity. The Act not only forces businesses with such policies to post a warning sign, it commands that the sign use a format and language that is controversial, misleading and offensive to the Plaintiffs, their staff, and their customers. Specifically, this warning sign must appear with large red and yellow "NOTICE" text at the top, and boldface black block letters on a white background stating that "THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM." The Act compels Plaintiffs to engage in this unwanted controversial speech or risk six months' imprisonment and/or a fine of up to $500, as well as other enforcement actions or civil penalties under Title 68, Chapter 120 of the Tennessee Code.

1

In addition to requiring Plaintiffs to communicate the legislature's controversial viewpoint about sex, the Act creates confusion and presents fundamental problems of enforceability that the Defendants all but concede. Defendants, who are tasked with enforcing the Act, have no guidance or instruction to business owners for interpreting its language, even when such guidance might be sought in a good-faith effort to comply with the Act. It is impossible to determine whether any person is or is not transgender just by looking at them. Plaintiffs have no way to verify anyone's "biological sex," nor do they wish to undertake the type of invasion into their customers', employees' or clients' privacy that is inherent to such a task. In fact, any business or entity in Tennessee with public restrooms or other facilities that does not verify people's "biological sex" before they enter the restroom has an "informal policy" allowing transgender people to use the appropriate sex-designated restroom, and is therefore required to display this warning notice, or face criminal penalty. While businesses open to the public are subject to regulation, and may sometimes be required to post specific notices of purely factual and non-controversial content, this Act requires Plaintiffs and all other similarly situated businesses to communicate a hotly contested, controversial, and misleading message on issues of sex and transgender rights—and to characterize it as their own policy.

Days after the Act took effect, this Court granted Plaintiffs' motion for a preliminary injunction against Defendants' enforcement of the Act, writing that it represented a "brazen violation," of the principles at the core of the First Amendment's prohibition against government compelled speech. Mem. Op. at 31, ECF No. 22. The Court found that "the Act unambiguously mandates that the plaintiffs and other regulated parties speak a particular message, in public, that they have shown, with evidence, that they earnestly consider to be anathema to their beliefs and values." *Id.* at 18. Throughout discovery in this matter, the Defendants have failed to produce

any evidence to contradict or undermine that conclusion, or to otherwise demonstrate that "the message of the required signs is uncontroversial[.]" *Id.* at 24. Nor have the Defendants met the substantial burden of producing undisputed evidence that, "this law would come anywhere close to surviving strict scrutiny," as would be required in order for the Act to be upheld. *Id* at 19–20.

Moreover, nothing in the current record would contradict this Court's previous finding that the Act would not survive any level of review because there is no rational basis for "mandating this precise formulation for the language of the sign, despite the fact that the language itself is, if anything, unnecessarily confusing[.]" *Id.* at 25. This Court correctly held that "[a] rational, content-neutral signage law would not use a business's viewpoint on [the issue of allowing transgender people to use restrooms based on their gender identity] to determine whether transparency and disclosure should be required." *Id* at 25–26.

Plaintiffs now request that this Court grant their motion for summary judgment, and permanently enjoin enforcement of the Act.

## FACTUAL BACKGROUND

For nearly a decade, state legislatures across the country have attempted to restrict transgender people's ability to access single-sex spaces such as restrooms or youth sports through the passage of legislation, frequently using the phrase "biological sex." See, e.g., H.B. 2, § 1.2(a)(1), 2015 Gen. Assemb., 2nd Extra Sess. (N.C. 2016) (restricting access to multiple-occupancy restrooms based on "biological sex," defined as "[t]he physical condition of being male or female, which is stated on a person's birth certificate"); W. Va. Code Ann. § 18-2-25d(b)(1) (West 2021) (restricting participation in youth sports based on "biological sex" defined as "an individual's physical form as male or female based solely on the individual's reproductive biology and genetics at birth"); Idaho Code Ann. § 33-6203(3) (West 2020) (restricting

