# Exhibit 8

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF TENNESSEE
                  NASHVILLE DIVISION


BONGO PRODUCTIONS, LLC, ROBERT        )
BERNSTEIN, SANCTUARY PERFORMING       )
ARTS LLC, and KYE SAYERS,             )
                                      )
        Plaintiffs,                   )
                                      ) NO. 3:32-cv-00490
VS.                                   )
                                      ) JUDGE TRAUGER
CARTER LAWRENCE, Tennessee State      )
Fire Marshal, in his official         )
capacity, CHRISTOPHER BAINBRIDGE,     )
Director of Codes Enforcement, in     )
his official capacity, GLENN R.       )
FUNK, District Attorney General for   )
the 20th Judicial District, in his    )
official capacity, and NEAL           )
PINKSTON, District Attorney General   )
for 11th Judicial District, in his    )
official capacity,                    )
                                      )
        Defendants.                   )
```

---

WEB CONFERENCE/REMOTE DEPOSITION OF

**OFFICE OF THE TENNESSEE FIRE MARSHAL AND**
**OFFICES OF THE DISTRICT ATTORNEYS GENERAL**
**By and Through: Joyce Leigh Ferguson**

December 20, 2021



LYNETTE L. MUELLER, LCR, RDR, CRR, FAPR
LCR No. 351

**OMEGA REPORTING**
OmegaReporting.com   901.827.8671

1    The web conference/remote deposition of

2  OFFICE OF THE TENNESSEE FIRE MARSHAL AND OFFICES OF THE

3  DISTRICT ATTORNEYS GENERAL, By and Through: Joyce Leigh

4  Ferguson, is taken on December 20, 2021, on behalf of

5  the Plaintiffs, pursuant to notice and consent of

6  counsel, beginning at approximately 10:11 a.m.

7    This web conference/remote deposition is

8  taken pursuant to the terms and provisions of the

9  Federal Rules of Civil Procedure.

10    The right to read and sign was requested.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2       **ALL PARTIES APPEARING VIA ZOOM WEB CONFERENCE**

 3
     FOR THE PLAINTIFFS:
 4
             MALITA PICASSO, ESQ.
 5           American Civil Liberties Union Foundation
             125 Broad Street
 6           18th Floor
             New York, NY 10004
 7           (212) 549-2633

 8           and

 9           THOMAS H. CASTELLI, ESQ.
             American Civil Liberties Union
10           Foundation of Tennessee
             P.O. Box 120160
11           Nashville, TN 37212
             (615) 320-7142
12
     FOR THE DEFENDANTS:
13
             ALEXANDER S. RIEGER | SENIOR ASSISTANT
14           ATTORNEY GENERAL
             Public Interest Division, Office of the
15           Tennessee Attorney General
             War Memorial Building
16           301 Sixth Avenue North
             Nashville, TN 37202
17           (615) 741-2408

18   COURT REPORTER:

19           Lynette L. Mueller, LCR, RDR, CRR, FAPR,
             MS-CSR, AR-CCR
20           Tennessee LCR No. 351
             Mississippi CSR No. 1794
21           Arkansas CCR No. 788
             Omega Reporting
22           6465 North Quail Hollow Road
             Suite 200
23           Memphis, TN 38120
             901.827.8671
24           Lynette@OmegaReporting.com

25
```

1                         I N D E X

2     **JOYCE LEIGH FERGUSON:**                          <u>PAGE</u>

3     Examination by Ms. Picasso                          5

4

5

6

7                       E X H I B I T S

8     <u>NO.</u>                  DESCRIPTION              <u>PAGE</u>

9     Exhibit 1      Plaintiffs' Notice of Rule          8
                     30(b)(6) Deposition
10
      Exhibit 2      Public Chapter 453, House Bill      34
11                   No. 1182

12    Exhibit 3      Responses to Plaintiffs' First      74
                     Set of Interrogatories and
13                   Requests for Production of
                     Defendants
14
      Exhibit 4      Commerce and Insurance Final        107
15                   Submission for HB1182/SB1224

16

17

18

19
      Court Reporter's Certificate                       114
20

21

22

23

24

25

1    **OFFICE OF THE TENNESSEE FIRE MARSHAL AND**

2    **OFFICES OF THE DISTRICT ATTORNEYS GENERAL**

3    **By and Through: Joyce Leigh Ferguson,**

4    having been first duly sworn, was examined and

5    testified as follows:

6    **EXAMINATION**

7    **BY MS. PICASSO:**

8    Q.       Good morning, Ms. Ferguson.  Thank you so much

9    for taking the time to speak with us today.

10           So can I just start by asking you to state

11   your full name and spell it, if you wouldn't mind, just

12   to have it on the record.  Thanks.

13   A.       Full legal name is Joyce Leigh Ferguson.  I go

14   by Leigh Ferguson.  L-E-I-G-H F-E-R-G-U-S-O-N.

15   Q.       Thank you.

16           And have you ever been deposed before?

17   A.       No.

18   Q.       Okay.  So I'm going to just give you some

19   general information; lay out some ground rules about

20   how to, you know, respond and things.  And so if you

21   have any questions, you can just let me know.

