IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

BONGO PRODUCTIONS, LLC, ROBERT BEINSTEIN, SANCTUARY PERFORMING ARTS, LLC, and KYE SAYERS,

Plaintiffs,

v.

CARTER LAWRENCE, Tennessee State Fire Marshal, in his official capacity, CHRISTOPHER BAINBRIDGE, Director of Codes Enforcement, in his official capacity, GLENN R. FUNK, District Attorney General for the 20th Judicial District, in his official capacity, and NEAL PINKSTON, District Attorney General for the 11th Judicial District, in his official capacity,

Defendants.

CIVIL ACTION
CASE NO. 3:21-cv-00490
JUDGE TRAUGER

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure Defendants Carter Lawrence, Christopher Bainbridge, Glenn R. Funk, and Neal Pinkston, in their official capacities only, hereby respond in opposition to Plaintiffs'[1] Motion for Summary Judgment. (DE 35).

### BACKGROUND

On March 29, 2021, and April 29, 2021, the General Assembly passed House Bill 1182/Senate Bill 1224 by overwhelming majorities in both Houses. Governor Lee signed House Bill 1182 into law on May 17, 2021, as Public Chapter 453 ("the Act"). (Ex. A.) The Act furthers the State's interests in informing persons patronizing buildings open to the public of the building

---

[1] Plaintiffs Kye Sayers and Sanctuary Performing Arts, LLC, are no longer participating in this matter.

1

operator's bathroom policy should it deviate from any existing bathroom signage designating a bathroom as available only to persons of a specific biological sex. Plaintiffs seek to enjoin the enforcement of the entire Act, which took effect on July 1, 2021.

### A. The Contested Statute.

As pertinent here, the Act applies to all businesses and entities within the State that are open to the public and, "as a matter of formal or informal policy, allow[] a member of either biological sex to use any public restroom within the building or facility." (Ex. A. Act, § 1(a).)

"Public restroom," as defined by the Act, includes restrooms, locker rooms, shower facilities, dressing areas, and any similar facility that is "open to the general public," "designated for a specific biological sex," and constitutes a "facility or area where a person would have a reasonable expectation of privacy." (Ex. A. Act, §§ 1(d)(2)(A)(i)-(iii).) However, the term "[p]ublic restroom" does not include single-occupancy restrooms or family restrooms "intended for use by either biological sex." (Ex. A. Act § 1(d)(2)(B).)

Business and entities that are subject to the Act must post signage that is easily visible to people entering the restroom[2] and that informs the public that "THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM." (Ex. A. Act, § 1(b)(3).)

In short, the Act requires that any entity with multi-user, sex-designated public restrooms—and a policy of allowing all users to use either restroom, regardless of their biological sex—to post signage reflecting that policy on or near the restroom entrances. Qualifying businesses and entities that do not comply with the Act's requirements must have received notice of their noncompliance

---

[2] To that end, the Act also specifically describes the dimensions, coloring, and location of the required signage. (Ex. A. Act, §§ 1(b)(1)-(5).)

at least 30 days before any action is taken against them.  (Ex. A. Act, § 1(c).)

   B.   **Case History**

Plaintiffs—a Tennessee business and its owner filed a Complaint on June 25, 2021, challenging the constitutionality of the Act.  (*See generally* DE 1; DE 1, PageID# 1.)  Plaintiffs allege that they do not wish to post the signage required by the Act because they perceive that the signage required—which mirrors their bathroom-usage policies—is controversial and stigmatizing.  (DE 1, PageID# 2.)  They allege that by requiring them to post this signage, the Act compels speech in violation of the First Amendment to the United States Constitution.  (DE 1, PageID# 18.)   Contemporaneously with the filing of their Complaint, Plaintiffs moved for a preliminary injunction "enjoining enforcement of H.B. 1182/S.B. 1224, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021)."  (*See generally* DE 6.)

Shortly thereafter, this Court granted Plaintiffs' Motion for Preliminary Injunction and enjoined Defendants from enforcing the Act. (DE 22; DE 23).  On January 31, 2022, Plaintiffs filed the instant Motion for Summary Judgment.  (DE 35).

