# In The Matter Of:

*Bongo Productions, LLC, et al. vs.*
*Carter Lawrence, et al.*

---

*Shayne Taylor, M.D.*
*December 22, 2021*

---

*Omega Reporting*
*6465 North Quail Hollow Road*
*Suite 200*
*Memphis, Tennessee*
*Info@OmegaReporting.com*



The Ultimate in Professional Reporting...

Original File taylor122221.txt
Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BONGO PRODUCTIONS, LLC, ROBERT )
BERNSTEIN, SANCTUARY PERFORMING )
ARTS LLC, and KYE SAYERS, )
)
    Plaintiffs, )
)NO. 3:32-cv-00490
VS. )
)JUDGE TRAUGER
CARTER LAWRENCE, Tennessee State )
Fire Marshal, in his official )
capacity, CHRISTOPHER BAINBRIDGE, )
Director of Codes Enforcement, in )
his official capacity, GLENN R. )
FUNK, District Attorney General for )
the 20th Judicial District, in his )
official capacity, and NEAL )
PINKSTON, District Attorney General )
for 11th Judicial District, in his )
official capacity, )
)
    Defendants. )

WEB CONFERENCE/REMOTE DEPOSITION OF

SHAYNE TAYLOR, M.D.

December 22, 2021

LYNETTE L. MUELLER, LCR, RDR, CRR, FAPR
LCR No. 351

**Omega Reporting**
**901.827.8671**

Case 3:21-cv-00490   Document 39-1   Filed 03/02/22   Page 2 of 13 PageID #: 867
OMEGA REPORTING
OmegaReporting.com   901.827.8671

```
 1            The web conference/remote deposition of
 2   SHAYNE TAYLOR, M.D. is taken on December 22, 2021, on
 3   behalf of the Defendants, pursuant to notice and
 4   consent of counsel, beginning at approximately
 5   11:00 a.m.
 6            This web conference/remote deposition is
 7   taken pursuant to the terms and provisions of the
 8   Federal Rules of Civil Procedure.
 9            The right to read and sign was requested.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    A P P E A R A N C E S

 2        **ALL PARTIES APPEARING VIA ZOOM WEB CONFERENCE**

 3
      FOR THE PLAINTIFFS:
 4
            MALITA PICASSO, ESQ.
 5          American Civil Liberties Union Foundation
            125 Broad Street
 6          18th Floor
            New York, NY 10004
 7          (212) 549-2633

 8          and

 9          THOMAS H. CASTELLI, ESQ.
            American Civil Liberties Union
10          Foundation of Tennessee
            P.O. Box 120160
11          Nashville, TN 37212
            (615) 320-7142
12
      FOR THE DEFENDANTS:
13
            ALEXANDER S. RIEGER | SENIOR ASSISTANT
14          ATTORNEY GENERAL
            Public Interest Division, Office of the
15          Tennessee Attorney General
            War Memorial Building
16          301 Sixth Avenue North
            Nashville, TN 37202
17          (615) 741-2408

18    COURT REPORTER:

19          Lynette L. Mueller, LCR, RDR, CRR, FAPR,
            MS-CSR, AR-CCR
20          Tennessee LCR No. 351
            Mississippi CSR No. 1794
21          Arkansas CCR No. 788
            Omega Reporting
22          6465 North Quail Hollow Road
            Suite 200
23          Memphis, TN 38120
            901.827.8671
24          Lynette@OmegaReporting.com

25
```

INDEX

SHAYNE TAYLOR, M.D.:                                    PAGE

Examination by Mr. Rieger                                  5

Examination by Ms. Picasso                               112


                              E X H I B I T S

NO.                DESCRIPTION                           PAGE

Exhibit 1    Dr. Taylor's Bibliography                      9

Exhibit 2    Dr. Taylor's Curriculum Vitae                 10

Exhibit 3    Expert Report of Dr. Shayne                   60
             Sebold Taylor, M.D.

