**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| BONGO PRODUCTIONS, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action |
| | ) | No. 3:21-cv-490 |
| | ) | Judge Trauger |
| CARTER LAWRENCE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

### DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

---

Defendants respond as follows to Plaintiffs' statement of material facts as to which there are no genuine issues for trial:

**<u>PARTIES</u>**

1.     Plaintiff Bongo Productions, LLC ("Bongo") owns several restaurants, coffee shops and a coffee roasting company all located in Nashville, Tennessee. Bernstein Decl. ¶ 1, ECF No. 7-1; Bernstein Dep. at 16:14–17:3, Picasso Decl. Ex. 2.

**RESPONSE:**  Undisputed for purposes of summary judgment.

2.     Plaintiff Robert M. Bernstein is the founder and chief manager of Bongo. Bernstein Decl. ¶ 2, ECF No. 7-1.

**RESPONSE:**  Undisputed for purposes of summary judgment.

3.    Mr. Bernstein is responsible for decisions regarding compliance with state and local building codes for Bongo's establishments. Pls.' Resp. to Defs.' Interrogs. at 5–6, Picasso Decl. Ex. 10.

**RESPONSE:**  Undisputed for purposes of summary judgment.

4.    Defendant Carter Lawrence is the Commissioner of the Tennessee Department of Commerce and Insurance, and in that capacity, is also the Tennessee Fire Marshal and authorized by statute to enforce the state building code. Defs.' Resp. to Pls.' Interrogs. at 6–7, Picasso Decl. Ex. 9; Tenn. Code Ann. § 68-120-106.

**RESPONSE:**  Undisputed for purposes of summary judgment.

5.    Defendant Christopher Bainbridge is the Director of the Codes Enforcement Section of the Tennessee State Fire Marshal's Office and in that capacity has enforcement authority over statewide building codes and standards, including the Act. Defs.' Resp. to Pls.' Interrogs. at 6–7; Tenn. Comp. R. & Regs. 0780-02-16.01.

**RESPONSE:**  Undisputed for purposes of summary judgment.

6.    Defendant Glenn R. Funk is the District Attorney General for the 20th Judicial District which covers Metropolitan Davidson County and Nashville, Tennessee, and in that

capacity is responsible for prosecuting all violations of the state criminal statutes occurring in the judicial district. Tenn. Code Ann. §§ 8-7-103, 40-3-104.

**RESPONSE:** Undisputed for purposes of summary judgment.

7.     Defendant Neal Pinkston is the District Attorney General for 11th Judicial District which covers Hamilton County and Chattanooga, Tennessee, and in that capacity is responsible for prosecuting all violations of the state criminal statutes occurring in the judicial district. Tenn. Code Ann. §§ 8-7-103, 40-3-104.

**RESPONSE:** Undisputed for purposes of summary judgment.

**THE ACT**

8.     On April 29, 2021, the Tennessee General Assembly passed H.B. 1182 ("The Act"). H.B. 1182/S.B. 1224, 112th Gen. Assemb., 1st Reg. Sess. (Tenn. 2021), Picasso Decl. Ex. 1.

**RESPONSE:** Undisputed for purposes of summary judgment.

9.     On May 17, 2021, the Governor of Tennessee signed the Act into law. H.B. 1182.

**RESPONSE:** Undisputed for purposes of summary judgment.

3

10.     The Act went into effect on July 1, 2021.  H.B. 1182.

**RESPONSE:**  Undisputed for purposes of summary judgment.

11.     Enforcement of the Act was enjoined by the Court's Order granting Plaintiffs' Motion for a Preliminary Injunction against enforcement of the Act, dated July, 9, 2021. Mem. Op., ECF No. 22.

**RESPONSE:**  Undisputed for purposes of summary judgment.

12.     As enacted, the Act requires "[a] public or private entity or business that operates a building or facility open to the general public and that, as a matter of formal or informal policy, allows a member of either biological sex to use any public restroom within the building or facility shall post notice of the policy at the entrance of each public restroom in the building or facility."  H.B. 1182 § 1(a).

**RESPONSE:**  Defendants submit that the language of the Act speaks for itself and requires no separate acknowledgement.  However, to the extent a response is required, this restatement is undisputed for purposes of summary judgment.

13.     The Act's definition of "policy" includes "the internal policy of a public or private entity[.]" H.B. 1182 § 1(d)(1).

4

**RESPONSE:** Defendants submit that the language of the Act speaks for itself and requires no separate acknowledgement. However, to the extent a response is required, this restatement is undisputed for purposes of summary judgment.

14.     The Act defines "public restroom" to include those with facilities that are designated for "a specific biological sex," and to "exclude" "a unisex, single-occupant restroom or family restroom intended for use by either biological sex." H.B. 1182 § 1(d)(2).

**RESPONSE:** Defendants submit that the language of the Act speaks for itself and requires no separate acknowledgement. However, to the extent a response is required, this restatement is disputed for purposes of summary judgment as the Act specifically sets forth a number of criteria in (d)(2)(A) beyond those restated here.