participation in school athletics programs based on "biological sex" to be "verified" by relying on "reproductive anatomy, genetic makeup, or normal endogenously produce testosterone levels," or a combination of those factors); Miss. Code Ann. § 11-62-3(c) (2016) (stating "biological sex" is "immutable" and "objectively determined by anatomy and genetics at time of birth"); and S.B. 1367/H.B. 1233, § 3.4, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021) (providing that "'sex' means a person's immutable biological sex as determined by anatomy and genetics at the time of birth," and that "[e]vidence of a person's biological sex includes, but is not limited to, a government issued document that accurately reflects a person's sex listed on the person's original birth certificate"). Similarly, former President Trump led federal efforts to rescind regulatory protections for transgender people that were framed in terms of exclusions based on "biological sex," which were promptly met with nation-wide resistance and protest.[1] Among those in stern opposition to these efforts were over 2,600 scientists who wrote an open letter to the administration asserting:

> The proposal is in no way 'grounded in science' as the administration claims. The relationship between sex chromosomes, genitalia, and gender identity is complex, and not fully understood. There are no genetic tests that can unambiguously determine gender, or even sex. Furthermore, even if such tests existed, it would be unconscionable to use the pretext of science to enact policies that overrule the lived experience of people's own gender identities.[2]

---

[1] Erica L. Green, Katie Benner & Robert Pear, *'Transgender' Could Be Defined Out of Existence Under Trump Administration*, N.Y. Times (Oct. 21, 2018), https://www.nytimes.com/2018/10/21/us/politics/transgender-trump-administration-sex-definition.html, Picasso Decl. Ex. 12; Sarah Mervosh & Christine Hauser, *At Rallies and Online, Transgender People Say They #Won't Be Erased*, N.Y. Times (Oct. 22, 2018), https://www.nytimes.com/2018/10/22/us/transgender-reaction-rally.html, Picasso Decl. Ex. 14.

[2] Open Letter from Over 2600 Scientists Opposing Proposed Legal Definition of Gender (Oct. 26, 2018), https://not-binary.org/press/, Picasso Decl. Ex. 15.

4

Seizing on this momentum, Representative Tim Rudd sponsored the introduction of H.B. 1182, the bill that would become the Act, stating that the bill was necessary to "protect[] women and children against" people who could "tak[e] advantage of policies, executive orders, or legislation[] that [] allow the 'opposite biological sex' to enter a [multi-occupancy] restroom, shower, or locker room." Picasso Decl. ¶ 20. He explained, with "new [laws] . . . giving transgenders [sic] [more] rights . . . I don't want women . . . or children calling me next year [about] how they have been raped or molested [while using the bathroom facility]." *Id.* at ¶ 21. In another more veiled reference to the alleged threat posed by transgender people's use of restrooms in accord with their gender identity, Representative Rudd stated in a subsequent debate of H.B. 1182 that "a woman has the right to know whether a man is going to be in her bathroom and vice versa for a man." *Id.* at ¶ 22. Representative Rudd went on to make several more dog whistle references to and unfounded claims about the danger of permitting transgender people to use the restroom consistent with their gender identity, all of which culminated in the Act at issue in this matter. *Id.* at ¶ 25. Plaintiff Robert M. Bernstein is the founder and chief manager of Plaintiff Bongo Productions, LLC ("Bongo"), which owns several restaurants, coffee shops, and a coffee roasting company all located in Nashville, Tennessee. Bernstein Decl. ¶¶ 1–2, ECF No. 7-1. Mr. Bernstein opened Fido, one of the Bongo businesses, in 1996. Fido is a restaurant located in the Hillsboro Village neighborhood of Nashville. Fido has twenty-five employees currently on staff and has employed hundreds of people over the years. *Id.* at ¶¶ 3–5.

Bongo and Mr. Bernstein have worked over the years to create a welcoming environment in their businesses for the LGBTQ community. Bongo has employed transgender individuals in the past, and its patrons include members of the transgender community. *Id.* at ¶¶ 6–7. In reaction to the rash of anti-transgender laws that passed this year and to show their support for

transgender people, Fido's staff decorated one of their drink menu blackboards with transgender and LGBTQ pride flag colors. *Id.* at ¶ 8.