22           But generally, you know, we're looking for

23   clear, verbal responses to the questions.  And if you

24   wouldn't mind, just let me finish asking questions

25   before you respond.  And that way, we can let the court

1  going to use the term "Tennessee Building Code."  Thank
2  you for the -- thank you for the correction.
3  A.        If not, I may need to clarify another answer
4  earlier that I can answer these questions.
5  Building Code.
6  Q.        Yes.  No.  Absolutely.
7            So I will refer to the "Tennessee
8  Building Code."
9            So, generally speaking, can you tell me how
10 the Tennessee Building Code, the provisions are
11 enforced.  So we can start from just, you know, the
12 beginning a business is created and wants to start --
13 or open a building or facility to the public.  And so
14 what would be -- at what point would the SFMO be
15 involved in that process?
16 A.        Okay.  I'll answer this question initially for
17 a business that's in the jurisdiction where we have the
18 authority having jurisdiction.
19            So our office has the authority, by
20 statute, to adopt and enforce a Building Code.  That
21 process is done by rule.  So our rules set forth which
22 codes apply.  Those codes apply regardless of whether
23 our office does any plans review or inspections.
24            So there are some buildings in our
25 jurisdiction that we don't inspect or do plans review

```
 1   for, because they don't meet a threshold requiring that
 2   additional review.  So generally, for schools, jails,
 3   places of assembly over 300, that's when we're going to
 4   become involved to do a plans review and, then, in
 5   construction inspection.  We do not --
 6   Q.       Okay.  And when -- sorry.
 7   A.       I was just going to say:  We do not inspect
 8   every building that's constructed in our jurisdiction.
 9   Q.       Okay.  And thank you.
10            And when you say a "plans review," could
11   you explain to me what a "plans review" is.
12   A.       So for those -- for example, schools, jails,
13   or places of assembly over 200, they are required to
14   have architects draw and submit sealed plans to our
15   office for review.  So when we say a
16   plans review, we mean architectural plans.
17            So they look at things like sprinkler --
18   fire sprinkler systems, means of egress, fire
19   separation, things of that nature.  Obviously that's
20   not all that they're looking at, but those are some of
21   the primary things they do look at.
22   Q.       Okay.  Thank you.
23            And would a plan -- would a plan that is
24   submitted for plans review include a, for example,
25   location of a restroom?
```

```
1   A.        So the Plumbing Code --
2   Q.        Yes.
3   A.        -- has minimum requirements for plumbing
4   fixtures based on the occupant load.  My understanding
5   is that it's simply a plumbing fixture based on the
6   occupant load.  However, if an assembly designates a
7   facility -- never mind.
8             What's the question again?
9   Q.        That the -- if a business were to submit a
10  plan for a plan review, would that plan generally
11  include the existence or location of restrooms?
12  A.        To ensure that the building complied with the
13  plumbing -- the minimum fixture plumbing requirements
14  in the Plumbing Code, yes.
15  Q.        Okay.  Thank you.
16            And so, again, just talking about the
17  buildings that would have to submit a plan, which I
18  heard you limit that, so just talking about those
19  businesses.
20            Once a plan is submitted and reviewed and
21  what -- would the Agency then issue a license?  Like,
22  what would be the next step in that process once a plan
23  has been reviewed?
24  A.        So after the minimum requirements established
25  by rule for the plan review have been met, they
```

1  would -- I believe they issue a letter saying it's been
2  approved.  That -- the commercial -- the
3  Code Enforcements section doesn't issue permits.  So it
4  wouldn't necessarily be a permit.  It would be an
5  approval letter for the plan, and that would allow them
6  to begin construction.
7  Q.       Okay.  And -- okay.
8            So would a -- would a business be required
9  to seek a permit through SFMO?  Or is that a separate
10 agency that handles requests for permits to operate a
11 building?
12 A.       So a local jurisdiction would be able to
13 provide that, if their local rules require it.
14 Q.       Okay.  So once the letter approving a plan is
15 sent and the building -- and the business begins
16 construction of the building, at what point after that
17 would SFMO be involved again prior to opening to the
18 public?
19 A.       So there are -- there would be periodic
20 inspections, construction inspections, and likely
21 electrical inspections.
22 Q.       Okay.  And who would conduct those
23 inspections?
24 A.       The authority having jurisdiction.  So for
25 buildings in the State Fire Marshal's jurisdiction, it

1  would be inspectors employed by the Codes Enforcement
2  Division.
3  Q.      Okay.  And approximately how many code
4  enforcer inspectors are there?
5  A.      I don't know.  I work with, primarily, the
6  manager.  So I don't know that number.
7  Q.      Okay.  Great.
8          So there would be construction inspections
9  throughout -- would it just be one construction
10 inspection that occurs while construction is happening?
11 Or would there be multiple construction inspections?
12 A.      There's usually multiple.
13 Q.      Okay.  And then once construction has been
14 completed, would there be another inspection that
15 occurs prior to opening to the public?
16 A.      A final inspection is required before a
17 Certificate of Occupancy is issued, and that is what
18 gives permission to open.
19 Q.      Okay.  So the Certificate of Occupancy is what
20 gives a building permission to open to the public?
21 A.      Yes.
22 Q.      Okay.  And --
23 A.      From a Building Code perspective.
24 Q.      I'm sorry?
25 A.      From a Building Code perspective.  There might

1    be local rules that --

2    Q.        Right.

3    A.        Okay.

4    Q.        Great.  That makes sense.  Thank you.

5              And those local -- so that is -- yeah.

6              So this is from the state agency?  And

7    there would be additional requirements from local --

8    from local governments as well?

9    A.        There may be.  I just can't speak to that.

10   Q.        Okay.  So once the -- once a business has

11   received a Certificate of Occupancy for a building,

12   would SFMO come in again to conduct additional

13   inspections after opening?

14   A.        Only if we receive a complaint.

15   Q.        Okay.  So there would not be continued

16   periodic inspections, other than in response to a

17   complaint?

18   A.        Only schools and jails receive annual

19   inspections.

20   Q.        Okay.

21   A.        Commercial occupancies do not.

22   Q.        Okay.  And other buildings -- privately

23   operated buildings with occupancy over 300 people,

24   those would not receive periodic inspections, other

25   than those in response to a complaint?

1  we adopt.

2  Q.      Okay.  So thank you for that response.

3          And I'd like to ask you a little bit about

4  complaints at this point.  So you mentioned that SFMO

5  or its agents would conduct some sort of inspection in

6  response to a complaint; is that correct?

7  A.      If the complaint is within our jurisdiction,

8  yes, we would conduct an inspection.

9  Q.      And by "within your jurisdiction," do you mean

10  geographical jurisdiction or legal jurisdiction?

11  A.      So the Code jurisdiction, if we are the

12  authority having jurisdiction.  If we are not the

13  authority having jurisdiction, we would refer it to the

14  jurisdiction that is.

15  Q.      Okay.  And are there instances in which there

16  would be multiple agencies or governments that have

17  jurisdiction over a particular building and/or

18  building -- Building Code provision?

19  A.      The statute sets forth that there is

20  concurrent jurisdiction.  However, the practice of the

21  office has been not to -- to allow the locals, if they

22  are an exempt jurisdiction, to be the primary

23  enforcement authority, unless there is a conflict.  And

24  then the State Fire Marshal would help resolve that

25  conflict.

1    risk of hazard from fire.

2    Q.        Okay.  Thank you.

3              And are there other provisions beyond --

4    strike that, please.

5              Would there be other types of violations of

6    provisions of the Tennessee Building Code, other than

7    those that pose a risk of fire or serious hazard from

8    fire, that as a matter of practice the Agency would

9    pursue if a local jurisdiction or some other government

10   entity that shares jurisdiction chose not to pursue

11   enforcement?

12             MR. RIEGER:  I would object to the form of the

13   question.

14             But go ahead and answer, please.

15   A.        So that's really getting into a policy

16   question, and I'm not the one that makes those policy

17   determinations.  There are -- there are provisions in

18   the state -- in the statute that require notice of a

19   violation, but it doesn't necessarily require immediate

20   action.  I think that's my -- that's -- period.

21   Q.        Okay.  Thank you.

22             And when you say "notice of a violation,"

23   is that -- is that notice to -- who is that notice

24   directed to and who would send that notice?