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial."  *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).  After the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of material facts in dispute.  An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that

3

results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). When the moving party has carried this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). In evaluating a motion for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

## ARGUMENT

Here, summary judgment is inappropriate. As a threshold matter, this Court lacks subject matter jurisdiction for two reasons: 1) Plaintiffs have failed to demonstrate standing because the enforcement of the Act that gives rise to their alleged injury-in-fact is not imminent or even likely; and 2) Plaintiffs' First Amendment claim is not ripe as the effect of any potential enforcement is uncertain. Further, even if subject matter jurisdiction were present, the Act satisfies constitutional scrutiny. Plaintiffs' Motion for Summary Judgment should therefore be denied.

**I.    The Court Lacks Subject Matter Jurisdiction to Consider Plaintiffs' Claims.**

    **A..    The Plaintiffs Lack Standing Because their Alleged Injury-in-Fact is not Imminent.**

Article III of the United States Constitution limits the jurisdiction of federal courts to cases and controversies. U.S. Const. art. 3, § 2. The doctrine of standing is "an essential and unchanging

4

part of the case-or-controversy requirement," and defines the boundaries of jurisdiction under Article III by "identifying those disputes which are appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Thus, as a threshold matter, federal courts are "under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines" that a plaintiff must satisfy. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations and citation omitted); *see Copas v. Lee*, 396 F.Supp.3d 777, 786 (M.D. Tenn. 2019) ("Standing is a 'threshold determinant[ ] of the propriety of judicial intervention.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

In determining whether a plaintiff has standing, courts consider whether the plaintiff has alleged "an 'injury in fact' that is 'fairly traceable to the challenged action of the defendant' and is capable of being 'redressed' by the court." *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Lujan*, 504 U.S. at 560-61). And the plaintiff bears the burden of establishing the presence of all three elements. *Id*. To establish "injury-in-fact," the plaintiff must show he suffered a *concrete* injury that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Moreover, the injury alleged must be particularized to the plaintiff—"not a generalized grievance." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Here, Plaintiffs challenge the Act under the First Amendment yet they do not allege that the Defendants have actually enforced or will enforce any provisions of the Act against them. "In a pre-enforcement challenge, whether the plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact' before the state has actually commenced an enforcement proceeding against him." *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014). Although Plaintiffs are not required to subject themselves to actual arrest or prosecution as a prerequisite, pre-enforcement challenges typically require "the threatened injury [to be] certainly impending or

5

[that] there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, n. 5 (2013)). Specifically, the Supreme Court has permitted satisfaction of the "injury-in-fact" requirement in the pre-enforcement context when plaintiffs allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979).

Under the Act, "[i]f an entity or business is notified that it is not in compliance with this section, the entity or business has thirty (30) days in which to comply before any action is taken against the entity or business." (Ex. A. Act, § 1(c).) Plaintiffs in this case do not want to display the government-mandated warning notice required by the Act. (DE 1, PageID# 2.) But as Plaintiffs have neither received a threat of enforcement nor a notice pursuant to the statute, there mere existence of the statute alone does not amount to "a credible threat of prosecution" under the Act.

In *McKay*, the plaintiff brought a Section 1983 claim against public officials charged with enforcing a state court's administrative order prohibiting recording devices in the courtroom. 823 F.3d at 864-65. There, the plaintiff did not allege that he requested or was denied permission to use a recording device, nor that he attempted to enter the courthouse with such a device. Instead, he merely alleged that he did not wish to be subject to contempt, confiscation of a device, a fine, or jail time pursuant to the order. *Id*. at 865-66. In holding that the plaintiff lacked standing, the Sixth Circuit considered a series of factors that, in conjunction with a plaintiff's allegation of a subjective First Amendment chill, could establish injury-in-fact:

> (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; and/or (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement

> action…[and] a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.

*Id*. at 869 (internal citations omitted). Indeed, courts considering credible threats of prosecution in the context of a pre-enforcement First Amendment challenge consistently look to some indication of a threat beyond the simple possibility of enforcement. *Id*; *see also Kiser*, 765 F.3d at 609 (finding a credible threat where the plaintiff received two letters from the defendant warning him that he was in violation of the regulation at issue); *Susan B. Anthony List*, 573 U.S. at 164 (2014) (noting that the plaintiff was previously prosecuted by the defendant for the same sort of speech); *Plunderbund Media, L.L.C v. DeWine*, 753 Fed. App'x. 362, 366-72 (6th Cir. 2018) (finding no credible threat where there was no history of enforcement against defendants or the kind of speech at issue, nothing making the statute easier or more likely to enforce, and no evidence of an intention to enforce).