Exhibit 4    DSM-5 Excerpt                                 94

Exhibit 5    Article: "Gender dysphoria in                 97
             adolescence: current
             perspectives"

Court Reporter's Certificate                              115

1   SHAYNE TAYLOR, M.D.,
2   having been first duly sworn, was examined and
3   testified as follows:
4   EXAMINATION
5   BY MR. RIEGER:
6   Q.      Hi, Dr. Taylor. Thanks for -- thanks for
7   sitting down with us to have this deposition right
8   before the holidays. We do appreciate it.
9           My name is Alex Rieger, and I am with the
10  Attorney General's office. And I am lead counsel for
11  the Defendants in this case.
12          For the record, could I get you to
13  introduce yourself and spell your last name for the
14  record.
15  A.      Sure. My name is Dr. Shayne Taylor. My last
16  name is Taylor. T, as in Tom, A-Y-L-O-R.
17  Q.      All right. Well, thank you.
18          So in order to ensure that the deposition
19  goes as smoothly as possible, I like to start with some
20  rules of the road. So I know, from your preliminary
21  statement in your expert report, that you have given a
22  deposition before; is that correct?
23  A.      Just one. Yes.
24  Q.      Okay. And what was the -- what was your role
25  in that case? Were you an expert witness in that case?

1 Q.     Okay.  Is there anything else you do to stay
2 current on medical research and literature as described
3 in paragraph 9?
4 A.     That's generally most of what I do.
5 Q.     Okay.
6 A.     The occasional just literature search to make
7 sure I'm not missing anything big.
8 Q.     Okay.  All right.
9        Paragraph No. 14, when you say "sex" in
10 that paragraph, what are you referring to?  Are you
11 referring to biological sex?
12        MS. PICASSO:  Object to form.
13        But go ahead and answer, Dr. Taylor.
14 A.     I'm describing the sex as assigned at birth by
15 the visual appearance of an infant's genitals, external
16 genitals.
17 Q.     Is the concept of sex assigned at birth
18 different from the concept of biological sex?
19        MS. PICASSO:  Object to form.
20        But go ahead and answer, Dr. Taylor.
21 A.     I think the intention of both of those terms
22 is the same.  I think the difference in the language is
23 just a bit more nuanced.
24 Q.     Can you describe the nuance for me.
25 A.     I think "biological sex" can mean any number

1  just in general.
2  A.  I think -- I think both. I think it's
3  problematic for the person who is faced with the
4  decision to go to the bathroom and being faced with
5  this sign. I think it's also a larger scale as being a
6  member of a community whose state legislature feels
7  that it's appropriate to put up that sign.
8  Q.  Okay. Now, is it possible that someone who
9  has gender dysphoria could see the sign that's proposed
10 by the challenged law and not think -- not risk
11 worsening their gender dysphoria or having any -- or
12 not thinking that it's dangerous and distressing?
13 A.  Sure. That's certainly possible.
14 Q.  So is there any way to know in advance who
15 would have that issue of thinking the sign is dangerous
16 and distressing and -- you know, someone with gender
17 dysphoria, is there any way to tell whether or not, in
18 advance of them seeing the sign, that seeing that sign
19 would worsen their gender dysphoria or be dangerous or
20 distressing to them?
21 A.  No, not that I'm aware of.
22 Q.  Okay. Would it just be in -- you know, does
23 it depend on what they think it represents? What
24 someone with gender dysphoria, if they saw the sign, is
25 the harm that you described, that it's dangerous and

distressing and runs the risk of worsening gender dysphoria, is that based upon their perception of what the sign and use of the term "biological sex" represents?

A. Again, I think that that's part of it, for sure.

Q. Okay. And the other part being the sort of penumbral societal issue that you've talked about; is that right?

A. Yeah.

Q. Okay. Are there any other -- are there any other facets of harm besides that, you know, person by person, you know, it's dangerous, distressing, worsening gender dysphoria, and the societal aspect, are there any other facets of harm that you think would be caused by the sign referenced in the challenged law?

A. I'm sure --

MS. PICASSO: Object to form.