15.     The Act further mandates: "Signage of the notice must be posted in a manner that is easily visible to a person entering the public restroom and must meet the following requirements: (1) Be at least eight inches (8") wide and six inches (6") tall; (2) The top one-third (1/3) of the sign must have a background color of red and state "NOTICE" in yellow text, centered in that portion of the sign; (3) The bottom two-thirds (2/3) of the sign must contain in boldface, block letters the following statement centered on that portion of the sign: THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM; (4) Except as provided in subdivision (b)(2), have a background color of white

with type in black; and (5) Be located on a door to which the sign must be affixed or have its leading edge located not more than one foot (1') from the outside edge of the frame of a door to which the sign must be affixed." H.B. 1182 § 1(b).

**RESPONSE:**  Defendants submit that the language of the Act speaks for itself and requires no separate acknowledgement.  However, to the extent a response is required, this restatement is undisputed for purposes of summary judgment.

16.     The Act does not define "biological sex." H.B. 1128.

**RESPONSE:**  Defendants submit that the language of the Act speaks for itself and requires no separate acknowledgement.  However, to the extent a response is required, this restatement is undisputed for purposes of summary judgment.

17.     Tennessee law requires that "[p]ublicly and privately owned facilities where the public congregates shall be equipped with sufficient temporary or permanent restrooms to meet the needs of the public at peak hours." Tenn. Code Ann. § 68-120-503(a); Ferguson Dep. at 15:23–16:14, Picasso Decl. Ex. 8.

**RESPONSE:**  Defendants submit that the quoted language speaks for itself and requires no separate acknowledgement.  However, to the extent a response is required, this restatement is undisputed for purposes of summary judgment.

**LEGISLATIVE HISTORY**

18.     During the legislative debates on H.B. 1182, the sole justification offered by its sponsor, Representative Tim Rudd, was that the bill was necessary to "protect[] women and children against" people who could "tak[e] advantage of policies, executive orders, or legislation[] that [] allow the 'opposite biological sex' to enter a [multi-occupancy] restroom, shower, or locker room." Picasso Decl. ¶ 20.

**RESPONSE:** Defendants submit that the legislative history of the Act speaks for itself and requires no separate acknowledgement. However, to the extent a response is required, this restatement is disputed as it is a modified version. The original version can be found here: https://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB1182. Defendants submit that the separate recitation in the Declaration of Malita Picasso (DE 37-1, ¶ 20) is accurate.


19.     He explained with "new [laws] . . . giving transgenders [sic] [more] rights . . . I don't want women . . . or children calling me next year [about] how they have been raped or molested [while using the bathroom facility]." Picasso Decl. ¶ 21.

**RESPONSE:** Defendants submit that the legislative history of the Act speaks for itself and requires no separate acknowledgement. However, to the extent a response is required, this restatement is disputed as it is a modified version. The original version can be found here: https://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB1182. Defendants submit that the separate recitation in the Declaration of Malita Picasso (DE 37-1, ¶ 21) is accurate.

7

20.     During a subsequent committee meeting, Representative Rudd stated that "a woman has the right to know whether a man is going to be in her bathroom and vice versa for a man." This too was a reference to transgender people using the restrooms that accord with their gender identity. Picasso Decl. ¶ 22.

**RESPONSE:** Defendants submit that the legislative history of the Act speaks for itself and requires no separate acknowledgement. However, to the extent a response is required, this restatement in the first sentence is undisputed. But Defendants submit that the editorializing in the second sentence is not supported by the Declaration of Malita Picasso (DE 37-1, ¶ 22), and is therefore disputed.

21.     When questioned by other representatives about the need for this bill, Representative Rudd responded that the bill was suggested by a constituent at a fundraiser, and he felt that the bill was needed because of the executive orders regarding rights for transgender people "coming out of Washington." Picasso Decl. ¶¶ 21, 23.

**RESPONSE:** Defendants submit that the legislative history of the Act speaks for itself and requires no separate acknowledgement. However, to the extent a response is required, this description of the legislative history is disputed as it is not in its original form. The original version can be found here: https://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB1182. Defendants submit that the separate recitations in the Declaration of Malita Picasso (DE 37-1, ¶¶ 21, 23) are accurate.

8

22.     During House floor debates on March 29, Representative Mike Stewart asked about the public policy underlying H.B. 1182. Representative Rudd once more responded that with the new executive orders and policies from Washington, it would be "good to put on notice." He also stated that it is "shocking and a danger to people that enter a bathroom marked 'men' or 'women' and someone of the opposite sex is standing there, which could scare people and provoke violence." Picasso Decl. ¶¶ 24–25.