Fido has three restrooms. One is a single-user unisex restroom, which is not subject to the Act. *Id.* at ¶ 9. The other two restrooms have multiple stalls and/or urinals and bear sex designations. *Id.* Prior to the passage of the Act, Fido's management and Mr. Bernstein had never thought about a formal policy as to who could use which restroom. *Id.* at ¶ 11. Their informal policy was to allow people to use the sex-designated restroom that aligned with their gender identity. *Id.* Mr. Bernstein has never received any complaints or concerns about their restroom policy. *Id.* at ¶12.

Robert Bernstein, Bongo, and Bongo's staff are supportive of the LGBTQ community and have transgender patrons. They are concerned that the warning notice mandated by the Act is offensive and will alienate or offend their customers and employees. *Id.* at ¶ 14. The Act will also mischaracterize their policy by suggesting they do not have sex-designated restrooms despite the designation on the restrooms. *Id.* at ¶¶ 10–11, 15. Plaintiffs are subject to the Act because Fido is open to the public, and has multi-use, sex-designated restrooms. *Id.* at ¶¶ 4, 9. Plaintiffs' informal restroom policy has been to allow people to use the sex-designated restroom that best matches their gender identity. *Id.* at ¶ 11. The legislative history of the Act confirms that it was intended to and does in fact apply to businesses that allow transgender people to use the bathroom that corresponds to their gender identity, regardless of their sex assigned at birth, and commands such business to post the government's message. Picasso Decl. ¶¶ 20–25. In fact, Defendants' 30(b)(6) witness testified that an entity that permits transgender people to use the restroom that aligns with their gender identity but refused to post the sign mandated by the Act would be in violation of the Act. Ferguson Dep. at 60:9–65:8, Picasso Decl. Ex. 8.

6

Defendants are jointly authorized to enforce the provisions of the Tennessee Building Code, which includes the Act. Defs.' Resp. to Pls.' Interrogs. at 6–7, Picasso Decl. Ex. 9; Ferguson Dep. at 14:9–23, 17:14–18:2, 19:10–14. This authority permits Defendants to inspect buildings that are open to the public to ensure compliance with the Tennessee Building Code, and, if a building is found to be in violation of the Act, the State Fire Marshall Office will issue a notice to the business owner, informing them of the violation and directing them to come into compliance with the Act by posting the mandated sign within 30 days. H.B. 1182/S.B.1224, § 1(c), 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021), Picasso Decl. Ex. 1; Ferguson Dep. at 21:2–25, 24:24–27:3, 30:12–24, 51:8–23.

Failure to post the required signage within the thirty-day period is classified as a Class B misdemeanor, which is punishable by six (6) months in prison and fines of up to $500.00. Defs.' Resp. to Pls.' Interrogs. at 6–7, 13; Tenn. Code Ann. § 40-35-111(e)(2). If a business owner asserts that the phrase "biological sex" as it appears in the Act lacks a clear meaning, that business would be treated as refusing to comply with the Act and the State Fire Marshall Office would refer the business owner to the local District Attorney for further enforcement. Ferguson Dep. at 95:7–99:5. Moreover, it is a crime to submit false information to a state agency, and the State Fire Marshall Office is authorized to verify whether a business owner falsely asserts that he does not have a policy that would require him to post the sign mandated by the Act. *Id.* at 55:17–56:13.

While Tennessee law contemplates and permits the existence of exempt jurisdictions, which are those in which the local governmental body are authorized to enforce the provisions of the code, this authority is shared with the State Fire Marshall Office, which holds the ultimate power to resolve any conflicts that may arise in the exercise of this concurrent enforcement

7

authority. *Id.* at 21:15–25. When an exempt jurisdiction refuses or otherwise fails to enforce the provisions of the Tennessee Building Code, the State Fire Marshall Office is authorized to notify the exempt jurisdiction of the failure and to take further enforcement action if the local authority persists in its failure to enforce.  *Id.* at 23:5–24:7. Moreover, Defendants cannot identify any statute that would prohibit the State Fire Marshall Office from enforcing the Act in an exempt jurisdiction in which the local authority is refusing or otherwise failing to enforce the Act. *Id.* at 82:22–84:16.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of "identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (internal citation omitted).