25   A.        So it would depend on the violation.  There

1  are provisions that require notice to be sent to the

2  property owner and, then, there is a requirement if the

3  State Fire Marshal's office determines that the exempt

4  jurisdiction is not enforcing the Building Code, that

5  we would provide notice to the exempt jurisdiction that

6  we are aware of a provision that they are not

7  enforcing.

8  Q.        Thank you.

9            And you mentioned just briefly, I think a

10 couple responses ago, that -- the question I asked was

11 a little bit difficult to answer because it's a policy

12 question and you aren't involved in the policymaking in

13 that -- in that area.

14           And so I'm just wondering:  Can you

15 identify who would be involved in making those policy

16 decisions.

17 A.        So I'm involved, but I'm not the one that

18 makes the final policy decision.  As the State

19 Fire Marshal, it is -- the Commissioner and his

20 designees make those policy decisions.  I just advise

21 on the legal implications and what the state law

22 allows.

23 Q.        Thank you.

24           Okay.  So going back to the complaint

25 process.  Who would be making such a complaint?

1  A.        The statute allows any person to make a

2  complaint in writing.

3  Q.        Okay.  And that complaint, to whom would that

4  complaint be submitted?

5  A.        Anyone in the office.

6  Q.        Apologies.  Let me clarify.

7            To which office or department or government

8  entity would such a complaint be filed?

9  A.        So we have a generic email account.  We

10 receive complaints through that.  We receive complaints

11 through the Commissioner's suite.  We receive

12 complaints to the Governor's office.  We receive

13 complaints to individual inspectors.  And then other

14 state agencies or local governments will send us

15 complaints.

16 Q.        Okay.  Thank you.

17            Okay.  So once SFMO receives a complaint on

18 a matter that it will be moving forward with, I guess,

19 exercising its jurisdiction and enforcing the

20 provision, what would -- what would be the first step

21 in enforcing that provision?

22 A.        Usually the first step would be that an

23 inspector would go to the location where the complaint

24 is alleging a code violation and they would conduct

25 what we call a safety inspection.

```
1  Q.        And what does a safety inspection involve?
2  A.        When an inspector conducts a safety
3  inspection, they're primarily looking to the
4  allegations made in the complaint for a life safety
5  hazard or code violation.  In addition to the
6  allegations made in the complaint, if there's any
7  visible life safety hazard, they also address that.
8  Q.        Okay.  And when you say they "address that,"
9  would you mind explaining what you mean by "addressing
10 that."
11 A.        So it would depend on the violation.  For
12 example -- do you need a for example?
13 Q.        Yes, please.  I was about to ask:  Could you
14 provide an example?  So thank you.
15 A.        The easiest example is, like, double doors.
16 If an inspector were to go to a facility and the double
17 doors are chained, they would note in the inspection
18 report that that was a violation.  However, they would
19 also require the property owner at that moment to
20 unlock those doors because it is such a serious
21 violation and poses such a serious risk to the
22 occupants of the building, that that's how something
23 like that would be addressed.
24           Something that would not be as serious
25 would simply be noted on an inspection report and the
```

1 owner would be required at whatever time frame the
2 inspector allows to fix it. So the remedy obviously
3 depends on the nature of the violation.
4 Q.       Okay. And do inspectors receive any type of
5 guidance, information, or training on how to determine
6 which violations are serious and require immediate
7 response or -- versus those that would be responded to
8 in some other form?
9 A.       Yes.
10 Q.       And what -- so, I guess, let me break that
11 down.
12          Do they receive guidance as to that
13 information?
14 A.       Yes.
15 Q.       Okay. And what form does that guidance take?
16 A.       So it will depend on the issue. Sometimes
17 it's just in a staff meeting. And sometimes our office
18 issues formal guidance not only to inspectors but to
19 the general public.
20 Q.       Okay. And the staff meeting, who would be --
21 is that all the staff of SFMO or particular people
22 within SFMO?
23 A.       Most likely, the Codes Enforcement Division,
24 the inspectors within that group.
25 Q.       Okay. And would the inspectors also receive

1    distribution during trainings for inspectors -- either
2    new inspectors who have just joined or ongoing
3    trainings that inspectors may receive?
4    A.        So if a training is provided that requires a
5    publication, then they would maintain that document.
6    So if it's being provided to any members of the public
7    or like a presentation at a meeting, that would be
8    maintained.
9    Q.        Okay.  Thank you.
10             Okay.  So we -- once an inspector -- I'd
11   like to go -- sorry.  I'd like to go back.
12             We were going through the process of
13   responding to a complaint that has been filed.  So once
14   an inspector visits the site of the alleged violation
15   and makes a determination about whether a violation is
16   more serious and requires immediate response or less
17   serious, if the inspector determines that it is a
18   less -- or less serious violation, what would be the
19   next step in responding to that violation?
20   A.        An inspection is completed.  And if a
21   violation is discovered, the inspection form asks for a
22   Plan of Corrective Action, or a PoCA.  And the
23   inspector will set a deadline by which the property
24   owner must make the identified corrections.
25   Q.        Okay.  And, actually, I have one more question

```
 1   role as attorney for the State Fire Marshal's office,
 2   we are from time to time asked to just review
 3   legislation that's been filed.
 4   Q.       Okay.  And that -- and would it be the -- who
 5   would ask the -- not the individual -- but, like, what
 6   official would ask the Legal Department to conduct a
 7   bill analysis?
 8   A.       So we receive assignments from our legislative
 9   team.
10   Q.       Okay.  And I'd like to ask who -- or which
11   officials are members of the legislative team.
12   A.       So Alex Lewis is the Assistant Commissioner
13   and then Shiri Anderson, Graham Tudor -- this is
14   embarrassing.  I forgot her name.  Candice Dawkins.
15   She's not my contact.
16   Q.       Okay.
17   A.       I forgot her name.
18   Q.       Okay.  Thank you.
19            And -- okay.  Thank you.
20            So can I ask what state interest does this
21   Act serve?
22            MR. RIEGER:  I'll object to the form of the
23   question.
24            Go ahead and answer, to the extent you can.
25   A.       The state interest that this Act serves is a
```