Here, Plaintiffs do not allege facts that satisfy any of the *McKay* factors, and therefore do not allege a credible threat of prosecution. (*See generally*, DE 1.) Indeed, they do not allege receipt of any warning letters, any attribute of the Act that would make enforcement easier or more likely,[3] or that Defendants have refused to disavow enforcement against them. Just the opposite is true: Defendant District Attorney General Funk has made public statements expressing his intention to disavow enforcement of the Act in Davidson County, where Bongo's business is located. Kimberlee Kruesi, *Nashville DA won't enforce new bathroom sign law*, Associated Press (May 24, 2021), https://apnews.com/article/nashville-laws-government-and-politics-50412b91ca33cc45c426a9b5a89b1133 (Ex. B).

---

[3] The Act's 30-day notice requirement before Defendants could subject Plaintiffs to penalties under the Act make its enforcement *more* difficult and *less* likely.

7

Moreover, the Act provides a 30-day cure period for businesses before any action can be taken. (Ex. A. Act, § 1(c).) Yet Plaintiffs do not allege receipt of such notice. In other words, despite Plaintiffs' express desire not to comply with the Act, they cannot be subject to any action for at least 30 days, starting from notice of noncompliance. Thus, because Plaintiffs fail to allege a credible threat of prosecution under the Act, they fail to properly allege injury-in-fact and lack standing to bring this claim.

Lastly, because Plaintiffs do not allege enforcement of the challenged statute by Defendants, there is no injury for the court to redress in this case. In *California v. Texas*, 593 U.S. ___, No. 19-840, 2021 WL 2459255 (June 17, 2021), the Supreme Court considered the standing of several individual plaintiffs to challenge the Affordable Care Act's minimum-coverage requirement. The Court held that those plaintiffs lacked standing because "no unlawful Government action "fairly traceable" to [the challenged statute] caused the plaintiffs'… harm." *Id*. at *5. As the Court pointed out, it has consistently required plaintiffs "to assert an injury that is the result of a statute's actual or threatened enforcement, whether today or in the future." *Id*. The Court further noted that issuing an injunction in a case where plaintiffs were not harmed by actual or threatened injury would ultimately amount to "an advisory opinion without the possibility of any judicial relief." *Id*. at *6 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 129, (1983) (Marshall, J., dissenting)); *see also Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (Article III "require[s] that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions"). Here, Plaintiffs simply cannot show a relationship between the judicial relief requested and the "injury" they allege because they have not suffered an injury. In effect, Plaintiffs are requesting an advisory opinion under the guise of injunctive relief.

8

### B. Plaintiffs' Claims are Not Ripe.

Like the doctrine of standing, the ripeness doctrine is rooted in Article III limitations on federal-court jurisdiction. However, ripeness distinctly aims at ensuring cases or controversies filed in federal court are timely to help the court "avoid[]…premature adjudication." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). To show that the claim is ripe for review, a plaintiff must allege more than some future acts or events that "may not occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997).

Determining whether a claim is ripe for review requires a court to consider both "the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs*, 387, U.S. at 149. Specifically, the Sixth Circuit considers three factors in determining whether a claim is ripe: "(1) the likelihood that the harm alleged will ever come to pass; (2) whether the factual record is sufficiently developed to allow for adjudication; and (3) hardship to the parties if judicial review is denied." *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002); *see also Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003). In the context of a claim that relies on the threat of injury, instead of an actual one, the standing and ripeness doctrines can be difficult to distinguish. *Airline Pros. Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332 F.3d 983, 988 (6th Cir. 2003). For example, "[a] threatened or imminent injury may satisfy standing's injury-in-fact requirement, yet the claim may still be unripe if the issues are not fit for judicial review, perhaps because future events may greatly affect the outcome of the litigation and the cost of waiting is not particularly severe." *Id*.

Here, as discussed above at I.A., Plaintiffs fail to allege an injury beyond potential future events that may not occur as they expect or may not occur at all. Plaintiffs do not know that the Act will be enforced against them, and even assuming it were enforced against them, they can

9

predict neither how it would be enforced nor the effect of its enforcement. This case therefore lacks the factual development necessary for this Court to properly adjudicate Plaintiffs' claim.

Thus, due to a lack of standing and ripeness that deprives this Court of subject matter jurisdiction, summary judgment is inappropriate.