But go ahead and answer, Dr. Taylor.

A. I'm sure there are plenty. And if -- you know, given time, I could maybe think of others. But those are the overarching ones that I'm seeing right now.

Q. Okay. Have you had any -- without going into patient identity, without broaching any sort of

1  confidentiality, have you had a patient who has -- who
2  has had worsening gender dysphoria for seeing the
3  term or having the term said to them "biological sex"?
4  A.      No, not specifically that --
5  Q.      Okay.
6  A.      Nobody has come to my office and said, "I read
7  this term and that made my dysphoria worse."
8  Q.      Okay.  Are there common -- this is -- I'm not
9  a doctor.  I'm a lawyer.  So forgive me if this is --
10 this is imprecise or a problem.  Feel free to correct
11 me.
12          Are there common triggers for worsening
13 gender dysphoria that are common in your practice?
14 A.      Yes.
15 Q.      What are those?
16 A.      There are many upon many upon many.  But one
17 of them could be discrimination that patients are
18 facing in their communities or at their schools or in
19 their families.  You know, they can be -- I mean, there
20 are countless reasons why people come to me or reasons
21 to tell me that their dysphoria is worsening.
22          For fear -- like, in my young -- my young
23 patients, fear that they will no longer be able to
24 legally access hormonal treatment; that that could
25 potentially be taken away from them.  They lose

1 insurance. They can potentially lose access to their
2 treatment.
3       There are many things that -- I mean,
4 hundreds -- of why somebody would come to my office and
5 be feeling more dysphoric than prior.
6 Q.    But in your opinion, in your years of
7 practice, the term "biological sex" isn't one of those
8 common triggers for worsening gender dysphoria?
9 A.    No. That has not been something that somebody
10 has come to my office and complained about
11 specifically.
12 Q.    Okay. Okay.
13       MR. RIEGER: Well, that will do it for me. I
14 believe that your counsel wants to take a break and
15 then ask you a couple more questions. I can't promise
16 that I'm done. Because, you know, I may, depending on
17 the cross, have one or two.
18       But I'm ready to take that break, Malita,
19 if you are to go from there.
20       MS. PICASSO: Yeah. Is there any way I could
21 just have like a ten-minute break? I just have to run
22 to the restroom. Is that all right?
23       MR. RIEGER: Of course.
24       MS. PICASSO: All right. Cool.
25       MR. RIEGER: Thank you, Dr. Taylor, for

AMENDMENT SHEET

I, the undersigned, SHAYNE TAYLOR, M.D., do hereby certify that I have read the foregoing deposition in the case of BONGO PRODUCTIONS vs. CARTER LAWRENCE and that, to the best of my knowledge, said deposition is true and accurate with the exception of the following corrections listed below:

PAGE/LINE/REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____
Date                          Signature of Witness

Sworn to and Subscribed before me, _____,
this _____ day of _____, 2022.

_____        _____
Notary Public                 My Commission Expires

REPORTER'S CERTIFICATE

STATE OF TENNESSEE  )

COUNTY OF SHELBY    )

       I, LYNETTE L. MUELLER, LCR #351, RDR, CRR, FAPR, and Notary Public for the State of Tennessee, do hereby certify that the above transcript of proceedings was reported by me and that the foregoing transcript, consisting of Pages 1-115, at the time and place set forth in the caption thereof, were stenographically reported by me; constitute a true and correct transcript of said proceedings to the best of my knowledge, skills, and ability.

       I FURTHER CERTIFY that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome or events of this action.

       I FURTHER CERTIFY that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

       I FURTHER CERTIFY that the right to read and sign was requested.

       IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of office on 6th of January, 2022.

_____
LYNETTE L. MUELLER, LCR, RDR, CRR, FAPR
LCR NO. 351, Expires June 30, 2022
Tennessee LCR No. 351
Mississippi CSR No. 1794
Arkansas CCR No. 788
Notary Public at Large
For the State of Tennessee
Commission Expires August 17, 2025