**RESPONSE:**  Defendants submit that the legislative history of the Act speaks for itself and requires no separate acknowledgement.  However, to the extent a response is required, this restatement is disputed as it is a modified version.  The original version can be found here: https://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB1182.  Defendants submit that the separate recitations in the Declaration of Malita Picasso (DE 37-1, ¶¶ 24–25) are accurate.

23.     In 2021, the Tennessee General Assembly passed, and Governor Lee signed into law, five bills targeting transgender people in Tennessee, two of which specifically use the term "biological sex." Tenn. Code Ann. §§ 49-2-802, 68-120-120.

**RESPONSE:**  Defendants submit that the cited statutes speak for themselves and require no separate acknowledgement.  However, Defendants submit that the editorialization of these statutes is unsupported by the citations to this proposed undisputed fact and thus dispute Plaintiffs' depiction of them.

**ENFORCEMENT**

24.     The Office of the State Fire Marshal ("SFMO") is authorized to enforce the provisions of the Tennessee Building Code, which includes the Act. Defs.' Resp. to Pls.' at 6–7; Ferguson Dep. at 14:9–23, 17:14–18:2, 19:10–14.

**RESPONSE:** Undisputed for purposes of summary judgment.

25.     SFMO is authorized to enforce provisions of the Tennessee Building Code, including the Act, by receiving, reviewing, and responding to complaints from the public about violations. Ferguson Dep. at 21:2–25, 24:24–25:25.

**RESPONSE:** Undisputed for purposes of summary judgment.

26.     When SFMO receives a complaint alleging a violation of the Tennessee Building Code, it is authorized to send a building inspector to conduct a safety inspection of the building, and to issue a notice of violation to the building occupant informing them of the violation and directing them to remedy the violation by a set deadline. Ferguson Dep. at 25:17–27:3, 30:12–24.

**RESPONSE:** Undisputed for purposes of summary judgment.

27.     The Tennessee Building Code contemplates and permits the existence of exempt jurisdictions, which are those in which the local governmental body shares authority to enforce the provisions of the code with SFMO. Ferguson Dep. at 21:15–25.

**RESPONSE:** Undisputed for purposes of summary judgment.

28.     The SFMO shares the authority to enforce the provisions of the Tennessee Building Code, which includes the Act, with these local law enforcement agencies because its enabling statute sets forth concurrent jurisdiction. Ferguson Dep. at 21:15–25.

**RESPONSE:**  Undisputed for purposes of summary judgment.

29.     Where there is a conflict between SFMO and the local law enforcement agency, SFMO is authorized to resolve the conflict. Ferguson Dep. at 21:15–25.

**RESPONSE:**  Undisputed for purposes of summary judgment.

30.     When an exempt jurisdiction refuses or otherwise fails to enforce the provisions of the Tennessee Building Code, SFMO is authorized to notify the exempt jurisdiction of the failure and to take further enforcement action if the local authority persists in its failure to enforce.  Ferguson Dep. at 23:5–24:7.

**RESPONSE:**  Undisputed for purposes of summary judgment.

31.     If SFMO were to receive a complaint of an alleged violation of the Act, an SFMO inspector would schedule an inspection of the building that is the subject of the complaint. Ferguson Dep. at 51:8–23.

**RESPONSE:**  Undisputed for purposes of summary judgment.

32.     Defendants allege that the Act, "puts the burden on the business owner to either post a sign if they have a policy that allows a member of either biological sex to use the public restroom[,]" or not post a sign if they do not have a policy. Ferguson Dep. at 51:24–52:11, 59:1–6; 101:13–102:9.

**RESPONSE:**  Undisputed for purposes of summary judgment.

33.     Defendants have not provided any guidance to assist Tennessee business owners with complying with the Act.  Ferguson Dep. at 51:24–53:19.

**RESPONSE:**  Undisputed for purposes of summary judgment.

34.     Defendants acknowledge that it is a crime to submit false information to a state agency and that they are authorized to verify whether a business owner "submitted false information to a state agency in a regulatory context[,]" if a business owner informed SFMO that his building does not have a restroom policy that would require it to post the sign mandated by the Act. Ferguson Dep. at 55:17–56:13.

**RESPONSE:** Undisputed for purposes of summary judgment.

35.     Defendants' representative testified that an entity that permits transgender people to use the restroom that aligns with their gender identity but refused to post the sign mandated by the Act would be in violation of the Act. Ferguson Dep. at 60:9–65:8.

**RESPONSE:** Undisputed for purposes of summary judgment.

36.     Buildings or entities that violate the Act would be given written notice directing discontinuance of such illegal action and would be required to post the required sign within thirty days of receipt of the notice. Defs.' Resp. to Pls.' at 6–7, 13.

**RESPONSE:** Defendants submit that the language of the Act speaks for itself and requires no separate acknowledgement.  However, to the extent a response is required, this restatement is undisputed for purposes of summary judgment.

37.     Failure to post the required signage within the thirty-day period is classified as a Class B misdemeanor. Defs.' Resp. to Pls.' at 6–7, 13.