In evaluating evidence, the Court must draw all inferences in the light most favorable to the non-moving party. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient"; the non-moving party's proof must be more than "merely colorable." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Rather, an issue of fact is "genuine" only if, taking the record on the whole, a reasonable trier of fact could find for the non-moving party. *Moldowan*, 578 F.3d at 374; *Matsushita*, 475 U.S. at 587.

# ARGUMENT

## I.    Plaintiffs Have Standing to Challenge the Act

This Court has already found that Plaintiffs' claims, "fall well within the ordinary, well-established boundaries of pre-enforcement standing in the First Amendment context." Mem. Op. at 14, ECF No. 22. When the First Amendment is implicated, a standing "analysis must begin with the recognition that, where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128–29 (2007) (emphasis in original); *see also Fieger v. Michigan Sup. Ct.*, 553 F.3d 955 (6th Cir. 2009) (amended panel opinion). As the Sixth Circuit has explained, "[g]overnmental activity constitutes an injury-in-fact when 'the challenged exercise of governmental power [is] regulatory, proscriptive, or compulsory in nature, and the complainant [is] either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging.'" *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764–65 (6th Cir. 2019) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). While "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *Laird*, 408 U.S. at 13–14, Plaintiffs have shown that the harm created by the Act is an objective mandate to post an offensive and alarming warning sign.

Plaintiffs maintain an informal policy of permitting transgender people to use the restroom that aligns with their gender identity, Bernstein Decl. ¶¶ 10–11, ECF No. 7-1, and Defendants' representative testified that an entity that permits transgender people to use the restroom that aligns with their gender identity but refused to post the sign mandated by the Act would be in violation of the Act. Ferguson Dep. at 60:9–65:8. Plaintiffs assert that the phrase "biological sex" as it appears in the Act lacks a clear meaning, which Defendants' representative

9

testified can be treated as a refusal to comply with the Act and would be referred to the local District Attorney for further enforcement. *Id.* at 95:7–99:5. Plaintiffs assert that permitting transgender people to use the restroom that aligns with their gender identity is not the same as "ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM[,]" H.B. 1182 § 1(b)(3), but taking such a position in the course of an investigation by the State Fire Marshalls Office could subject the Plaintiffs to criminal liability for submitting false information to a state agency. Ferguson Dep. At 55:17–56:13. Plaintiffs have therefore demonstrated that the Act, "is regulatory, proscriptive, or compulsory in nature," and that they are, "prospectively subject to [its]regulations, proscriptions, or compulsions.'" *Speech First, Inc.*, 939 F.3d at 764–65 (quoting *Laird*, 408 U.S. at 11). Plaintiffs have satisfied the Article III demand that they show an injury-in-fact.

## II.     The Act Unconstitutionally Compels Plaintiffs to Speak a Controversial Message that They Oppose

The First Amendment prohibits the government from compelling private entities "to participate in the dissemination of an ideological message by displaying it on [their] private property in a manner and for the express purpose that it be observed and ready by the public." *Wooley v. Maynard*, 430 U.S. 705, 713–14 (1977). The individual's right to freedom of speech enshrined in the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Id.* at 714. The federal constitution and courts presume "that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 791 (1988). For this reason, laws that both require an individual to speak and mandate the content of his speech are presumptively unconstitutional content-based regulations of speech that must be struck down unless "the government proves that [the law is] narrowly tailored to serve compelling state interests." *EMW Women's Surgical Ctr.*,

10

*P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (quoting *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) [hereinafter *NIFLA*]). As this Court previously observed "[p]articularly repugnant to the First Amendment is when the government forces a private party to voice the government's compelled message, not merely in private or in direct dealings with government itself, but 'in public,' as an involuntary 'instrument for fostering public adherence to an ideological point of view.'" Mem. Op. at 18, ECF No. 22 (quoting *Wooley*, 430 U.S. at 715).

The Act forces Plaintiffs to voice the government's compelled message "in public" because it expressly provides that "[s]ignage of the notice must be posted in a manner that is easily visible to a person entering the public restroom," before proceeding to dictate the exact size, form, language, coloring and placement of the required "warning." H.B. 1182 § 1(b).