1  notice interest, providing people who may be using
2  facilities where there is a reasonable expectation of
3  privacy what they may encounter.
4  Q.      Okay.  And when you say "notice interest," are
5  you aware of other provisions of the Tennessee
6  Building Code that further a notice interest?
7          MR. RIEGER:  Object to the form of the
8  question.
9              Go ahead and answer.
10         THE WITNESS:  Okay.
11 A.      There are requirements for, like, exit signs
12 that would provide notice for individuals in the event
13 of an emergency.  There are general -- I think that's
14 probably the most obvious one, is that exit sign
15 requirement.
16 Q.      Okay.  And are there -- so sticking with the
17 example of exit signs.
18              Are there other interests that --
19 provisions of the Tennessee Building Code that require
20 exit signs serve?
21         MR. RIEGER:  Object to the form of the
22 question.
23              Go ahead and answer.
24 A.      Again, earlier when I talked about the concern
25 regarding the hazards for life and safety as they

```
 1   notice interest?
 2           MR. RIEGER:  Object to the form of the
 3   question.
 4               Go ahead.
 5   A.       I cannot.  But not -- I cannot identify one,
 6   simply because I have not reviewed the statutes to
 7   address that question.
 8   Q.       Okay.  Thank you.
 9               Okay.  So now I'm going to ask you about
10   some of the language in the -- in the Act itself.
11               So under Section 1, Subsection (a), there's
12   a paragraph that begins, "a public or private entity or
13   business . . ."  Do you see that paragraph?
14   A.       Yes.
15   Q.       Okay.  Would you mind just reviewing it
16   briefly and, then, I'm going to ask you some questions
17   just about Subsection (a).
18   A.       (Witness reviewing document.)
19               All right.
20   Q.       Okay.  Could you please define the phrase
21   "biological sex" as used in this provision of the Act.
22           MR. RIEGER:  Object to the form of the
23   question.
24               Go ahead.
25   A.       The statute does not define "biological sex."
```

1  So as far as statutory interpretation goes, you would
2  consider the plain meaning of that text.
3  Q.      Okay.  And what is the plain meaning of
4  "biological sex"?
5  A.      It would simply be the ordinary understanding
6  of "biology" and "sex."
7  Q.      Okay.  Would you mind -- could you please
8  provide the ordinary meaning of "biology" and "sex."
9         MR. RIEGER:  Object to the form of the
10 question.
11         Go ahead.
12 A.      So I would -- I would understand "biology" to
13 be the body, the being; and then "sex" to be either
14 male or female.
15 Q.      Okay.  And when you say "the body," are you
16 referring exclusively to physical -- the physical
17 outward presentation of the body?
18         MR. RIEGER:  Object to the form of the
19 question.
20         Go ahead.
21 A.      I went to law school.  I am not a scientist.
22 My understanding of "biology" is that it could be the
23 outward -- that is a component; but I cannot speak to
24 the technical term with a scientific understanding.  Or
25 I couldn't -- nor could I interpret that.  That would

1  being for a judge to decide.

2  Q.        Okay.  And does SFMO or the Department of

3  Commerce and Insurance provide guidance to inspectors

4  about how to interpret "biological sex"?

5  A.        So we have been enjoined from enforcing the

6  Act.  So there has been no need to provide any guidance

7  to the inspectors regarding that phrase.

8  Q.        Oh.  Sorry.  I thought somebody was saying

9  something.

10            So I'd like to get a sense of how an

11  inspector, if the law were not enjoined, would go about

12  enforcing the provisions and recognizing whether a

13  violation of the Act has occurred.  And so would an

14  inspector -- what information or knowledge would an

15  inspector be expected to rely on in order to identify

16  if a violation of this Act has occurred?

17            MR. RIEGER:  Object to the form of the

18  question.

19            Go ahead and answer, please.

20  A.        The statute places the burden of making that

21  determination on the entity or the business and not the

22  inspector.

23  Q.        Okay.  And are you aware of any instances,

24  besides this Act, in which the individual business

25  owner or building operator is relied upon to determine

1   that determination on the entity and not the State Fire

2   Marshal's office.  The State Fire Marshal does

3   understand "sex" to include male and female, as we

4   discussed in the Plumbing Code with water fixtures if a

5   facility elects to have separate facilities.  That's

6   how the State Fire Marshal's office would need to

7   understand "biological sex" as a term.

8   Q.        Okay.  And if SFMO -- were the Act not -- were

9   SFMO not enjoined from enforcing the Act, were SFMO or

10   the Department to receive a complaint alleging a

11   violation of the Act, how would SFMO proceed with

12   investigating the merits of that complaint?

13           MR. RIEGER:  Object to the form of the

14   question.

15           Go ahead and answer.

16   A.        So like any complaint, the complaint -- I

17   don't know that it's called a Complaint Coordinator --

18   but the person responsible for reviewing the complaint

19   would determine if we were the authority having

20   jurisdiction.  If we were, it would be sent to an

21   inspector to schedule an inspection.  If we were not

22   the authority having jurisdiction, we would send it to

23   the exempt jurisdiction for them to inspect.

24           If an inspection were conducted and they

25   determined that there -- they would look to see whether

1    there was a sign or whether there was not a sign.  We
2    would send the inspection report to the property owner,
3    reporting the results of the inspection.  And, again,
4    the statute puts the burden on the business owner to
5    either post a sign if they have a policy that allows a
6    member of either biological sex to use the public
7    restroom.  If they do not have that policy, they are
8    not required to post that sign.  So we would notify
9    them of the statute and give them a time frame in which
10   to contact our office to report compliance with the
11   statute.
12   Q.      Okay.  Is there anyone within -- any official
13   or agent within SFMO or the Department who is capable
14   of receiving inquiries from business owners who operate
15   buildings about how to interpret the term "biological
16   sex" as it is included in this provision of the Act?
17          MR. RIEGER:  Object to the form of the
18   question.
19              Go ahead and answer.
20   A.      Our office would likely encourage the public
21   or private entity to consult with their consultants to
22   determine whether they have a policy that requires
23   posting that notice and that it would not be our
24   office's position to opine on whether a business needs
25   that policy.  That would be on them.

1  Q.        Okay.  Let me clarify.

2              Not whether they are -- I'd like to clarify

3  that I'm not asking whether there would be somebody at

4  SFMO or the Department who would opine on whether a

5  business owner should or, you know, must have a policy

6  based on the Agency's interpretation of biological sex,

7  but whether there would be somebody to provide guidance

8  or information to business owners about how to comply

9  with this Act and specifically by providing information

10  about the definition of "biological sex."

11              MR. RIEGER:  Object to the form of the

12  question.

13              Go ahead and answer.

14  A.        I think in this instance we would provide them

15  with the statute and rely -- ask them to rely on the

16  plain meaning of the text, as we are.  And if they have

17  further questions, they should contact the people that

18  are either on their staff or that they can hire to

19  answer any more specific questions.