## II.     The Act is Constitutional.

Even if the Court finds that it possesses subject matter jurisdiction, the Court should decline to grant summary judgment as the Act satisfies constitutional scrutiny.

Plaintiffs raise only one claim challenging the constitutionality of the Act: that the Act violates their First Amendment rights by compelling them, on pain of criminal penalty, to communicate a misleading and controversial government-mandated message that they would not otherwise display. (DE 1, PageID# 2.)  Plaintiffs urge this Court to subject the Act to strict scrutiny.  Plaintiffs, though, have conceded that, as businesses open to the public, they are subject to regulation, including regulations that require them to post certain signage. (DE 7, PageID# 51). Plaintiffs also conceded that "notices [that] communicate purely factual and non-controversial speech [] do[] not offend the First Amendment." (DE 7, PageID# 51.)

Plaintiffs' prior concessions confirm that strict scrutiny is inappropriate. It is well settled, of course, that a State may not "constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public." *Wooley v. Maynard*, 430 U.S. 705, 713 (1977).

But while the State has "'no power to restrict expression because of its message, its ideas, its subject matter, or its content,'" "[u]nder the First Amendment," it may still "regulate certain aspects of speech." *Thomas v. Bright*, 937 F.3d 721, 729 (6th Cir. 2019) (quoting *Police Dep't of*

10

*City of Chi. v. Mosely*, 408 U.S. 92, 95 (1972)). And when a statute does not regulate or compel expressive or ideological speech, strict scrutiny is not the applicable constitutional test. Indeed, the federal appellate courts have repeatedly declined to apply strict scrutiny to non-expressive, non-ideological disclosure requirements in the face of First Amendment challenges. *See, e.g., Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985) (declining to apply strict scrutiny to commercial speech); s*ee also Nat'l Electric Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) (upholding a labeling requirement containing purely factual and uncontroversial speech); *Conn. Bar Ass'n v. United States*, 620 F.3d 81 (2d Cir. 2010) (subjecting disclosure requirements to rational basis review); *N. Y. State Rest. Ass'n v. N. Y. C. Bd. of Health*, 556 F.3d 114 (2d Cir. 2009) (applying rational basis review to government mandated caloric disclosure requirements); *Scope Pictures, of Mo, Inc. v. City of Kan. City*, 140 F.3d 1201 (8th Cir. 1998) (upholding a signage requirement regarding venereal disease where the signage conveyed no political or ideological message); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) ("First Amendment protection against compelled speech. . . has only been found in the context of governmental compulsion to disseminate a particular political or ideological message.").

The signage required by the Act is neither ideological nor expressive speech. Ideological speech is speech which conveys a "point of view." *Wooley*, 430 U.S. at 715. An accurate statement of fact—such as the bathroom-usage policy chosen by Plaintiffs—does not communicate an ideological or political message. *See, e.g.*, *Dutchess/Putnam Rest. & Tavern Ass'n, Inc. v. Putnam Cnty. Dep't of Health*, 178 F.Supp.2d 396, 406 (S.D.N.Y. 2001) (holding that state-

mandated signs informing patrons of the risk of smoking did not constitute ideological speech and therefore did not violate the First Amendment).

Plaintiffs either misapprehend or have mischaracterized what the Act does. It does not compel that a business adopt a particular bathroom policy. Nor does it require exclusion of transgendered persons from the bathroom of their choice. Nor does it stigmatize businesses or patrons. Instead, the law requires only one thing: if a business's bathroom-use policy is different from its existing bathroom signage, it needs to inform its patrons as such. (Ex. A. Act.). Plaintiffs have imagined an idiosyncratic, hidden undertone to the signage that is not reflected in the Act's plain language. But Plaintiffs' projections cannot transform a neutral statute requiring a simple truthful statement of fact—aimed at informing the public without compelling the business or entity's ultimate choice of bathroom-usage policy—into expressive speech.