**RESPONSE:** Undisputed for purposes of summary judgment.

38.     Under Tennessee Law, a Class B misdemeanor is punishable by six (6) months in prison and fines of up to $500.00. Tenn. Code Ann. § 40-35-111(e)(2).

13

**RESPONSE:** Defendants submit that the language of the cited statute speaks for itself and requires no separate acknowledgement. However, to the extent a response is required, this restatement is undisputed for purposes of summary judgment.

39. Defendants allege that the Act is intended to further the state's interest in "providing people who may be using facilities where there is a reasonable expectation of privacy what they may encounter." Ferguson Dep. at 37:20–38:3.

**RESPONSE:** Undisputed for purposes of summary judgment.

40. Defendants have not provided any definition of the phrase "biological sex" in the Act, asserting a lack of the requisite scientific and medical expertise to do so. Ferguson Dep. at 41:20–43:1, 91:19–95:6.

**RESPONSE:** Defendants submit that the language of the Act speaks for itself and requires no separate acknowledgement. However, to the extent a response is required, this restatement of the language of the Act is undisputed for purposes of summary judgment.

41. If a business owner asserted that the phrase "biological sex" as it appears in the Act lacks a clear meaning, that business would be treated as refusing to comply with the Act and SFMO would refer the business owner to the local District Attorney for further enforcement. Ferguson Dep. at 95:7–99:5.

14

**RESPONSE:** Undisputed for purposes of summary judgment.

42.     Defendants have never received a complaint relating to a transgender person using a restroom at a business open to the public. Ferguson Dep. at 71:1–6.

**RESPONSE:** Undisputed for purposes of summary judgment.

43.     An exempt jurisdiction that persistently fails to enforce the Act could lose its exempt status based on its persistent failure to enforce the Act. Ferguson Dep. at 81:8–82:21.

**RESPONSE**: Undisputed for purposes of summary judgment

44.     SFMO is not prohibited from enforcing the Act in an exempt jurisdiction in which the local authority is refusing or otherwise failing to enforce the Act. Ferguson Dep. at 82:22–84:16.

**RESPONSE:** Undisputed for purposes of summary judgment.

**PLAINTIFFS ARE SUBJECT TO THE ACT**

45.     Mr. Bernstein opened Fido in 1996. Fido is a restaurant located in the Hillsboro Village neighborhood of Nashville. Bernstein Decl. ¶ 4, ECF No. 7-1.

**RESPONSE:** Undisputed for purposes of summary judgment

15

46.     Fido has 25 employees currently on staff and has employed hundreds of people over the years. Bernstein Decl. ¶ 5, ECF No. 7-1.

**RESPONSE:** Undisputed for purposes of summary judgment

47.     In the past, Bongo has employed transgender people. Bongo's and Fido's patrons include members of the transgender community. Bernstein Decl. ¶ 6, ECF No. 7-1.

**RESPONSE:** Undisputed for purposes of summary judgment

48.     Bongo and Mr. Bernstein have worked over the years to create a welcoming environment in their business for the LGBTQ community. In reaction to the rash of anti-transgender laws that passed this year and to show their support for transgender people, Fido's staff decorated one of their drink menu signs with transgender and LGBTQ pride flag colors. Bernstein Decl. ¶¶ 7–8, ECF No. 7-1.

**RESPONSE:** Undisputed for purposes of summary judgment except that Defendants dispute the mischaracterization of Tennessee's laws.

49.     Fido has three restrooms. One is a single-user unisex restroom, which is not subject to the Act. The other two restrooms have multiple stalls and/or urinals and bear sex-designations. Bernstein Decl. ¶ 9, ECF No. 7-1; Bernstein Dep. at 17:24–18:11.

16

**RESPONSE:** Undisputed for purposes of summary judgment

50.    Fido's two multi-stall and/or urinals that bear sex-designations are subject to the Act. Bernstein Decl. ¶ 9, ECF No. 7-1.

**RESPONSE:** Undisputed for purposes of summary judgment

51.    Prior to the passage of the Act, Fido's management and Mr. Bernstein had never thought about a formal policy as to who could use which restroom. Bernstein Decl. ¶ 11, ECF No. 7-1.

**RESPONSE:** Undisputed for purposes of summary judgment

52.    Plaintiffs' informal policy was to allow people to use the sex-designated restroom that best matches their gender identity. Bernstein Decl. ¶ 11, ECF No. 7-1.

**RESPONSE:** Undisputed for purposes of summary judgment

53.    Plaintiffs allows all women, including transgender women, to use the women's restroom and all men, including transgender men, to use the men's restroom. Bernstein Decl. ¶ 10, ECF No. 7-1.

**RESPONSE:** Defendants do not dispute that Plaintiffs allow anyone who identifies as a woman to use the women's restroom and anyone who identifies as a man to use the men's restroom, regardless of their biological sex.