### A. The message that Plaintiffs are compelled by the Act to speak is controversial and offensive to the Plaintiffs.

State laws that coerce individuals into "betraying their convictions" by compelling them to speak a message that they find offensive and with which they vehemently disagree are particularly damaging and odious to the constitution. *See, Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). The Sixth Circuit has held that "the most aggressive form of viewpoint discrimination [is] compelling an individual 'to utter what is not in [her] mind' and indeed what she might find deeply offensive." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943) (second alteration in original)).

The Act compels Plaintiffs to speak a message to the public that they have demonstrated is offensive to them, and with which they strongly disagree. Plaintiffs pride themselves in being strong supporters of transgender people, and greatly value the patronage and support of

11

transgender people who have been among Plaintiffs' customers, friends, family and employees. Bernstein Decl. ¶¶ 6–8, ECF No. 7-1. Plaintiffs take offense to the Act's use of the term "biological sex," which is a highly controversial term regularly used by those who oppose and seek to restrict and eliminate the legal recognition and protection of transgender people. *Id.* at ¶¶ 14–16; *see also* Katrina Karkazis, *The Misuses of 'Biological Sex'*, 394 The Lancet 1898, 1898–99 (Nov. 23, 2019), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(19)32764-3/fulltext, Picasso Decl. Ex. 7. The Act's legislative history corroborates Plaintiffs' assertion that the Act was intended to promulgate an anti-transgender message.

While states may compel commercial speech that is limited to "purely factual and uncontroversial information about the terms under which [] services will be available[,]" *Zauderer v. Office of Disciplinary Counsel of the S. Ct. of Ohio*, 471 U.S. 626, 651 (1985), this exception to the First Amendment's general prohibition on compelled speech only applies where businesses are required to disclose "factual information," not "in dispute within the scientific or medical community[.]" *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 526 (6th Cir. 2012). States are not permitted to force individuals to disseminate a message that aims to "simply frighten consumers or to otherwise attempt to flagrantly manipulate the emotions of consumers." *Id.* at 529.

Plaintiffs have submitted undisputed evidence, including expert testimony, that the phrase "biological sex" is a relatively recent one without a fixed or uniform definition, and thus far from the type of "factual information" not "in dispute in the medical and scientific community" that the Sixth Circuit recognized might be subject to a standard of review less demanding than strict scrutiny. To the contrary, Plaintiffs have demonstrated that its uses within the fields of science and medicine reflect differing and inconsistent interpretations. Taylor Expert Report ¶¶ 15–16,

Picasso Decl. Ex. 3; Karkazis, Ex.7, *supra*, at 1898–99. Here, as this Court has already

recognized, the Act's reference to "biological sex" does, "in fact, address the issue of gender

identity[,]" Mem. Op. at 20–21, ECF No. 22, and it was, "devised, quite consciously and

explicitly, as a direct response to social and political trends involving transgender people." *Id.* at

23.

### B.  The Act fails strict scrutiny review.

Where the government compels private actors to display an ideological message with

which they disagree, strict scrutiny applies. *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,

475 U.S. 1, 18 (1986). A statute that compels private entities "to speak a particular message" is

considered a content-based regulation of speech. *NIFLA,* 138 S. Ct. at 2371.  Content-based

restrictions are "presumptively unconstitutional and may be justified only if the government

proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of

Gilbert*, 576 U.S. 155, 163 (2015). Courts apply this exacting standard because, a State that

compels an individual to voice ideas with which he disagrees undermines the very essence of our

democratic system of government. *Janus*, 138 S. Ct. at 2464 (2018). Under the strict scrutiny

analysis, the Defendants bear the burden of proof to establish  that the state's Act serves a

compelling interest and that the Act is narrowly tailored to serve that interest. *See Republican

Party of Minn. v. White*, 536 U.S. 765, 774–75 (2002) (holding that once a challenger has shown

that a state law infringes on the First Amendment freedom of speech, the government bears the

burden to prove that the law serves a compelling interest and is narrowly tailored to further that

interest).