20  Q.        Are you aware of any other provisions of the

21  Tennessee Building Code, the International Plumbing

22  Code as adopted by Tennessee, or the International

23  Business Code {sic} as adopted by Tennessee in which a

24  business owner who seeks to comply with the provisions

25  of the law would be instructed to determine their own

```
 1              MR. RIEGER:  Object to the form of the
 2    question.
 3                   Go ahead and answer.
 4    A.        So what we have done in the past is if there's
 5    a question, we would say -- we would need for the
 6    person asking whether they need to be licensed to show
 7    us why they're -- usually it's they're asking not to be
 8    licensed.  And so we have asked that person to say why
 9    that explosive that they're using isn't one of the
10    defined.  And it's usually there's a defined term,
11    which is not the case in this statute.  But we ask them
12    to show why it's not a thing that we regulate.
13                   So it's not an exact comparison.  But, yes,
14    there are instances where we rely on other people to
15    define or to explain if what they're doing is a
16    violation of the statute.
17    Q.        And in that instance, would an assurance from
18    the subject of the investigation be sufficient?  Or
19    would SFMO seek information and guidance elsewhere?
20              MR. RIEGER:  Object to the form of the
21    question.
22                   Go ahead and answer.
23    A.        It likely would be sufficient, because we
24    recognize that there are other parties that are
25    interested in regulating.  And I believe it is a crime
```

1    to submit -- to knowingly submit false information to a

2    state agency.  So we do rely, a certain degree, on a

3    licensee or a member of the public's truthfulness in

4    dealing with the state agency.

5            We always have the ability, if -- if we

6    receive a complaint or if something happens, to go back

7    and question that person and then we have documentation

8    that they have submitted -- potentially submitted false

9    information to a state agency in a regulatory context.

10           But, no, we don't have a separate

11    enforcement agency that verifies every assurance that

12    is made to either the State Fire Marshal's office or

13    the Department.

14    Q.      Okay.  And how is -- how does the Department

15    or SFMO, how do they make a determination about whether

16    a statement made by the -- by the business owner was a

17    false statement?

18           MR. RIEGER:  Object to the form of the

19    question.

20           Go ahead and answer.

21    A.      The most public example that I can recall is

22    we had an applicant who was trying to become licensed

23    as an explosives -- a blaster, and the form -- this was

24    before the Fresh Start Act.  So the form asked if the

25    person was -- had ever been convicted of a felony.  The

```
 1   Q.        Yes.  So is it SFMO's position that the way
 2   that an inspector determines if a business is required
 3   to post the sign mandated by the Act, is by seeing
 4   whether the sign that is mandated by the Act has been
 5   posted?
 6   A.        Yes.
 7             MR. RIEGER:  I'll object to the form of the
 8   question.
 9             MS. PICASSO:  Okay.
10             MR. RIEGER:  But the answer stands.
11             MS. PICASSO:  Thank you.
12   Q.        (BY MS. PICASSO)  And are there any other
13   ways, besides the posting of the mandated sign, that an
14   inspector or any official from SFMO or the Department
15   can determine whether a business is required to post
16   the sign?
17             MR. RIEGER:  Object to the form of the
18   question.
19                  Go ahead and answer.
20   A.        I guess the only other way would be if the
21   property owner or the business owner said -- told the
22   inspector they had a policy.
23   Q.        Okay.  Okay.
24                  So based on SFMO's interpretation of the
25   Act, is a business required to post a -- to post this
```

1  mandated sign solely because it allows transgender

2  people to use the restroom that aligns with their

3  gender identity?

4          MR. RIEGER:  Object to the form of the

5  question.

6                  Go ahead and answer.

7  A.      I'm going to have to ask you to repeat the

8  question.

9  Q.      Okay.  So is it SFMO's position that -- and

10 interpretation of the Act that a business is required

11 to post the sign mandated by the Act solely because it

12 allows transgender people to use the restroom that

13 aligns with their gender identity?

14         MR. RIEGER:  Object to the form -- same

15 objection.

16                 Go ahead.

17 A.      So the State Fire Marshal's position is

18 limited to the text of the Act.  The -- it is clear,

19 from the definition of "public restroom," that they are

20 addressing facilities open to the general public,

21 designated for a specific biological sex in a facility

22 or area where a person would have a reasonable

23 expectation of privacy.

24                 So the State Fire Marshal's office position

25 is that the notice is required in areas where a person

```
 1   has a reasonable expectation of privacy to have notice
 2   as to which biological sex will be using that facility.
 3   Q.        Okay.  So an inspector -- for example, if
 4   SFMO -- an SFMO inspector were at a building inspecting
 5   a violation completely unrelated to this Act and
 6   witnessed a transgender woman entering the women's
 7   restroom, would that -- and witnessing that there was
 8   no sign as mandated by this Act, would that inspector
 9   be able to note that as a potential violation of the
10   Act, at least warranting further investigation?
11             MR. RIEGER:  Object to the form of the
12   question.
13                  Go ahead and answer.
14   A.        So the inspector would have to -- if the
15   inspector were at the facility and inspecting an
16   allegation or an alleged code violation that didn't
17   address the Act, the only other -- the only other items
18   that they are -- the only other items that they are to
19   note in their inspection report are serious life safety
20   hazards or violations that they see on their way to
21   conduct that inspection of the underlying allegation.
22                  So I -- it would be likely that -- well, I
23   can't say that.
24                  I do not know how the inspector would
25   note -- you said a transgender woman using a women's
```

1  restroom?

2  Q.      Yes.

3  A.      I do not know how that would be -- can you ask

4  a clarifying question?

5  Q.      Yes.  Okay.

6          So if SFMO is made aware, either through a

7  complaint or an inspection, that a business that is

8  open to the public and subject to the Act is permitting

9  transgender -- let's just stick with a transgender

10 woman -- to use the women's restroom, would SFMO or the

11 Department see that as a potential violation that at

12 least warrants further investigation?

13         MR. RIEGER:  Object to the form of the

14 question.

15         Go ahead and answer.

16 A.      So if the sole allegation in the complaint is

17 a violation of this Act, our department would send --

18 would likely send a notice to the property owner that

19 we received the complaint and that they had 30 days to

20 notify us if they were in compliance with the Act.

21 Q.      Okay.  And in this example, if a business

22 owner responded to that notice and said, "My business

23 will continue to allow transgender people to use the

24 restroom that corresponds with their gender

25 identity" -- full stop -- what steps, if any, would

1   SFMO take in response to that?

2         MR. RIEGER: Object to the form of the

3   question.

4           Go ahead and answer.

5   A.      So the other remedies that set forth action

6   the Fire Marshal's office can take in Title 68 are

7   limited to -- most of the other remedies are limited to

8   the hazards from fire. Our office does not consider

9   the violation of the Act to present a hazard from fire.

10         So there is the general provision that a

11   violation of the Chapter is a Class B misdemeanor. And

12   so as we have done with other violations that either

13   did not constitute a violation that presented a fire

14   hazard or issues that we have -- we have not been able

15   to obtain compliance through our actions, we would

16   refer it to the local District Attorney for them to

17   review.

18   Q.      Okay. Is there any statutory or regulatory

19   provision that prevents SFMO from taking further

20   enforcement action in that situation, even if there is

21   no presence of life or safety hazards?