Plaintiffs' evidence in support of their idiosyncratic interpretation of the Act is a disputed fact rendering summary judgment inappropriate. In their statement of undisputed material facts, Plaintiffs assert that the term "biological sex" is a recent one without a uniform definition. Not so. The phrase "biological sex" is a common phrase that is also used throughout scientific literature and possesses a fixed and uniform definition. *See* Am. Psychiatric Assoc., *The Diagnostic and Statistical Manual of Mental Disorders*, 15 (5th ed. 2013) (Ex. C); Riittakerttu Kaltiala-Heino et al., *Gender dysphoria in adolescence: current perspectives*, ADOLESCENT HEALTH, MEDICINE AND THERAPEUTICS 2018: 9, 21, 21 (2018) (Ex. D); L.A. Walter and A.J. McGregor, *Sex- and Gender-specific Observations and Implications for COVID-19*, WEST J EMERG MED. 21(3): 507-509 (2020) (Ex. E); E.P. Scully et al., *Considering how biological sex impacts immune responses and COVID-19 outcomes*, NAT REV IMMUNOL 20, 442-447 (2020) (Ex. F); S.L. Klein et al., *Biological sex impacts COVID-19 outcomes*, PLOS PATHOG 16:6 (2020) (Ex. G). Further, "biological sex"

12

has the same meaning as the longstanding and broadly accepted definition of "sex." *See, e.g.*, *Sex*, New Oxford American Dictionary (3d ed. 2010) ("either of the two main categories (male and female) into which humans and many other living things are divided on the basis of their reproductive functions").

Plaintiffs also argue that the term "biological sex" is stigmatizing and inherently discriminatory. Again, not so. The term "biological sex" is a neutral term that conveys no stigma or viewpoint. Nor is the term necessarily indicative of attempts to limit or eliminate the legal recognition, protection, and rights of transgender people. *See*; *Doe 2 v. Shanahan*, 917 F.3d 694, 698 (D.C. Cir. 2019); *Able v. United States*, 88 F.3d 1280, 1286 (2d Cir. 1996); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 614 (4th Cir. 2020); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020); *Doe by and through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 347 (7th Cir. 2017); *Cruzan v. Special Sch. Dist, No. 1*, 294 F.3d 981, 983 (8th Cir. 2002); *Jackson v. Valdez*, --- Fed.App'x ---, 2021 WL 1990788, at *5 (5th Cir. 2021); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1225 (10th Cir. 2007); *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 578 (6th Cir. 2018) (affirmed by *Bostock v. Clayton Cnty., Ga.*, 140 S.Ct. 1731 (2020)); *Doe v. Hamilton Cnty. Bd. of Educ.*, 329 F.Supp.3d 543, 580 (E.D. Tenn. 2018); *Farmer v. Brennan*, 511 U.S. 825, 829 (1994); *Bostock*, 140 S.Ct. at 1752. The challenged Act speaks for itself, and like the cited judicial opinions, uses the term "biological sex" objectively and neutrally. *See also* Taylor Depo. at 79: 17-22 ("I think the intention of both of those terms ["biological sex" and "sex assigned at birth"] is the same".) (Attachment A).

Plaintiffs' preferred term "gender identity" is the newcomer. "Gender identity" is a term popularized by Robert Stoller, a UCLA psychoanalyst. According to Stoller, "sex was biological

13

but gender was social." David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles, 1945-2001*, Archives of Sexual Behavior, Apr. 2004, at 93 (Ex. H). The term "gender"—previously a grammatical term only—was itself introduced into scientific discourse in the 1950s by John Money, a psychologist at Johns Hopkins University. Joanne Meyerowitz, *A History of "Gender,"* 113 The American Historical Review 1346, 1354 (2008) (Ex. I). Research has not established "a strong biological basis" connecting transgender individuals' gender identity with the biological reality of how their bodies' reproductive systems are organized. Accordingly, many purported gender identities are unmoored from the male/female binary. *Cf. United States v. Varner*, 948 F.3d 250, 256-57 (5th Cir. 2020). Thus, gender identity plays no role in determining sex. *See* Bachtrog et al., *Sex Determination, Why So Many Ways of Doing It?* PLoS Biol, 2014 Jul; 12(7) (Ex. J).

Nor is their expert testimony on the alleged stigmatizing effect of the term "biological sex" undisputed. *See* Taylor Depo. 108; 8-13; 109; 24-25; 110; 1-7 (Attachment A). Plaintiffs' own expert testified that the term "biological sex" does not, in her experience, worsen gender dysphoria. *Id.* And Plaintiffs' attempts to call the term "biological sex" into question using rare syndromes likewise fails. Humans with disorders of sexual development still have a sex. For example, humans with Klinefelter syndrome (47XXY) are still men, and humans with Turner syndrome (45XO) are still women. Despite departures from the normal development expected for humans with 46XY or 46XX chromosomes, those with Klinefelter syndrome still have a male reproductive system while those with Turner system still have a female reproductive system. These two chromosomal disorders occur in a small proportion of the population. *See* NIH, *Klinefelter Syndrome*, Eunice Kennedy Shriver National Institute of Child Health and Human Development -

NICHD (nih.gov) (Ex. K); NIH, *Turner Syndrome*, Eunice Kennedy Shriver National Institute of Child Health and Human Development - NICHD (nih.gov) (Ex. L).