54.     Plaintiffs have never received any complaints or concerns about their restroom policy or about transgender people using the restrooms consistent with their gender identity. Bernstein Decl. ¶ 12, ECF No. 7-1; Bernstein Dep. at 11:25–13:14, 28:5–29:23.

**RESPONSE:** Undisputed for purposes of summary judgment

55.     Plaintiffs believe that posting the warning notice sign required by the Act will offend Bongo's staff, customers, friends, and family, and that Plaintiffs may lose staff and customers if forced to post the sign. Bernstein Decl. ¶ 14, ECF No. 7-1; Bernstein Dep. at 34:10–16, 35:23–36:22, 50:9–13.

**RESPONSE:** Undisputed for purposes of summary judgment

56.     On or about August 18, a customer dining at Plaintiff Robert Bernstein's restaurant left a note for Mr. Bernstein expressing support of his and Plaintiff Bongo Production, LLC's challenge to the Act. The handwritten note states, "Thank you for suing the Tennessee Gov't on the Anti-Transgender Bathroom Bill. Here is a small contribution towards legal fees or

18

as you see fit. Thanks!!!" The customer did not disclose their identity and, to date, Mr. Bernstein

does not know who left the note. Pls.' Resp. to Defs.' Interrogs. at 6–7.

**RESPONSE:** Undisputed for purposes of summary judgment

## "BIOLOGICAL SEX"

57.     The phrase "biological sex" is a relatively recent one without a fixed or uniform

definition. Its uses within the fields of science and medicine are uncommon and at best reflect

differing and inconsistent interpretations among users, which can only be ascertained by relying

on additional information and the context in which it is used. Pls.' Resp. to Defs.' Interrogs. at 8;

Taylor Expert Report ¶¶15–16, Picasso Decl. Ex. 7.

**RESPONSE:** Disputed.  The phrase "biological sex" is a common phrase that is also used

throughout scientific literature and possesses a fixed and uniform definition.  *See* Am.

Psychiatric Assoc., *The Diagnostic and Statistical Manual of Mental Disorders*, 15 (5th ed.

2013); Riittakerttu Kaltiala-Heino et al., *Gender dysphoria in adolescence:  current perspectives*,

ADOLESCENT HEALTH, MEDICINE AND THERAPEUTICS 2018: 9, 21, 21 (2018); L.A. Walter and

A.J. McGregor, *Sex- and Gender-specific Observations and Implications for COVID-19*, WEST J

EMERG MED. 21(3): 507-509 (2020); E.P. Scully et al., *Considering how biological sex impacts*

*immune responses and COVID-19 outcomes*, NAT REV IMMUNOL 20, 442-447 (2020); S.L. Klein

et al., *Biological sex impacts COVID-19 outcomes*, PLOS PATHOG 16:6 (2020).  Further,

"biological sex" has the same meaning as the longstanding and broadly accepted definition of

"sex."  *See, e.g.*, *Sex*, New Oxford American Dictionary (3d ed. 2010) ("either of the two main

categories (male and female) into which humans and many other living things are divided on the

basis of their reproductive functions").

19

58.     Plaintiffs understand the phrase "biological sex" to be frequently used by those who seek to limit or eliminate the legal recognition, protection, and rights of transgender people. Plaintiffs understand the phrase to be used in the Act in order to single out transgender people by attempting to suggest a distinction between gender identity and so-called "biological sex." Used in contexts like the Act, Plaintiffs understand "biological sex" to be a phrase that is stigmatizing to transgender people. Pls.' Resp. to Defs.' Interrogs. at 8; Taylor Expert Report ¶¶ 30–31; Bernstein Decl. ¶¶ 14–16, ECF No. 7-1; Bernstein Dep. at 39:3–8, 41:22–42:5, 44:1–7, 53:7–54:6, 56:14–22.

**RESPONSE:** Disputed.  The term "biological sex" is a neutral term that conveys no stigma or viewpoint.  Nor is the term necessarily indicative of attempts to "limit or eliminate the legal recognition, protection, and rights of transgender people."  *See* Resp. to Undisputed Material Fact # 57; *Doe 2 v. Shanahan*, 917 F.3d 694, 698 (D.C. Cir. 2019); *Able v. United States*, 88 F.3d 1280, 1286 (2d Cir. 1996); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 614 (4th Cir. 2020); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020); *Doe by and through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 347 (7th Cir. 2017); *Cruzan v. Special Sch. Dist, No. 1*, 294 F.3d 981, 983 (8th Cir. 2002); *Jackson v. Valdez*, --- Fed.App'x ---, 2021 WL 1990788, at *5 (5th Cir. 2021); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1225 (10th Cir. 2007); *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 578 (6th Cir. 2018) (affirmed by *Bostock v. Clayton Cnty., Ga.*, 140 S.Ct. 1731 (2020)); *Doe v. Hamilton Cnty. Bd. of Educ.*, 329 F.Supp.3d 543, 580 (E.D. Tenn. 2018); *Farmer v. Brennan*, 511 U.S. 825, 829 (1994); *Bostock*, 140 S.Ct. at 1752. The challenged Act speaks for itself, and like the cited judicial opinions, uses the term

20

"biological sex" objectively and neutrally. *See also* Taylor Depo. at 79: 17-22 ("I think the intention of both of those terms ["biological sex" and "sex assigned at birth"] is the same".)