Defendants have failed to show that the Act serves a compelling interest or that it is

narrowly tailored to serving that interest. Defendants first suggest that the Act serves the interest

of "ensuring that patrons are informed of the bathroom-use policy at businesses they frequent—especially when the bathroom-usage policy differs in practice from the existing bathroom signage used by business owners." Defs.' Resp. to Pls.' Interrogs. at 6. Defendants further assert that the Act is intended to serve a "notice interest," that is, the Act "provid[es] people who may be using facilities where there is a reasonable expectation of privacy what they may encounter." Ferguson Dep. at 37:20–38:3. Even if the Court were to find that the state has a compelling interest in ensuring that patrons are informed about an establishment's restroom -usage policy, though it is difficult to see why it must suddenly do so, the Defendants fail to provide any evidence to support their proposition that allowing transgender people to use the restroom that aligns with their gender identity "does not provide the same level of privacy and comfort that a patron could expect in a facility separated based on biological sex." Defs.' Resp. to Pls.' Interrogs. at 6 (internal quotes omitted).

Defendants have also failed to offer any evidence that permitting transgender people to use the restroom that aligns with their gender identity creates any safety risks, as Representative Rudd suggested when he sponsored HB. 1182, which would eventually become the Act.[3] To the contrary, Defendants acknowledge they have never received a complaint relating to a transgender person using a restroom at a business open to the public. Ferguson Dep. at 71:1–6. Plaintiffs, who have long permitted transgender people to use the restroom that aligns with their gender identity, have similarly never received a complaint from the public or staff about this policy. Bernstein Decl. ¶ 12, ECF No. 7-1.  Simply put, a state cannot have a compelling interest to address a problem that does not exist. *See Janus*, 138 S. Ct. at 2465 (holding that, even

---

[3] Picasso Decl. ¶¶ 20–25.

assuming a compelling purpose, the law at issue would fail judicial review because there was "no evidence that the pandemonium . . . imagined would result if [the law] were not allowed").

Even accepting that the State has a general compelling interest in providing notice about legitimate risks, the Act is not narrowly tailored to advance that interest. To the contrary, the Act is confusing, misleading and presented in a manner to incite fear without cause. The Act's mandated use of "BIOLOGICAL SEX" is confusing and fails to give the reader the information that would permit them to make the informed decision that Defendants claim the Act is meant to ensure. *See* discussion *supra* Section I.A. ("BIOLOGICAL SEX" is a disputed term and subject to differing definitions). As such, the Act is not narrowly constructed so as to serve any interest in giving the public notice so as to make an informed decision about whether or not to use a building's restroom, because the notice sign required by the Act is so confusing that even Defendants are unable to provide a clear definition of its mandated terms.

Any assertion that the Act is narrowly tailored is similarly undermined by the fact that its mandated message is misleading. Plaintiff Bongo Productions' Fido location has two restrooms that have multiple stalls and/or urinals and bear the sex-designations of "Gentlemen" and "Women." Bernstein Decl. ¶ 9, ECF No. 7-1; Bernstein Dep. at 25:13–26:2, Picasso Decl. Ex. 2. Plaintiffs informal policy has been to allow people to use the sex-designated restroom that they feel comfortable using and that best matches their gender identity. Bernstein Decl. ¶ 11, ECF No. 7-1. Posting a notice that says "THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM" suggests Plaintiff's multi-stall restrooms are unisex or gender neutral, which is not true. Pls.' Resp. to Defs.' Interrogs. at 11–12, Picasso Decl. Ex. 10. It is also inaccurate and misleading to equate allowing transgender people to use the restroom

15

that matches their gender identity with allowing anyone to use the restroom or having all gender restrooms. Taylor Dep. at 98:25–99:10, Picasso Decl. Ex. 19. Moreover, the phrase "EITHER BIOLOGICAL SEX" is misleading as it necessarily and incorrectly implies that only two sexes exist on a rigid binary of either male or female, and that the many biologically-rooted characteristics that compromise a person's sex will all align consistently as either male or female. Pls.' Resp. to Defs.' Interrogs. at 11; Taylor Expert Report ¶ 15; Ferguson Dep. at 41:20–42:14.