22   A.      That prevents the Fire Marshal?

23   Q.      Uh-huh.

24   A.      So I believe -- I'm reviewing the

25   interrogatory, because I think we addressed this there.

```
 1                    (Witness reviewing document.)
 2                    Yeah.  The response to Interrogatory 4
 3    provides that any person who violates a provision of
 4    the Chapter commits a Class B misdemeanor.  And so our
 5    office does not interpret that to mean any private
 6    person.  We hold ourselves to the same standard.
 7    Q.        I'm sorry.  Could you -- could you repeat
 8    that?
 9    A.        So you were saying if there -- you were
10    asking -- I guess, restate the question so I can make
11    sure I'm answering it.
12    Q.        So what I'm asking is:  Is there any statutory
13    or regulatory provision that would prevent SFMO from
14    further -- taking any further enforcement action in
15    response to the hypothetical that I posed earlier,
16    other than as a general practice SFMO will only
17    usually, you know, proceed with enforcement where
18    there's a life or safety hazard?
19                    MR. RIEGER:  I will object to the form there.
20                    But go ahead and answer.
21    A.        So we're obviously limited by our statutory
22    authority, the jurisdiction that we're given by the
23    General Assembly.  And so some of the remedies that are
24    set forth in our enabling statutes do restrict how we
25    can use that authority.  So those statutes would
```

```
 1    prevent us from taking action, if a violation of the
 2    Act didn't meet those standards.
 3              However, because of Tennessee Code
 4    Annotated 68-120-108, application of the Building Code
 5    is not arbitrary and that any person who violates that
 6    provision would commit a Class B misdemeanor.  So we
 7    are bound by the statute, just as the business owners
 8    are bound by the statute.
 9    Q.        Okay.  So is it SFMO's position that they lack
10    the statutory authority to further -- to enforce the
11    provisions of this Act beyond the issuance of a Notice
12    of Compliance?
13              MR. RIEGER:  Object to the form.
14              Go ahead.
15    A.        So the State Fire Marshal's office -- yes.
16    Q.        Okay.  Thank you.
17              Okay.
18              MS. PICASSO:  Why don't we -- is it all right
19    if we take five?  I have to use the restroom.  Like,
20    I'm drinking a lot of water over here.  Is that all
21    right with you?  We could take five.
22              MR. RIEGER:  That's fine.
23              MS. PICASSO:  Okay.
24              MR. CASTELLI:  Do you want to maybe do ten,
25    come back at 10:15 --
```

1           So are you aware of any incidents in which
2   an individual filed a complaint with the Tennessee
3   Department of Commerce and Insurance or with the SFMO
4   relating to a transgender person using a restroom at a
5   business open to the public?
6   A.      No.
7   Q.      Okay.  And I just want to be clear.  Is that
8   information that you -- that you would be aware of,
9   were it to exist?
10          MR. RIEGER:  Object to the form of the
11  question.
12          Go ahead and answer.
13  A.      So I do not review every complaint.  I get
14  questions if an inspector or if the person reviewing
15  the complaints doesn't know where to send them.  And so
16  it would be likely that I would be aware of a
17  complaint.  Because until the Act passed, that was not
18  something that our office was responsible for --
19  Q.      Okay.
20  A.      -- in our jurisdiction.  I need to make that
21  clear too.
22  Q.      Yes.  Yes.
23          And is a complaint filed by an individual
24  required to cite to a specific provision of the
25  Tennessee Building Code that they suspect is being

1  to have to -- I don't know the -- it's review of exempt
2  jurisdictions, I think.
3  Q.        Okay.  And is that a rule that was issued by
4  SFMO or the Department of Commerce and Insurance?
5  A.        So our rules are promulgated by the
6  Department, reviewed by the Governor's office, the
7  Attorney General's office, and the General Assembly.
8  Q.        Okay.  So were enforcement of the Act not
9  enjoined, would persistent noncompliance or
10  non-enforcement of the Act by the exempt jurisdiction
11  discovered during a routine audit be grounds for
12  revoking that jurisdiction's exempt status?
13            MR. RIEGER:  Object to the form of the
14  question.
15            Go ahead and answer.
16  A.        If the failure to enforce the Act were the
17  only finding in the audit, an ALJ would have to make a
18  determination that the exempt status would be revoked.
19  However, as we stated, the authority is to enforce
20  standards incident to the design, construction,
21  alteration, and repair of buildings and structures.
22            And so an ALJ would just have to find that
23  the violation of the Act meant that the exempt
24  jurisdiction could not adequately perform those
25  requirements.  The state -- let me clarify.

1          The State Fire Marshal's office doesn't

2    revoke an exempt jurisdiction status.  That's a hearing

3    before an ALJ.

4    Q.        And would that hearing be initiated by either

5    SFMO or the Department of Commerce and Insurance?

6    A.        Yes.  We would file a notice of hearing and

7    charges, but we would not make that determination.

8    Q.        Okay.  And in filing that complaint and those

9    charges to the ALJ's office, would SFMO or the

10   Department be required to list the persistent

11   violations that are the subject of the complaint?

12          MR. RIEGER:  Object to the form of the

13   question.

14          Go ahead and answer.

15   A.        The notice would require us to provide the

16   exempt jurisdiction with notice as to why we were

17   requesting the revocation of their exempt status.  So

18   we would have to provide notice of the alleged

19   violation and, then, the Administrative Law Judge is a

20   neutral party that would determine whether that

21   justified revoking the exemption.

22   Q.        Okay.  In an exempt jurisdiction, can SFMO

23   still enforce the Building Code or are they prohibited

24   from doing so by statute or regulation?

25          MR. RIEGER:  Object to the form.

```
1              Go ahead.
2    A.         The Building Code authority flows through the
3    Commissioner of Commerce and Insurance.  Again, if
4    there's a conflict, it's up to the State Fire Marshal
5    to resolve.  And there is the provision in statute
6    that locals -- or that we have concurrent jurisdiction.
7    So we would not be prohibited.
8              It's, I guess, a question of practice that
9    I would leave to the Assistant Commissioner or
10   Commissioner to make.
11   Q.         Okay.  And if SFMO receives complaints of a
12   specific type of -- a specific violation of the
13   Tennessee Building Code, could that be a basis for SFMO
14   to pursue enforcement of that provision without relying
15   on the exempt jurisdiction to enforce it itself?
16             MR. RIEGER:  Object to the form.
17             Go ahead.
18   A.         The practice of this office has been when --
19   when possible, allow the local exempt jurisdiction to
20   be the authority having jurisdiction.  There are times
21   when the local exempt jurisdiction either cannot handle
22   something and they request help from our office.  We
23   will help them.
24             Or if they -- there have been times when
25   they have declined and asked us to pursue action
```

1  because they can't.  We will take action.  The State

2  Fire Marshal's office, like every other state agency,

3  has limited resources and cannot be the super enforcer

4  for all exempt jurisdictions across the state.