Nor do Plaintiffs demonstrate that the Act's required language would be misleading or untruthful. By the Act's plain language, Plaintiffs need only post the required signage if they *agree* with the language set forth by the Act—that "this facility maintains a policy of allowing the use of restrooms by either biological sex, regardless of the designation on the restroom." (Ex. A, Act. § 1(a) & (b)(3) (capitalization omitted)).

This distinction is critical. Because Plaintiffs need only comply with the Act if the signage language matches their bathroom-usage policy, the Act can only compel speech that is necessarily accurate. Accordingly, as the Act only requires the disclosure of accurate, non-ideological, and non-expressive speech, strict scrutiny does not apply and the statute need only satisfy the requirements of rational-basis review.

Thus, because the Act does not require expressive or ideological speech, the deferential standard of rational-basis review applies. Under rational-basis review, a law is presumed constitutional, and "[t]he burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotations omitted); *see also Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001) (stating that a statute is subject to a "strong presumption of validity" under rational-basis review and will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis").

A court conducting a rational-basis review does not sit "as a super legislature to judge the wisdom or desirability of legislative policy determinations" but asks only whether there is some conceivable rational basis for the challenged statute. *Heller*, 509 U.S. at 319. This means that under rational-basis review, it is "'constitutionally irrelevant [what] reasoning in fact underlays

15

the legislative decision.'" *R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603, 612 (1960)).

In enacting the informed-consent provision, the General Assembly and the citizens of Tennessee had "absolutely no obligation to select the scheme" that a court might later conclude was best. *Nat'l R.R. Passenger Corp. v. A.T. & S.F.R. Co.*, 470 U.S. 451, 477 (1985); *see McGowan v. Maryland*, 366 U.S. 420, 425-426 (1961) ("State legislatures are presumed to have acted within their constitutional power despite the fact that in practice, their laws result in some inequality."). And Tennessee "has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).

Here, the rational basis for the Act is readily apparent. Tennessee certainly has a compelling interest in ensuring that patrons are informed of the bathroom-use policy at businesses they frequent—especially when the bathroom-usage policy differs in practice from the existing bathroom signage used by business owners. Many Tennesseans would agree that being "forced to share changing, shower, and bathroom space with members of the opposite sex" does not provide the same "level of privacy and comfort that" a patron could "expect" in facilities separated based on biological sex. *Stuart v. Metro. Gov't of Nashville & Davidson Cnty.*, 679 F. Supp. 2d 851, 854, 859 (M.D. Tenn. 2009) (Trauger, J.), *vacated after settlement*.

And, although not required by rational-basis review, the statute is also narrowly tailored. The Act simply ensures that Tennesseans are informed of a company's policy before they enter a locker room or bathroom. It does not require Plaintiffs to adopt any specific bathroom-usage policy, nor does it blanketly prohibit patrons from using the bathroom contrary to their biological

16

sex. And the Act does not prohibit Plaintiffs from posting additional signs expressing their particular political or social views. Put another way, the law *does* allow Plaintiffs to permit any individual to use whatever restroom they choose, and it *does not* require using only the restroom that corresponds to biological sex. All that is required is that Plaintiffs inform their patrons of their bathroom-usage policy in the event that Plaintiffs use bathroom signage inconsistent with their chosen usage policy.

As the Act does not require—or inhibit—expressive, untruthful, or ideological speech, it easily satisfies the applicable constitutional standard.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

/s/ *Alexander S. Rieger*
ALEXANDER S. RIEGER
Senior Assistant Attorney General
Public Interest Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-2408
BPR No. 029362
Alex.rieger@ag.tn.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed and served electronically upon the following on this 2nd day of March, 2022:

Stella Yarbrough
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org
syarbrough@aclu-tn.org

Rose Saxe
Emerson Sykes
Malita Picasso
American Civil Liberties Union Foundation
125 Broad Street, 17th Floor
New York, NY 10004
Tel: (212) 549-2500
rsaxe@aclu.org
esykes@aclu.org

*/s/ Alexander S. Rieger*