59.  The sex of a child is most often determined after delivery based on the visual appearance of an infant's external genitals. Taylor Expert Report ¶ 14.

**RESPONSE:** Undisputed for purposes of summary judgment.

60.  Research has identified that determination of sex is far more complex than what is seen on genital exam. Instead, sex is a complex compilation of multiple factors including one's chromosomal make up (XX for those assigned female at birth, XY for those assigned male at birth), gonadal sex (presence of ovaries or testes), fetal hormonal sex (production of sex hormones by the fetus or exogenous exposure of sex hormones to the developing fetus), pubertal hormonal sex (the change in hormonal milieu that results in the development of secondary sexual characteristics- facial hair and deep voice for those assigned male at birth, breasts and menstrual cycles for those assigned female), hypothalamic sex (variations in brain structure and function as a result of embryonal exposure of sex hormones), and gender identity. Taylor Expert Report ¶ 15.

**RESPONSE:** Disputed. In humans, sex is determined by organization with respect to the reproductive system, which is determined by the sex chromosomes. *See* Bachtrog et al., *Sex Determination, Why So Many Ways of Doing It?* PLoS Biol, 2014 Jul; 12(7). These chromosomes initiate gonadal differentiation and "sex hormones initiate further sexual differentiation in nongonadal tissues and organs." *Id.* Gender identity is irrelevant to the

21

determination of a human's sex. Defendants also dispute that sex is "assigned" at birth; it is recorded.

61.     For each of the factors that contribute to the development of sex, there can be variations. Sex related characteristics do not always align as either completely male or completely female. Taylor Expert Report ¶ 16.

**RESPONSE:** Disputed as the underlying premise is disputed. *See* Resp. to Undisputed Material Fact # 60

62.     Many children are born with ambiguous genitalia, and as a result it is difficult to assign these infants as either male or female at birth. These patients are often identified as intersex, which is one of many disorders of sexual development (DSD). These children often see multiple specialists throughout their lifespan. Other examples of DSDs are those of chromosomal differences. The typical human chromosomal make up includes 46XY for males and 46XX for females. However, in male patients with Kleinfelter's syndrome their chromosomal makeup is 47XXY. These chromosomal male individuals have an extra X chromosome. The results include breast development and small testes, in addition to other physical findings. Patients with Turner Syndrome are 45XO. These female individuals are missing an X chromosome, and as such many of them do not develop normal female puberty and are often infertile. These variations are common. The Monroe Carrell Children's Hospital at Vanderbilt has an entire clinic to cater to the medical needs of this patient population. Taylor Expert Report ¶ 16.

**RESPONSE:**  Disputed except for the fifth and last sentences, which are undisputed for the purposes of summary judgment.  Most children are not born with ambiguous genitalia.  Further, sex is not assigned at birth; it is recorded as male or female.  Humans with disorders of sexual development still have a sex.  For example, humans with Klinefelter syndrome (47XXY) are still men, and humans with Turner syndrome (45XO) are still women.  Despite departures from the normal development expected for humans with 46XY or 46XX chromosomes, those with Klinefelter syndrome still have a male reproductive system while those with Turner system still have a female reproductive system.  These two chromosomal disorders occur in a small proportion of the population.  *See* NIH, *Klinefelter Syndrome*, Eunice Kennedy Shriver National Institute of Child Health and Human Development - NICHD (nih.gov); NIH, *Turner Syndrome*, Eunice Kennedy Shriver National Institute of Child Health and Human Development - NICHD (nih.gov)

63.     Gender identity is a person's inner sense of belonging to a particular gender. Identifying as male or female is a core component of one's overall identity. Every person has a gender identity. Research has shown that children begin to develop and express their gender identity during their toddler years, at around the age of 3 years old. It has a strong biological basis and cannot be changed. Taylor Expert Report ¶ 17.

**RESPONSE:**  Disputed.  "Gender identity" is a term popularized by Robert Stoller, a UCLA psychoanalyst.  According to Stoller, "sex was biological but gender was social."  David Haig, *The Inexorable Rise of Gender and the Decline of Sex:  Social Change in Academic Titles, 1945-2001*, Archives of Sexual Behavior, Apr. 2004, at 93.  The term "gender"—previously a

grammatical term only—was itself introduced into scientific discourse in the 1950s by John Money, a psychologist at Johns Hopkins University. Joanne Meyerowitz, *A History of "Gender,"* 113 The American Historical Review 1346, 1354 (2008). Research has not established "a strong biological basis" connecting transgender individuals' gender identity with the biological reality of how their bodies' reproductive systems are organized. Accordingly, many purported gender identities are unmoored from the male/female binary. *Cf. United States v. Varner*, 948 F.3d 250, 256-57 (5th Cir. 2020). And toddlers' beliefs about reality are not always (1) accurate, or (2) incapable of changing.