The Act further fails the narrowly tailored test because its mandated sign is so inflammatory that it seems designed to create panic despite any evidence that an actual risk to restroom users exists. At the preliminary injunction stage of this suit, this Court found "no evidence, in either the legislative record or the record of this case, that there is any problem of individuals' abusing private bathroom policies intended to accommodate transgender and intersex individuals for that purpose[.]" Mem. Op. at 19, ECF No. 22. Not only have the Defendants failed to produce any evidence of an actual problem arising from transgender people using the restroom consistent with their gender identity, Defendants' representative testified that they have never received a complaint relating to a transgender person using a restroom at a business open to the public. Ferguson Dep. at 71:1–6. The absence of evidence substantiating the state's alleged interest is reason enough to find that the Act fails to survive strict scrutiny. Mem. Op. at 19, ECF No. 22 (citing *Janus*, 138 S. Ct. at 2465). However, Defendants have also failed to produce any evidence to show why the state's purported interest in notifying patrons about a business' bathroom policies cannot be served by some less constitutionally offensive means than dictating the specific language, size, placement and color of the sign, as this Act does. *Id.*

(equating the Act's mandatory sign to a required disclosure of "Look Out: Dangerous Gender Expressions Ahead").

In sum, the Act compels Plaintiffs to speak a message to the public that they have shown is offensive, misleading, and confusing, clearly implicating the protections afforded to them by the First Amendment. Defendants have failed to provide any evidence of an actual public risk inherent to the use of public restrooms by transgender people that would sufficiently justify a law that so offends the First Amendment. Defendants have similarly failed to show that this Act is narrowly tailored to further the state's interest, an impossible task in light of the overwhelming evidence that the Act's construction is more confusing and alarmist than it is informative or instructive. The First Amendment prohibits states from forcing people to speak precisely because, as this Act illuminates, the speaker, rather than the government, knows best what he means to say.

## III. The Act Is Also Unconstitutional Under the Scrutiny Applied to Commercial Speech

While in some instances a lower level of review applies to commercial speech, the First Amendment protects "[c]ommercial speech that is not false, deceptive, or misleading[,]" unless the "State shows that the restriction directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest." *Ibanez v. Florida Dep't of Bus. and Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 142 (1994). The State bears the burden of "distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful[,]" and must satisfy this burden by going beyond "mere speculation or conjecture[,]" and "demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Id.* at 143 (citations omitted). Although the Supreme Court has recognized that the First Amendment distinguishes between outright prohibitions on

17

commercial speech and compelled commercial speech, this distinction only arises where the speech that the state is compelling involves "purely factual and uncontroversial information." *Zauderer*, 471 U.S. at 651.

As Plaintiffs have shown, however, the message required by the Act is neither "purely factual" nor "uncontroversial." *See* discussion *supra* Section I.A. Accordingly, the Act is not entitled to the lower standard of review articulated in *Zauderer. See NIFLA*, 138 S. Ct. at 2371 (*Zauderer* standard applies only to compelled disclosures of non-controversial information). Applying this standard of scrutiny, the Sixth Circuit upheld a federal regulation requiring manufacturers and sellers of tobacco to label their products and advertisements with factual statements about the health risks of tobacco consumption. *See Discount Tobacco City & Lottery, Inc.*, 674 F.3d at 527. Unlike here, "there [wa]s no indication that the textual element of the new [tobacco] warning labels, when viewed in isolation, express[ed] either completely 'subjective' or 'highly controversial' messages." *Id* at 525–6. Rather, the compelled warnings conveyed well-established information about the undisputed health risks of consuming tobacco. *Id*. at 558 (Stranch, J., concurring).

In contrast, as this Court has already recognized, the Act's compelled "warning" is controversial because it addresses "the issue of gender identity by making certain assumptions about the nature of biological sex and the standard social practices surrounding what it means to use a particular restroom 'regardless' of its 'designation.'" Mem Op. at 21. As stated above, Plaintiffs understand the phrase "biological sex" to be frequently used by those who seek to limit or eliminate the legal recognition, protection and rights of transgender people. Pls.' Resp. to Defs.' Interrogs. at 8. Plaintiffs understand the phrase to be used in the Act to single out transgender people suggesting a distinction between gender identity and so-called "biological

sex." *Id.* Used in contexts like the Act, Plaintiffs understand the phrase "biological sex" to be

stigmatizing to transgender people. *Id.* As the Court stated in its Memorandum Opinion:

> [T]he governing caselaw is clear that courts, when considering First Amendment
> challenges, are permitted to exercise ordinary common sense to evaluate the
> content of a message in context to consider its full meaning, rather than simply
> robotically reading the message's text for plausible deniability.