5          There is some expectation that if an exempt

6  jurisdiction is going to be an exempt jurisdiction,

7  they need to be the -- they need to be the authority

8  having jurisdiction.

9  Q.      Okay.  But there are no provisions of statute

10  or regulation that prevents or prohibits SFMO from

11  stepping in to enforce those provisions of the

12  Building Code that are being -- that the exempt

13  jurisdiction is refusing to enforce?

14          MR. RIEGER:  Object to the form.

15          Go ahead.

16  A.      Not to my knowledge.

17  Q.      Okay.  Thank you.

18          Oh.  And you mentioned that Nashville --

19  Metro Nashville is an exempt jurisdiction.  Is that

20  correct?

21  A.      Yes.

22  Q.      Okay.  Is Chattanooga an exempt jurisdiction?

23  A.      I believe so.  I know Hamilton County is.  I

24  think Chattanooga is too.

25  Q.      Okay.  Thank you.

1              And it reads:  "Carter Lawrence,

2    Commissioner, was contacted by Jim Brown, lobbyist for

3    the National Federation of Independent Businesses,

4    asking about the Department's plan for enforcement of

5    the Act."

6              And I'm wondering if you can tell me, when

7    did that occur?

8    A.         That occurred in June of 2021.

9    Q.         Okay.  Thank you.

10             And did Commissioner Lawrence respond to

11   the question?

12   A.         I was not there, so any information I have is

13   a result of my position as an attorney with the

14   Department.

15   Q.         Okay.  And I think I know how you're going to

16   answer this, but I'm going to ask anyway.

17             What was his response?

18   A.         I do -- I cannot speak to his response.

19   Q.         Okay.  I'd like to jump to Defendants'

20   response to Plaintiffs' Interrogatory No. 11, which is

21   on page 11, specifically the sentence that reads:

22   "Defendants submit that the term 'biological sex'

23   possesses an ordinary meaning for which no further

24   elaboration is necessary."

25             And I would just like to ask, specifically

1 in response to this: What the ordinary meaning of the
2 term "biological sex" is that is referenced in this
3 response?
4         MR. RIEGER: Object to the form.
5            Go ahead and answer.
6 A.      So we went through this a little bit earlier.
7 So "biological" would have the same -- the meaning of
8 being, you know, the body, exterior and interior; and
9 then "sex" would be either male or female.
10 Q.      Okay. And so just to clarify. Earlier we
11 hadn't distinguished, you know, interior or exterior
12 body. And so I'm just now seeking clarification, that
13 that internal and external components, are you -- are
14 you suggesting that that is part of the ordinary
15 meaning of the term "biological sex"?
16         MR. RIEGER: Object to the form.
17            Go ahead and answer, please.
18 A.      Again, I limit my lack of scientific
19 knowledge. I don't -- I think the ordinary meaning of
20 "biological" is not just exterior.
21 Q.      Okay. Is there anyone within SFMO or the
22 Department of Commerce and Insurance with the requisite
23 scientific knowledge to provide the ordinary meaning of
24 the term "biological sex"?
25         MR. RIEGER: Object to the form.

**OMEGA REPORTING**
OmegaReporting.com   901.827.8671
Case 3:21-cv-00490   Document 37-9   Filed 01/31/22   Page 43 of 53 PageID #: 466

```
 1              Go ahead and answer.
 2   A.         So as we stated earlier, it is not necessary
 3   for the Department to interpret that, as it is not a
 4   defined term.  You use your ordinary meaning.  And the
 5   Act places the obligation to make that determination on
 6   the property owner, the business owner.
 7   Q.         So a business owner is required to interpret
 8   the term "biological sex" despite the Act itself not
 9   providing a definition for "biological sex" within its
10   provisions?
11              MR. RIEGER:  Object to the form of the
12   question.
13                   Go ahead and answer.
14   A.         So the statute makes clear that it's the
15   responsibility of the operator of the public or private
16   entity or business to determine their policy as it
17   relates to who may use the restrooms.
18   Q.         Okay.  Would you agree that generally a term
19   that has an ordinary meaning would also have a
20   definition or be definable in some manner?
21              MR. RIEGER:  Object to the form of the
22   question.
23                   Go ahead and answer.
24   A.         So I think words -- well, can you clarify your
25   question?
```

1    Q.       Yes.  So I'm just trying to get a sense of

2    what it means for a term to have an ordinary meaning as

3    described -- or as referenced, rather, in Defendants'

4    interrogatory -- in Defendants' response to Plaintiffs'

5    Interrogatory No. 11.

6              MR. RIEGER:  Object to the form.

7                   Go ahead and answer.

8    A.       So there are lots of words that are used in

9    statutes that are not defined.  In fact, it's --

10   that's -- most statutory language is not comprised of

11   defined terms.  So it's -- it's common to use whatever

12   ordinary meaning that we assign words, to assign those

13   words to words in statutes that are not defined terms.

14                   But, again, in this instance, it's not up

15   to the State Fire Marshal's office to determine that

16   definition.  It's on the property owner.

17   Q.       Okay.  I understand that not all terms in

18   statutory provisions are defined within -- within those

19   statutes.  What I'm trying to get a sense of is:  What

20   meaning is being ordinarily assigned to the term

21   "biological sex" in order for the SFMO to even

22   determine what the Act means?

23              MR. RIEGER:  Object to the form.

24                   Go ahead and answer.

25   A.       So, again, the Fire Marshal's ability to

```
1    determine what the Act means and how a part -- a
2    business property owner is or is not complying, in
3    order for us to do that, we rely on the property owner
4    and their policy to establish that.  Beyond just
5    saying, you know, there is -- I think it's
6    unsatisfactory, but that's my answer.
7    Q.        Okay.  And can an entity owner or business
8    owner say that "biological sex" has no meaning
9    whatsoever and SFMO would be required to accept that
10   business owner's interpretation of the phrase
11   "biological sex" as it appears in the Act?
12             MR. RIEGER:  Object to the form of the
13   question.
14                  Go ahead.
15   A.        So my question to you would be:  How would
16   that -- can we walk through that?
17   Q.        Yes.  So you mentioned that SFMO, in enforcing
18   this Act, would be relying exclusively on the building
19   owner's interpretation of the phrase "biological sex"
20   as it appears in the Act.  And my question is:  Should
21   a business owner say the phrase "biological sex" has no
22   meaning whatsoever and has no significance, would SFMO
23   be required to accept that entity's interpretation of
24   the phrase "biological sex" in that instance?
25             MR. RIEGER:  Object to the form of the
```

1   question.

2               Go ahead and answer.

3   A.        So I would presume that the plain meaning of

4   the text, which says either biological sex, would

5   be male or female, if the property owner basically --

6   it sounds like you're saying the property owner is

7   basically denying that the statute has any application?