64.　　Scientific research has discovered many biological reasons for how an individual develops a gender identity. Complex interactions between hormones, chromosomes, and the developing embryo in utero are at the center of these theories. Taylor Expert Report ¶ 18.

**RESPONSE:** Disputed. These novel ideas are merely theories, and a transgender individual's gender identity is not determined by the biological reality of how his or her reproductive system is organized.

65.　　From a medical perspective, in the event that one's gender identity does not match their sex assigned at birth, i.e. in transgender people, one's gender identity should be the determining factor of their sex. The medical consensus recognizes that when one's sex related-characteristics are not in alignment, a person's gender identity is the determining factor, more important than the presence of their genitals, their chromosomal analysis, or their hormone levels. Taylor Expert Report ¶ 19.

**RESPONSE:** Disputed. Sex is not "assigned" at birth; it is recorded in recognition of the organization of the baby's reproductive system. The organization of the reproductive system is determined by sex chromosomes. *See* Bachtrog et al., *Sex Determination, Why So Many Ways of Doing It?* PLoS Biol, 2014 Jul; 12(7). These chromosomes initiate gonadal differentiation and "sex hormones initiate further sexual differentiation in nongonadal tissues and organs." *Id.* Gender identity plays no role in determining sex.

66. Transgender people have a gender identity that differs from the sex that was assigned to them at birth. Taylor Expert Report ¶ 20.

**RESPONSE:** Undisputed for purposes of summary judgment except that Defendants dispute the assertion that sex is "assigned" at birth; it is recorded.

67. This lack of alignment of assigned sex and gender identity can result in severe distress, depression, and anxiety. This constellation of symptoms is termed gender dysphoria. Taylor Expert Report ¶ 21.

**RESPONSE:** Undisputed for purposes of summary judgment except that Defendants dispute the assertion that sex is "assigned" at birth; it is recorded.

68. Treating gender dysphoria results in significant improvement in the quality of life, mental and physical health of transgender persons. Transgender people undergoing treatment for

their gender dysphoria can live long, happy, productive and meaningful lives. Taylor Expert Report ¶ 22.

**RESPONSE:** Immaterial for the purposes of summary judgment. This fact is irrelevant to the constitutionality of the Act on First Amendment compelled speech-grounds.

69.     Gender transition for those that suffer from Gender Dysphoria is a lengthy process with multiple components. These components may include social transition, medical transition, and surgical transition. Each transgender individual approaches transition differently, as the decision to undergo any aspect of transition is deeply personal and depends on the degree and type of dysphoria the patient is experiencing. Taylor Expert Report ¶ 23.

**RESPONSE:** Undisputed for purposes of summary judgment.

70.     The social transition is a formative aspect of a transgender person's experience. Social transition can include going by a different name, using different pronouns, or changing one's haircut or clothing to match one's gender identity. Taylor Expert Report ¶ 24.

**RESPONSE:** Immaterial for the purposes of summary judgment. This fact is irrelevant to the constitutionality of the Act on First Amendment compelled speech-grounds.

71.     As part of the social transition, a transgender individual will make changes that will allow them to seamlessly incorporate into their communities with a presentation that

matches with their gender identity. This may mean using a restroom facility that matches their gender identity in the same way that a non-transgender person uses the bathroom that matches their gender identity. Taylor Expert Report ¶ 25.

**RESPONSE:** Disputed. Not all transgender individuals view transition the same way, *see* Taylor Expert Report ¶ 25, and this "social transition" is not necessarily "seamless[]." Additionally, many purported gender identities are unmoored from the male/female binary. *Cf. United States v. Varner*, 948 F.3d 250, 256-57 (5th Cir. 2020). Individuals normally use the bathroom that matches their sex, which is biological.

72. In addition to social transition, some transgender individuals interface with a healthcare setting for medical or surgical intervention. Medical transition often includes the prescription of hormones so that the transgender person can develop secondary sexual characteristics of the sex with which they identify. This may mean that a transgender man (or someone who was assigned female at birth) may grow facial hair and develop a much deeper voice as a result of testosterone treatment. Alternatively, transgender women (assigned male at birth), may develop breast tissue and a more feminine body fat distribution as a result of estrogen that may be prescribed by a clinician. Taylor Expert Report ¶ 26.

**RESPONSE:** Immaterial for the purposes of summary judgment. This fact is irrelevant to the constitutionality of the Act on First Amendment compelled speech-grounds.

73.     Some transgender patients also seek surgical transition. These surgical procedures further change the patient's anatomy so that their outward appearance matches more closely with their gender identity. Taylor Expert Report ¶ 27.