Mem. Op. at 21, ECF No. 22.

Exercising such ordinary common sense in interpreting the Act's compelled message, the

Court concluded: "[O]f course the signs required by the Act are statements about the nature of

sex and gender and the role of transgender individuals in society." *Id.* at 22. That the Act was

intended to exclude transgender people from public restrooms is further evidenced by its

legislative history.[4] *See id.* at 23 ("[T]the legislative history of the Act shows that it was devised,

quite consciously and explicitly, as a direct response to social and political trends involving

transgender people.").

In addition to being controversial, the Act's mandated message is confusing and

misleading, *see* discussion *supra* II.B, and thus far from the "purely factual" information

discussed by the Court in *Zauderer*. 471 U.S. at 651. Because the Act's mandated warning sign

is neither "uncontroversial" nor "purely factual,." it does not fall within the scope of the factual

disclaimer that the Court in *Zauderer* held to a less exacting standard of review. Pls.' Resp. to

Defs.' Interrogs. at 11–12.

## IV.    The Act Cannot Survive Even Rational Basis Review

Even under the most deferential standard of review, "a law may be struck down if its

substance is 'so discontinuous with the reasons offered for it' that any pretense of rationality

cannot be sustained." Mem. Op. at 24, ECF No. 22 (quoting *Romer v. Evans*, 517 U.S. 620, 632

---

[4] e.g., Picasso Decl. ¶¶ 20–21.

(1996)). The court may consider whether the law does in fact, "operate so as rationally to further [the legitimate purpose professed,]" *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973), or is instead "counterproductive or irrationally overinclusive." *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 653 (1974) (Powell, J., concurring in the result). Rational basis review, while highly deferential, is not "toothless," *Berger v. City of Mayfield Heights*, 154 F.3d 621, 625 (6th Cir. 1998) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)), particularly where the proposed law is "born of animosity toward the class of persons affected." *Romer*, 517 U.S. at 634.

The State claims an interest in "ensuring that patrons are informed of the bathroom-use policy at businesses they frequent." Resp. in Opp'n to Mot. for Prelim. Inj. at 17, ECF No. 21. However, as stated above, the Act may in fact mislead patrons as to an entity's bathroom policy because the required sign suggests that anyone can use any sex-designated bathroom or that sex-designated bathrooms are actually unisex despite their signage. Moreover, the Act only requires disclosure of certain bathroom policies: those with which the State disagrees. An entity that *does* have a policy of prohibiting transgender people from using the restroom that matches their gender identity does not have to disclose their bathroom policies to their patrons. As the Court explains, requiring only certain entities to disclose their restroom-use policy bears no rational relationship to a governmental interest in transparency surrounding restroom-use policies. Mem. Op. at 25, ECF No. 22. Likewise, "there is no rational basis for adopting a color scheme that any reasonable, contemporary American viewer will know to convey a sense of warning and alarm." *Id.* Thus, the Act does not survive even rational basis review.

20

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant its motion for summary judgment.

Dated: January 31, 2022

Respectfully submitted,

*/s/ Stella Yarbrough*
Stella Yarbrough (No. 33637)
Thomas H. Castelli (No. 24849)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org
syarbrough@aclu-tn.org

Rose Saxe*
Emerson Sykes*
Malita Picasso*
American Civil Liberties
Union Foundation
125 Broad Street, 17th Floor
New York, NY 10004
Tel: (212) 549-2500
rsaxe@aclu.org
esykes@aclu.org
mpicasso@aclu.org

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2022, a true and correct copy of the foregoing report was served on the Tennessee Attorney General's Office, counsel for all Defendants, via the Court's ECF/CM system.

    Alexander S. Rieger
    Rainey A. Lankford
    Office of the Attorney General and Reporter
    P.O. Box 20207
    Nashville, Tennessee 37202-0207
    Alex.rieger@ag.tn.gov
    Rainey.lankford@ag.tn.gov

                                        */s/ Stella Yarbrough*
                                        Stella Yarbrough