8   Q.        Or any meaning whatsoever.

9   A.        So I think -- yeah, okay.

10              So I think what's going to -- what would

11  happen is -- so you're asking what happens if a

12  business owner is not going to comply with the statute

13  because they're arguing that it doesn't have -- the

14  term "biological sex" doesn't have a meaning?  Is that

15  what you're asking?

16  Q.        Yes.

17  A.        Okay.  So normally in instances -- in any

18  provision where a property owner refuses to comply with

19  a statute that we are tasked with enforcing, we would

20  refer it, if appropriate, to the local District

21  Attorney for them to enforce.

22  Q.        Would SFMO be prevented by any statute or

23  regulation from taking further action -- any other

24  further action besides forwarding it to the local

25  prosecuting law enforcement agency?

```
 1              MR. RIEGER:  Object to the form.
 2                   Go ahead.
 3   A.        Prevent it from taking additional action?
 4   Q.        Yes.
 5   A.        Such as?
 6   Q.        Any action that -- any enforcement action
 7   whatsoever, other than forwarding it for further
 8   prosecution by the local DA.
 9   A.        So I -- the Act has been passed.  It's a
10   requirement passed by the General Assembly, put in the
11   statute for our enforcement.  Because Tennesseans have
12   a reasonable expectation that statutes passed by the
13   General Assembly should be enforced, that would be our
14   course of action, to refer it.
15   Q.        So is it your testimony today that SFMO's only
16   recourse in that situation, no other recourse would be
17   available other than to forward it to the local -- the
18   local prosecutor for further -- for further
19   prosecutorial enforcement?
20              MR. RIEGER:  Object to the form of the
21   question.
22                   Go ahead and answer.
23   A.        So this doesn't meet the requirement that we
24   could order a remedy of removal because it doesn't
25   address a fire safety hazard.
```

1          My understanding in your question is that
2     the property owner was refusing to comply.
3     Q.        I think perhaps I can clarify.
4               The property owner in the hypothetical is
5     not refusing to comply, but simply saying the term
6     "biological sex" has absolutely no meaning whatsoever
7     and, therefore, I don't even know what it is that you
8     are contacting me about in terms of violation of this
9     Act.
10          MR. RIEGER:  To the extent that clarification
11    represents a new question in some different form, I
12    will object to the form.
13              But go ahead.  Go ahead.  Or continue your
14    answer, whichever -- whichever it was.
15    A.        So I think the plain meaning of the text
16    clearly says in several areas, either biological sex.
17    We understand that typically to mean, especially when
18    it says "unisex" or "single-occupant restroom," that it
19    would be male or female.  If that -- if a property
20    owner does not consent that that's what that means, I
21    think that we -- our office doesn't typically get into
22    the business of arguing legal issues and legal
23    interpretation with either property owners or
24    licensees.
25              If we were unable to obtain compliance with

1    any statute, we take appropriate remedy, up to and

2    including in this instance, would be referring and

3    would -- there are some matters that our office can't

4    resolve that would have to be resolved through private

5    litigation.

6    Q.      Okay.  And just to be clear.  I understand

7    that your earlier testimony was that the only way for

8    SFMO to interpret "biological sex" as it appears in

9    this Act is by relying on the business entity's own

10    interpretation of the language in the Act?

11          MR. RIEGER:  Object to the form.

12          Go ahead.

13    A.      So, yes, the business entity sets a policy to

14    determine who will use their facilities.  In the

15    context of non-unisex or non-single-occupant restrooms

16    or family restrooms.

17    Q.      Okay.  Thank you.

18          Oh.  Sorry.  I didn't mean to interrupt.  I

19    wasn't sure if you were finished.  Okay.  I'm sorry.

20    Okay.

21          So if we can move on to number --

22    Defendants' response to Interrogatory No. 14, which is

23    on page 13, specifically the sentence that reads, at

24    the bottom of the paragraph:  "If required to enforce

25    the Act, the Department would rely on the language of

1    public restroom within the building or facility'

2    because enforcement of the Act is enjoined."

3              But, "If required to enforce the Act, the

4    Department would rely on the language of the Act and

5    whether the facility or building posted a sign."

6              So my next question is -- you know what?

7    We can strike that.

8              And, actually, we could just move on from

9    that one because I've already asked.

10             So -- sorry.  I'm just looking through my

11   notes.

12             (PAUSE IN PROCEEDINGS.)

13   Q.        (BY MS. PICASSO)  Let's actually jump to

14   No. 15 -- response to No. 15, the paragraph that -- or

15   the sentence that reads:  "Were no injunction in place,

16   the SFMO would note on an inspection report whether a

17   sign was posted . . ."

18             And I just want to know:  So in this

19   example, the inspector would arrive to conduct an

20   inspection and then what would happen at that point?

21   Once they're there conducting the inspection, what -- I

22   guess, what would occur at that time?

23             MR. RIEGER:  Object to the form.

24             Go ahead.

25   A.        So as we stated earlier, the Act requires a

```
 1   private entity or business that operates that facility
 2   to have a sign if their policy allows members of either
 3   biological sex to use the facility.  The inspector
 4   would have noted if there was a sign present
 5   communicating that policy.  And then if there was no
 6   sign, then the inspector would note that there was no
 7   sign and would draw the conclusion that there is no
 8   policy, because a business owner is required by law to
 9   either have the sign or not based on their policy.
10   Q.      Okay.  And in that same response, there's a
11   sentence in the middle of the paragraph that says, "The
12   inspectors would not have asked follow-up information
13   from the property owner."
14           So does that mean that SFMO would not -- in
15   the case where an inspector arrives at the facility,
16   notes that there is no sign, that the inspector would
17   not ask the business owner any additional information
18   and would simply note the lack of sign?
19           I guess I'm trying to understand what "not
20   asking any follow-up information from the property
21   owner" means.
22   A.      So --
23           MR. RIEGER:  Object to the form.
24           Go ahead.
25           THE WITNESS:  Sorry.
```

113

1       AMENDMENT SHEET

2       I, the undersigned, JOYCE LEIGH FERGUSON, do
   hereby certify that I have read the foregoing
3   deposition in the case of BONGO PRODUCTIONS vs. CARTER
   LAWRENCE and that, to the best of my knowledge, said
4   deposition is true and accurate with the exception of
   the following corrections listed below:

5
   PAGE/LINE/REASON
6
   14 / 17 / "... where we are (not have) the authority..."
7   15 / 13 / strike '200' and replace with '300'

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20

21  1/24/ 2022

22  Date                    Signature of Witness

23  Sworn to and Subscribed before me, Ann Jones
   this  24th  day of  January  , 2022.

24  Ann Jones

25  Notary Public            My Commission Expires May 7, 2...

Omega Reporting
901.827.8671