**RESPONSE:**  Immaterial for the purposes of summary judgment.  This fact is irrelevant to the constitutionality of the Act on First Amendment compelled speech-grounds.

74.     Given the medical and surgical treatments that transgender patients may encounter, they are often no longer presenting as their sex assigned at birth. Taylor Expert Report ¶ 28.

**RESPONSE:**  Disputed.  Sex is not "assigned" at birth; it is recorded in recognition of the organization of the baby's reproductive system.  As the organization of the reproductive system is determined by sex chromosomes, *see* Bachtrog et al., *Sex Determination, Why So Many Ways of Doing It?* PLoS Biol, 2014 Jul; 12(7), transgender patients still medically present as their immutable biological sex, despite any differentiation in appearance.

75.     Forcing transgender people to use the restroom designated for the sex assigned to them at birth will increase rather than reduce stress and anxiety for bathroom users, both transgender and otherwise. Taylor Expert Report ¶ 28.

**RESPONSE:**  Disputed.  *See* Taylor Depo. 108; 8-13:

Q:  Okay.  Now is it possible that someone who has gender dysphoria could see the sign that's proposed by the challenged law and not think—not risk worsening their gender dysphoria or having any—or not thinking that it's dangerous and distressing?

A:  Sure.  That's certainly possible.

76.     There are approximately 1.6 million people in the United States who identify as transgender, of which an estimated 31,000 transgender people (or 0.6% of the state's population) live in the state of Tennessee. Tennessee is ranked 10th in the nation for its percentage of transgender residents. Taylor Expert Report ¶ 29.

**RESPONSE:**  Undisputed for purposes of summary judgment that this reflects the estimates of the 2016 Williams Institute report.  *See* Taylor Expert Report ¶ 29.  This organization's estimate is based on an optional questionnaire that did not include any responses by Tennesseans.  *See* Williams Institute, *How Many Adults Identify as Transgender in the United States?* 7 (June 2016).

77.     Experts who study sex and gender understand that the biology and identity of a human being is far more complex than what can be identified on an individual's genital anatomy or chromosomal evaluation. Taylor Expert Report ¶ 30.

**RESPONSE:**  Disputed.  While biology is no doubt a "complex" field of scientific inquiry, the phrase "biological sex" is a commonly used phrase that is also used throughout scientific literature and possesses a fixed and uniform definition.  *See* Resp. to Undisputed Material Fact #

29

57.  Further, sex is recorded in recognition of the biological organization of the reproductive system.  This is not typically a "complex" analysis.

78.     A large, posted sign referencing "biological sex" on every business is stigmatizing and isolating for transgender Tennesseans and runs the risk of worsening gender dysphoria for those that suffer from the condition. Taylor Expert Report ¶ 31.

**RESPONSE:**  Disputed.  *See* Taylor Depo. 109; 24-25; 110; 1-7:

Q:  Okay.  Having you had any—without going into patient identity, without broaching any sort of confidentiality, have you had a patient who has—who has had worsening gender dysphoria for seeing the term or having the term said to them "biological sex"?

A:  No, not specifically that—

Q:  Okay.

A:  Nobody has come to my office and said, "I read this term and that made my dysphoria worse."

*See also* Taylor Depo. 111: 6-12

Q:  But in your opinion, in your years of practice, the term "biological sex" isn't one of those common triggers for worsening gender dysphoria?

A:  No. That has not been something that somebody has come to my office and complained about specifically.

79.     The phrase "BIOLOGICAL SEX" does not have a single, agreed upon definition. Pls.' Resp. to Defs.' Interrogs. at 11; Taylor Expert Report ¶ 15, Katrina Karkazis, *The Misuses*

*of 'Biological Sex,'* 394 The Lancet 1898 (Nov. 23, 2019),

https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(19)32764-3/fulltext.

**RESPONSE:** Disputed. *See* Resp. Undisputed Material Fact # 57 and # 58.

80. There have never been any incidents or causes for concern arising from the Plaintiffs' restroom policies. Pls.' Resp. to Defs.' Interrogs. at 12; Bernstein Decl. ¶¶ 14–16, ECF No. 7-1; Bernstein Dep. 11:25–13:14, 28:5–29:23.

**RESPONSE:** Undisputed for purposes of summary judgment.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

/s/ *Alexander S. Rieger*
ALEXANDER S. RIEGER
Senior Assistant Attorney General
Public Interest Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-2408
BPR No. 029362
Alex.rieger@ag.tn.gov

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the foregoing was filed and served electronically upon the following on this 2nd day of March, 2022:

Stella Yarbrough
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org
syarbrough@aclu-tn.org

Rose Saxe
Emerson Sykes
Malita Picasso
American Civil Liberties Union Foundation
125 Broad Street, 17th Floor
New York, NY 10004
Tel: (212) 549-2500
rsaxe@aclu.org
esykes@aclu.org

*/s/ Alexander S. Rieger*