# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

BONGO PRODUCTIONS, LLC, and )
ROBERT BERNSTEIN, )
                                  )
**Plaintiffs,** )
                                  )
**v.** )       **Case No. 3:21-cv-00490**
                                  )        **Judge Aleta A. Trauger**
**CARTER LAWRENCE, Tennessee State** )
**Fire Marshall, in his official capacity,** )
**CHRISTOPHER BAINBRIDGE, Director** )
**of Code Enforcement, in his official capacity,** )
**GLENN R. FUNK, District Attorney** )
**General for the 20th Judicial District, in his** )
**official capacity, and NEAL PINKSTON,** )
**District Attorney General for the 11th** )
**Judicial District, in his official capacity,** )
                                  )
**Defendants.** )

## MEMORANDUM

Plaintiffs Bongo Productions, LLC ("Bongo") and Robert Bernstein have filed a Motion for Summary Judgment (Doc. No. 35), to which Commissioner/Fire Marshall Carter Lawrence, Codes Director Christopher Bainbridge, District Attorney General ("DAG") Glenn R. Funk, and DAG Neal Pinkston have filed a Response (Doc. No. 39), and the plaintiffs have filed a Reply (Doc. No. 41). For the reasons set out herein, the plaintiffs' motion will be granted.

## I. INTRODUCTION

"When the government wishes to state an opinion [or] to speak for the community, . . . it naturally chooses what to say and what not to say." *Shurtleff v. City of Bos., Mass.*, No. 20-1800, 2022 WL 1295700, at *4 (U.S. May 2, 2022) (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 206–07 (2015). That broad discretion, however, comes with a caveat: if the government wishes to speak freely, it must speak in its own voice. If the

government instead uses its police powers to "compel private persons to convey the government's" message, then the First Amendment's Free Speech Clause comes into play and "may constrain" the exercise of that power. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015).

That does not mean that compelled speech is always unconstitutional. Rather, courts have closely looked at the various situations in which compelled speech issues arise—from product labeling[1] to compulsory displays of patriotism[2]—and have concluded that some types of compelled speech are more constitutionally suspect than others. Although a complex range of factors may come into play, the type of forced-speech policy most likely to run afoul of the First Amendment is, generally speaking, one in which "individuals are coerced into betraying their convictions" by "involuntar[ily] affirm[ing]" the government's position on a "controversial" topic. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464, 2476 (2018). That is particularly true when the controversial speech being compelled is not "purely factual" in nature. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("*NIFLA*") (quoting *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985))

The Supreme Court has expressly recognized that "sexual orientation and gender identity" are among the "controversial subjects" capable of raising such constitutional concerns. *Janus*, 138 S. Ct. at 2476. In 2021, however, the Tennessee General Assembly passed a law mandating that private parties voice a specific message on precisely that issue. The newly-enacted law requires any qualifying business with what the court will, for efficiency's sake, refer

---

[1] *See, e.g., Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012).

[2] *See, e.g., W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

Case 3:21-cv-00490   Document 42   Filed 05/17/22   Page 2 of 40 PageID #: 1132

to as a "trans-inclusive" restroom policy—that is, a formal or informal policy of allowing transgender and nonbinary patrons to use the restrooms that they earnestly believe to be appropriate for them—to post a garish warning sign announcing that policy in specific language of the government's, not their, choice. This First Amendment challenge predictably followed.

The defendants in this case, public officials charged with enforcing that law, do not dispute that, if Tennessee had adopted a statute requiring private individuals to endorse or denounce a particular view of transgender individuals or transgender rights, that law would be unconstitutional. Rather, the defendants argue that Tennessee's law is nothing but a harmless, content-neutral rule directed at clarifying restroom signage, not a public jab at transgender Tennesseans or an endorsement of a particular vision of how gender identity should be understood. Even a cursory examination of the facts, however, reveals that the government's defense of the law is, at best, a thin and unconvincing veneer applied to a law that does exactly what the plaintiffs say it does. Because that kind of forced affirmance of a contestable message violates the Constitution, the plaintiffs argue, the enforcement of the Act should be enjoined.

## II. BACKGROUND

### A. The Parties

**1. Plaintiffs.** Bongo owns several restaurants and coffee shops, as well as a coffee roasting operation. Bernstein is its founder and chief manager. In that capacity, Bernstein is responsible for overseeing the operations of Bongo's businesses and making decisions regarding day-to-day issues, including those involving the businesses' compliance with building codes. (Doc. No. 40 ¶¶ 1–3.)

One of Bongo's most prominent restaurants is Fido, located in Nashville's Hillsboro Village neighborhood. Since Bernstein opened Fido in 1996, it has employed hundreds of

individuals and served many more, and it has counted transgender individuals among both its customers and its employees. (Id. ¶¶ 45–47.) According to Bernstein, he and Bongo have made a concerted effort to create a "welcoming environment . . . for the LGBTQ community" at Fido. (*Id.* ¶ 48.) For example, Bernstein states that Fido's employees "decorated one of their drink menu signs with transgender and LGBTQ pride flag colors." (Id.) That step, according to Bernstein, was a direct response to perceived hostility to transgender people in the form of a "rash of anti-transgender laws." (*Id.*)

Fido has three restrooms, including two multiple-user restrooms bearing "sex designations." (*Id.* ¶ 49.) Before the law at issue in this case was enacted, Bernstein and the rest of Fido's management "had never thought about a formal policy as to who could use which restroom." (*Id.* ¶ 51.) However, the restaurant's "informal policy was to allow people to use the sex-designated restroom that best matches their gender identity." (*Id.* ¶ 52.)

**2. State-Level Defendants.** Carter Lawrence is the Commissioner of the Tennessee Department of Commerce and Insurance. Part of his duties, as Commissioner, is serving as the State of Tennessee's Fire Marshall and heading the State Fire Marshall's Office ("SFMO"). It is undisputed that Fire Marshall Lawrence is "authorized by statute to enforce the state building code." (*Id.* ¶ 4 (citing Tenn. Code Ann. § 68-120-106).)

Christopher Bainbridge is the SFMO's Director of Codes Enforcement. It is undisputed that Director Bainbridge, like Commissioner Lawrence, "has enforcement authority over statewide building codes and standards." (*Id.* ¶ 5.)

The SFMO's duties include "receiving, reviewing, and responding to complaints from the public about violations" of that code. (*Id.* ¶ 25.) When SFMO receives a complaint, it is authorized to send a building inspector to perform a physical inspection of the subject building at

4

issue and to "issue a notice of violation to the building occupant informing them of the violation and directing them to remedy the violation by a set deadline." (*Id.* ¶ 26.)

The SFMO considers some parts of Tennessee to be what it refers to as "exempt jurisdictions." (*Id.* ¶ 27.) *See* Tenn. Code Ann. § 68-120-101(b)(1)(B). An exempt jurisdiction, however, is not actually exempt from compliance with the building code or from enforcement by the SFMO. Rather, the parties agree that, in an exempt jurisdiction, the SFMO "shares the authority to enforce the provisions of the Tennessee Building Code . . . with [exempt jurisdictions'] local law enforcement agencies" in a "concurrent" manner. (*Id.* ¶ 28.) The Defendants concede that, "[w]here there is a conflict between SFMO and the local law enforcement agency, SFMO is authorized to resolve the conflict." (*Id.* ¶ 29.) What this means, in practice, is that the SFMO "allow[s]" local authorities in exempt jurisdictions to be the "primary enforcement authority" when it comes to matters on which the SFMO and those authorities agree, but not if "there is a conflict" between the two. (Doc. No. 37-9 at 21 (testimony of Rule 30(b)(6) witness representing the SFMO).)

"When an exempt jurisdiction refuses or otherwise fails to enforce the provisions of the Tennessee Building Code, SFMO is authorized to notify the exempt jurisdiction of the failure and to take further enforcement action if the local authority persists in its failure to enforce." (Doc. No. 40 ¶ 30.) The SFMO does not, however, have a general statutory authority to commence criminal prosecutions of building code violations, which, like other state-law criminal prosecutions, are in the purview of the state's local DAGs.

**3. Prosecutor Defendants.** Glenn R. Funk is the DAG of Tennessee's 20th Judicial District. In that capacity, he "is responsible for prosecuting all violations of the state criminal statutes occurring in the judicial district." (*Id.* ¶ 6 (citing Tenn. Code Ann. §§ 8-7-103, 40-3-

104).) Neal Pinkston is the DAG for Tennessee's 11th Judicial District. His duties in that district are the same as Funk's in the 20th. (*Id.* ¶ 7.)

**B. The Act**

**1. Express Provisions of the Act.** On April 29, 2021, the Tennessee General Assembly passed H.B. 1182/S.B. 1224, which the Governor signed into law on May 17, 2021 and which this court will refer to as "the Act." (*See* Doc. No. 1-1 at 4.) The Act went into effect on July 1, 2021. (*Id.*) Subsection (a) of the Act requires that any

> public or private entity or business that operates a building or facility open to the general public and that, as a matter of formal or informal policy, allows a member of either biological sex to use any public restroom within the building or facility shall post notice of the policy at the entrance of each public restroom in the building or facility.

Act § 1(a). The Act defines "policy" to mean "the internal policy of a public or private entity or such policy as the result of a rule, ordinance, or resolution adopted by an agency or political subdivision of this state." Act § 1(d)(1). It defines "public restroom" as any "locker room, shower facility, dressing area, or other facility or area that is . . . [o]pen to the general public; [d]esignated for a specific biological sex; and [a] facility or area where a person would have a reasonable expectation of privacy." Act § 1(d)(2). That definition "[e]xcludes a unisex, single-occupant restroom or family restroom intended for use by either biological sex." Act § 1(d)(2)(B).

Although subsection (a) of the Act, on its face, requires only a posted "notice," subsection (b) mandates, in detail, the form that that notice must take:

> Signage of the notice must be posted in a manner that is easily visible to a person entering the public restroom and must meet the following requirements:
>
> > (1) Be at least eight inches (8") wide and six inches (6") tall;

6

(2) The top one-third (1/3) of the sign must have a background color of red and state "NOTICE" in yellow text, centered in that portion of the sign;

(3) The bottom two-thirds (2/3) of the sign must contain in boldface, block letters the following statement centered on that portion of the sign:

> THIS FACILITY MAINTAINS A POLICY OF ALLOWING THE USE OF RESTROOMS BY EITHER BIOLOGICAL SEX, REGARDLESS OF THE DESIGNATION ON THE RESTROOM

(4) Except as provided in subdivision (b)(2), have a background color of white with type in black; and

(5) Be located on a door to which the sign must be affixed or have its leading edge located not more than one foot (1') from the outside edge of the frame of a door to which the sign must be affixed.

Act § 1(b).

The Act gives any entity or business that is in violation of the Act thirty days from being "notified that it is not in compliance" to post the required signage, after which "action" may be "taken against the entity or business." Act § 1(c). Because the Act is situated in the state's building code, a violation of the Act—that is, not placing a required sign and then refusing, after thirty days, to do so—is a Class B misdemeanor. Tenn. Code Ann. § 68-120-108(a).

**2. The Act's Scope.** The language stating that the Act applies only to restrooms "[d]esignated for a specific biological sex" is somewhat confusing, given that few, if any, public restrooms in Tennessee make any express reference to "biological sex" in their signage. The legislative history of the Act, however, which the court will discuss in the next subsection, makes clear that the General Assembly intended the Act to reach any restroom with a verbal designation such as "men" or, by extension, a visual designation such as an icon appearing to wear gendered clothing.

This court is constitutionally bound to interpret the Act in the manner that it believes that the Tennessee Supreme Court would. *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016)

(discussing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938)). Tennessee caselaw is clear that, "[w]hen construing a statute, the intent of the legislature must prevail," at least as long as the legislature's intent can be reconciled with the "natural and ordinary meaning of the language in the statute, within the context of the entire statute." *Young v. Frist Cardiology, PLLC*, 599 S.W.3d 568, 571 (Tenn. 2020) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526–27 (Tenn. 2010)). In this case, the meaning expressly intended by the Tennessee General Assembly is among the readings consistent with the plain language of the Act, and that is that the Act applies to restrooms that are designated for use by any specific sex or gender in the ordinary manner—such as, for example, with a sign reading "Men" or "Women"—if the establishment's formal or informal policy does not restrict access to those restrooms by "biological sex," as the term was understood by the General Assembly.

     **3. Circumstances of Enactment.** The Act's sponsor, Representative Tim Rudd, explained that he introduced the Act because he was concerned about "[n]ew executive orders . . . and new legislation proposed in Congress giving transgenders [sic] rights and extending those rights."[3] He initially suggested, however, that he did not consider the law to be "aimed at transgenders [sic]."[4] Rather, he was concerned, he said, about the possibility of hypothetical sexual predators who would "take advantage of" trans-inclusive public restroom policies to "assault[] or rape[]" other restroom users.[5] Shortly before that declaration, Rudd was asked by Tennessee House Speaker Pro Tempore Pat Marsh whether the State was "having a problem with this now, that you know of . . . anywhere." Rudd was unable to provide any

---

[3] Debate of H.B. 1182 Before the H. Pub. Serv. Comm. at 31:49, 112th Gen. Assemb. (Mar. 10, 2021), at https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24150.

[4] *Id.*

[5] *Id.*

examples or evidence of such a problem. Instead, he explained that "[w]e shouldn't wait for people's rights to be abused" in order to act and potentially prevent "an attack."[6]

At a later committee hearing, however, Representative Rudd explained that the Act was justified, at least in part, by the fact that, in his view, "a woman has the right to know whether a man is going to be in her bathroom and vice versa for a man." (Doc. No. 40 ¶ 20.) During floor debates, Representative Rudd stated that it is "shocking and a danger to people when they walk into a restroom marked 'men' or 'women' and [someone of] the opposite sex is standing there. It could scare them. It could provoke violence."[7] The General Assembly ultimately approved the Act, and the Governor signed it into law. (Doc. No. 40 ¶ 23.)

**C. This Case**

On June 25, 2021, the plaintiffs, along with two other plaintiffs who are no longer part of this litigation,[8] filed a Complaint in this court stating a single count pursuant to 42 U.S.C. § 1983 for "violat[ing] Plaintiffs' rights under the First Amendment to the United States Constitution by compelling them, on pain of criminal penalty, to communicate a misleading and controversial government-mandated message that they would not otherwise display." (Doc. No. 1 ¶ 85.) Contemporaneously with the Complaint, they filed a Motion for Preliminary Injunction asking the court to enjoin the enforcement of the Act. (Doc. No. 6 at 1.) The defendants opposed the motion, arguing, among other things, that, (1) the plaintiffs lacked standing, (2) the plaintiffs'

---

[6] *Id.* at 31:17.

[7] Discussion of H.B. 1182 Before H. Floor Sess., 18th Legis. Day at 1:51:00, 112th Gen. Assemb. (Mar. 29, 2021), at http://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24423&meta_id=579987.

[8] Because those plaintiffs, who were from Hamilton County, are no longer part of this case, the court will dismiss any remaining claim specifically against DAG Pinkston, who lacks any enforcement authority over the remaining plaintiffs and therefore cannot be tied to a cognizable injury-in-fact against those plaintiffs.

9

claims were not ripe, and (3) the plaintiffs' claims were unlikely to succeed on the merits. (Doc. No. 21.)

On July 9, 2021, the court granted the plaintiffs' motion. (Doc. Nos. 22–23.) On the issue of standing, the court noted that the plaintiffs were subject to "longstanding and well-established expectations that they must comply" with the state's building code, even if enforcement proceedings had not yet been formally instituted against them. (Doc. No. 22 at 14.) The court also noted that their claims "f[e]ll well within the ordinary, well-established boundaries of pre-enforcement standing in the First Amendment context." (*Id.*) The court rejected the defendants' argument regarding ripeness on the same general grounds—that, because the plaintiffs already faced an injury caused by the imposition and enforceability of the Act, they did not need to actually wait until proceedings were specifically threatened or formally instituted against them to have a constitutionally cognizable injury. (*Id.* at 17.) Finally, the court concluded that the plaintiffs had demonstrated a strong likelihood of success under well-established precedents applying strict constitutional scrutiny to laws mandating private individuals to voice their support of a government-mandated message on a contestable ideological issue. (*Id.* at 17–26.) Accordingly, the court enjoined the defendants from enforcing the Act. (*Id.* at 23.)

The parties proceeded to discovery, and, on January 31, 2022, the plaintiffs filed a motion for summary judgment (Doc. No. 35), which the defendants have opposed (Doc. No. 39). The parties have supported their respective positions with depositions, interrogatory responses, and other documentary evidence.

**D. Additional Evidence Relevant to Summary Judgment**

**1. Evidence Regarding Enforcement of the Act.** Under Rule 30 of the Federal Rules of Civil Procedure, a litigant "may, by oral questions, depose any person, including a party" to the

case, if the proposed deponent possesses relevant information and otherwise meets the requirements of the Rule. Fed. R. Civ. P. 30(a)(1). The practice of relying on oral depositions, however, poses a challenge when what is needed is not the view or position of a single individual, but of an organization as a whole. To that end, Rule 30(b)(6) permits a party to "name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity," after which the party from whom the deposition was sought "must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf." *Id.* The plaintiffs in this case sought a Rule 30(b)(6) deposition on behalf of the SFMO and the offices of the two DAG defendants. The defendants elected for those three offices to testify through the same representative, Joyce Leigh Ferguson. (*See* Doc. No. 37-9 at 5.)

Although Ferguson's testimony was at times unclear, the parties agree that she ultimately "testified that an entity that permits transgender people to use the restroom that aligns with their gender identity but refused to post the sign mandated by the Act would be in violation of the Act." (Doc. No. 40. ¶ 35.) That is to say, she confirmed that the SFMO's interpretation of the Act was the same one espoused in the General Assembly. Ferguson further confirmed that the SFMO's position was that "any person who violates that provision would commit a Class B misdemeanor." (Doc. No. 37-9 at 65.) Ferguson explained that, in SFMO's view, the agency was "bound by the statute" to take that position and act accordingly. (*Id.*) As such, if SFMO was informed of any instance that met its definition of a violation of the Act , it "would likely send a notice to the property owner that we received the complaint and that they had 30 days to notify us if they were in compliance with the Act." (*Id.* at 62.) The parties agree that the business

11

owner's response to such a demand by the SFMO would be subject to Tennessee's criminal prohibition on submitting false information to a state regulatory agency. (Doc. No. 40 ¶ 34.)

Ferguson was asked about what steps the SFMO might take in response to a violation of the Act, other than issuing a notice of violation and demanding a response. She responded that "most of the other remedies" directly available to the SFMO "are limited to . . . hazards from fire" and that the Agency "does not consider the violation of the Act to present a hazard from fire." (Doc. No. 37-9 at 63.) Accordingly, if the SFMO was "not . . . able to obtain compliance through [its] actions, [it] would refer [the matter] to the local District Attorney for them to review." (*Id.*)

Ferguson also testified that, if the SFMO concluded that an exempt jurisdiction had failed or refused to enforce the state's building code, including the Act, the SFMO could initiate proceedings before an administrative law judge to have that jurisdiction's exempt status revoked. (*Id.* at 81–82.) Ferguson also confirmed that, even if an exempt jurisdiction has not lost its exempt status, the SFMO considers itself to have the authority to—and will—take action if it deems such steps necessary. (*Id.* at 83–84.) Those actions, however, would be subject to the general statutory enforcement structure that Ferguson described, which relies on local prosecutors to bring criminal charges after the SFMO's own efforts fail.

**2. Evidence Regarding Biology and Gender Identity.** The plaintiffs have filed an expert report by Dr. Shayne Sebold Taylor, M.D., to provide some medical background regarding issues related to the Act.[9] (Doc. No. 37-4.) Dr. Taylor is an Assistant Professor of

---

[9] Earlier in this case, Dr. Taylor provided a Declaration memorializing the same general opinions and conclusions, which the plaintiffs filed in support of their Motion for Preliminary Injunction. (*See* Doc. No. 7-3.) As a result, this portion of the court's opinion will repeat many facts that the court has already discussed. Such repetition is necessary, given the distinct procedural postures of the two motions.

Internal Medicine and Pediatrics at Vanderbilt University Medical Center and the Monroe Carrell Jr. Children's Hospital, both in Nashville. (*Id.* ¶ 2.)

Dr. Taylor explains that, from a medical perspective, the category of "sex" is "far more complex than what is seen on genital exam"—the mechanism through which individuals are typically assigned a sex designation at birth. (*Id.* ¶ 15.) Rather, the concept of sex implicates

> a complex compilation of multiple factors including one's chromosomal make up (XX for those assigned female at birth, XY for those assigned male at birth), gonadal sex (presence of ovaries or testes), fetal hormonal sex (production of sex hormones by the fetus or exogenous exposure of sex hormones to the developing fetus), pubertal hormonal sex (the change in hormonal milieu that results in the development of secondary sexual characteristics- facial hair and deep voice for those assigned male at birth, breasts and menstrual cycles for those assigned female), hypothalamic sex (variations in brain structure and function as a result of embryonal exposure of sex hormones), and gender identity.

(*Id.*) Unsurprisingly, given the general diversity of human minds and bodies, there "can be variations" among the many potential combinations of those factors. (*Id.* ¶ 16.) Dr. Taylor explains that, "[f]or example, many children are born with ambiguous genitalia," a sexual presentation generally described as being "intersex." (*Id.*)

Such variations are not limited to outward characteristics. Dr. Taylor explains that, while there are two "typical human chromosomal make up[s]" associated with designation as male and female, there are also other chromosomal configurations that naturally occur in the human population. (*Id.*) Males with Klinefelter Syndrome, for example, have an extra X chromosome, while females with Turner Syndrome are, compared to most individuals assigned female at birth, missing an X chromosome. These chromosomal variations often lead to physical and developmental differences, such as the development of breasts in patients genitally identified as male. (*Id.*)

13

Dr. Taylor explains that, according to the current understanding in his field, "gender identity" is an internal, psychological phenomenon that is conceptually distinct from any particular physical trait. Rather, "[g]ender identity is a person's inner sense of belonging to a particular gender." (*Id.* ¶ 17.) Although there may be disagreement among people about the normative question of what role gender identity should play in various situations, the purely descriptive fact that gender identity, as a type of internally experienced and reported phenomenon, *exists* is supported by both medical research and, at least for many people, confirmed by the ordinary experience of being a human. (*Id.*)

Many people report experiencing a gender identity that is inconsistent with the sex that they were assigned at birth based on a genital exam. If an individual's gender identity differs from their sex assigned at birth, that person is typically referred to as "transgender." (*Id.* ¶ 20.) According to Dr. Taylor, a 2016 study estimated that about 31,000 transgender people live in Tennessee, amounting to around 0.6% of the state's population (*Id.* ¶ 29.)

Dr. Taylor states that the "lack of alignment of assigned sex and gender identity can result in severe distress, depression, [and] anxiety," a "constellation of symptoms . . . termed gender dysphoria." (*Id.* ¶ 21.) As with any psychological condition that has a demonstrated negative effect on individuals' lives, treatments have been developed to address gender dysphoria. In particular, many individuals who have experienced gender dysphoria elect to undergo "gender transition," a "lengthy process with multiple components," including, potentially, "social transition, medical transition, and surgical transition."[10] (*Id.* ¶ 23.) "Social

---

[10] Dr. Taylor explains that medical and surgical transition can lead to changes in physical presentation even greater than changes to clothing, hair, makeup, or other non-medical external gender expressions. For example, a transgender man might undergo testosterone treatments that would allow him to grow a full beard and develop a deep voice, although the individual had been designated female at birth and, prior to medical transition, had not had those physical characteristics. (Doc. No. 37-4 ¶ 28.) Accordingly, an individual who has undergone medical transition, but who is then required to use the restroom

14

transition can include going by a different name, using different pronouns, or changing one's haircut . . . or clothing to match one's gender identity." (*Id.* ¶ 24.) At least for many individuals, successful social transition means being able to "seamlessly incorporate into their communities with a presentation that matches with their gender identity." (*Id.* ¶ 25.) In order to do so, the individual, if confronted with a situation in which they need to select a restroom designated as for men or for women, may select the restroom that corresponds with their gender identity. (*Id.*)

The plaintiffs have provided medical publications establishing that Dr. Taylor's view of these matters is not unique—namely, a piece from *The Lancet* regarding the "misuses of 'biological sex'" and a publication of the *Annals of Internal Medicine* entitled "Care of the Transgender Patient." (Doc. Nos. 37-7 & -8.)

**3. Defendants' Responses to Plaintiffs' Asserted Facts.** Under this court's local rules, "any motion for summary judgment . . . must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial," and "[e]ach fact must be supported by specific citation to the record." L.R. 56.01(b). After that statement of undisputed material facts is filed, any party opposing the motion must "respond to each fact set forth by the movant by either (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii) demonstrating that the fact is disputed." L.R. 56.01(c). In compliance with this Rule, the plaintiffs' Statement of Undisputed Material Facts includes a number of discussions of and citations to Dr. Taylor's report, to which the defendants have responded. While the defendants' responses do challenge a few genuinely factual components of Dr. Taylor's claims, the bulk of

---

corresponding to their sex assigned at birth, might, as a practical matter, give other users of the restroom the impression that the individual was disregarding the restroom's gender or sex designation by, for example, having a full beard and deep voice, as well as potentially male-coded clothing, in a restroom designated as for women.

their responses serve not so much to actually refute Dr. Taylor's factual assertions, but to (1) demonstrate that there are other, competing viewpoints and (2) explain how individuals who hold those other, competing viewpoints would characterize the same basic facts.

For example, the plaintiffs cite Dr. Taylor's opinion to discuss the process by which infants are "assigned male [or female] at birth." (Doc. No. 40 ¶ 60.) The defendants flag those statements—and many others involving assignment of sex at birth—as "[d]isputed" because, according to the defendants, "sex is not assigned at birth; it is recorded as male or female." (*Id.* ¶ 62.) But, of course, that is not a factual dispute at all; the plaintiffs and defendants are simply characterizing the exact same social practice, which both sides agree occurs, in different ways, based on different underlying assumptions about the norms and terminology at issue. This pattern occurs over and over. Indeed, at one point, the defendants abandon even bothering to cite countervailing evidence, simply dismissing the plaintiffs' assertions, supported by citation to Dr. Taylor's report, by stating that "[t]hese novel ideas are merely theories, and a transgender individual's gender identity is not determined by the biological reality of how his or her reproductive system is organized." (Doc. No. 40 ¶ 64.)

The picture ultimately conveyed by this mostly unproductive back-and-forth is not one of factual disagreement. Rather, the plaintiffs' assertions and the defendants' responses, taken together, serve to demonstrate what many observers likely already know: that there are, in Tennessee and in the United States more broadly, starkly differing viewpoints regarding how concepts and terminology related to sex and gender should be regarded and used.

### III. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003.) The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. *Id.*

Accordingly, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of its claims. Once the moving party makes its initial showing, the burden shifts to the non-moving party to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## IV. ANALYSIS

### A. Standing/Ripeness

The defendants' arguments regarding standing and ripeness are essentially the same at this stage as they were when the court considered the plaintiffs' request for a preliminary injunction. Specifically, the defendants argue that the plaintiffs have failed to present a justiciable case or controversy because the Act has not yet been enforced against them and they have not yet received the required 30-day notice that a prosecution under the Act is forthcoming. The facts developed in discovery, however, bear out the conclusion that the court previously held was likely: that the plaintiffs have demonstrated a rational, substantial, and concrete fear of the imminent consequences of being deemed out of compliance with the state's building code, giving rise to a concrete and particularized injury-in-fact sufficient to support standing and provide the basis for a ripe claim.

**1. Standing.** Article III of the Constitution grants the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975). A party seeking to invoke the court's jurisdiction must establish the necessary standing to sue before the court may consider the merits of that party's cause of action. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and (b) particularized, as well as (c) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These mandatory minimum constitutional requirements—commonly known as (1)

injury-in-fact, (2) causation, and (3) redressability—apply in every case. The defendants argue that the plaintiffs cannot meet the first requirement, an injury-in-fact that is imminent, not merely conjectural or hypothetical, because the Act has not yet been enforced against them and they do not know, with certainty, that it will be.

As the defendants ultimately concede, however, Article III does not require a plaintiff to engage in "costly futile gestures simply to establish standing, particularly when the First Amendment is implicated." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999) (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988); *Clements v. Fashing*, 457 U.S. 957, 962 (1982)). To the contrary, it is well established that "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging" the constitutionality of a law regulating an organization's ongoing and expected future behavior. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Nor is a plaintiff required to "expose himself to liability before bringing suit." *MedImmune*, 549 U.S. at 129. A plaintiff may, for example, establish an injury-in-fact based on its "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979).

A plaintiff can also establish an imminent injury by showing that it was forced to alter its behavior based on a reasonable fear of enforcement. *See Clements*, 457 U.S. at 962 (finding standing where plaintiffs alleged that, "but for the . . . provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision"). The caselaw also recognizes that an injury-in-fact can arise, not merely out of actual or even expected

19

enforcement actions, but also "costly, self-executing compliance burdens" or because the challenged law sufficiently "chills protected First Amendment activity." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citation omitted); *accord Hyman v. City of Louisville*, 53 F. App'x 740, 743 (6th Cir. 2002); *see also Am. Booksellers*, 484 U.S. at 392 (finding standing because "plaintiffs . . . , if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution") (citing *Craig v. Boren*, 429 U.S. 190, 194 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973)); *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 902 (S.D. Ohio 2016) ("[A]dditional compliance burdens may serve as an injury in fact.") (citing *All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 120–21 (D.D.C. 2011)). A plaintiff can establish standing to challenge a law by showing that the law "is directed at [the plaintiff] in particular[,] . . . requires [the plaintiff] to make significant changes in [its] everyday . . . practices[, and] . . . expose[s the plaintiff] to the imposition of strong sanctions" for noncompliance. *Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).

The plaintiffs' claims fall well within the well-established boundaries of pre-enforcement standing in the First Amendment context. As the court previously observed, the Act is not some obscure provision tucked away in a seldom-referenced corner of Tennessee's statutes; it is part of the state's formal building code, a code with which businesses such as the plaintiffs' have well-established expectations that they must comply. The legislative history of the Act, moreover, shows an affirmative intent that the Act be enforced immediately, before any supposed risk of harm can materialize, and there is no evidence that the State's executive branch disagrees with that position.

20

The defendants point out that DAG Funk's apparent public statements regarding the Act suggest that he is unlikely to pursue a criminal case based on a violation by Bongo or any other business. No such assurance, however, actually appears in any admissible form in the record, despite DAG Funk's being a party in this case, nor have the defendants explained how they would establish such a policy, if it exists, at trial. The defendants, moreover, have not identified any caselaw suggesting that a prosecutor's non-binding statement in support of exercising his enforcement discretion is sufficient to defeat what is otherwise a plainly sufficient constitutional injury.

Moreover, as the plaintiffs have now demonstrated, the defendants have tools that they are empowered and foreseeably likely to wield against violators, even without the cooperation of DAG Funk. A business that violates the Act openly—the only way that the Act can be violated, given that it involves public signage—effectively invites an investigation and demand for information from a state building inspector that the business otherwise would not receive and may even be subject to a physical inspection. The SFMO's Rule 30(b)(6) witness confirmed, moreover, that, once a building inspector has turned his eye to an establishment, he may—and indeed is expected to—note certain other violations he notices, even if those violations were not the original impetus for scrutiny. (Doc. No. 37-9 at 61 (testifying that an inspector should note any "serious life safety hazards or violations that they see on their way to conduct [an] inspection of [an] underlying allegation" of a general building code violation). The result is that, even wholly aside from the prospect of an eventual potential criminal prosecution, the Act effectively subjects those who defy it to a heightened level of potentially costly scrutiny under the state's building code.

Even in cases where that regulatory scrutiny does not result in an actual criminal prosecution, it is likely to require time, attention, and resources that regulated businesses do not wish to, and otherwise would not have to, expend—including by responding to the SFMO's demands for information. The imposition of such a regulatory burden is, in and of itself, a legally cognizable injury-in-fact. *See Little Sisters of the Poor Home for the Aged v. Sebelius*, 6 F. Supp. 3d 1225, 1235 (D. Colo. 2013) (finding constitutionally sufficient injury-in-fact based on plaintiff's having to devote time and clerical resources to filling out a "self-certification form"), *aff'd sub nom. Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151 (10th Cir. 2015), *vacated and remanded on other grounds without finding lack of standing sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016).

The court, moreover, need not take the plaintiffs' word for it that the SFMO's actions under the Act would be meaningfully coercive. SFMO's own Rule 30(b)(6) witness confirmed that the purpose of SFMO's system of notices, demands, and inspections is "to obtain compliance through [the agency's] actions." (Doc. No. 37-9 at 63.) It is unsurprising that that strategy often works; the court doubts that any experienced business owner would sign on to the position that an unwanted notice or demand for information from state building inspectors is nothing to worry about until the situation reaches the advanced stage in which criminal prosecution is at hand. The fact that a violation of the building code can ensnare a business in a time-consuming regulatory process, the threat of which itself encourages compliance, is part of how the building code works in the first place. The same is true of the Act, as a component of that code.

The defendants' argument is, in effect, that there is no injury in the fact that the plaintiffs must choose between posting the required signage or trying to move forward, as a functioning

business, knowing that the government has a building code violation in its back pocket to use any time it pleases, either to prosecute it or merely to bog it down in scrutiny from building inspectors. That would be a questionable proposition, even if the business was only putting itself at risk. A business that proceeds in violation of the state's building code, however, does not have the luxury of shouldering its risk alone. Under Tennessee law, "any architect, builder, contractor, person or corporation who has constructed or designed, or who has assisted in the construction or designing of the building, structure, or premises" in which a violation is found can be held to have "committed a separate offense" based on his involvement. Tenn. Code Ann. § 68-120-108(b). Accordingly, if a business were simply to proceed in open violation of the Act, it would not only subject itself to legal exposure, it would run the same risk for any third party it involved in any project potentially bearing on the issue of bathroom signage and design. Each of those potential third parties would have its own business to preserve, its own reputation for compliance to maintain, and its own insurance policies and carriers to worry about. The idea that the plaintiffs can simply ask anyone they do relevant business with to set those concerns aside is difficult to accept, to say the least.

The defendants attempt to liken this case to *California v. Texas*, 141 S. Ct. 2104, 2116 (2021), in which the Supreme Court held that an ostensible federal mandate that lacked any enforcement mechanism was insufficient to give rise to standing. If anything, though, the contrast with *California v. Texas* highlights the degree to which the plaintiffs have, in fact, suffered a concrete and particularized injury in this case. The provision at issue in *California v. Texas* had "no means of enforcement" whatsoever. *Id.* at 2114. There was not a single government official empowered to take any action against a violator. The plaintiffs' alleged "injury" was therefore irremediable, because there was "no one, and nothing, to enjoin." *Id.* at

2116. The Act, in contrast, is, if anything, notable for the number of officials empowered to enforce it. Most Tennessee laws are not formally and explicitly commended to the "concurrent jurisdiction" of both state-level and local authorities. There are, moreover, a number of enforcement actions available to the defendants in their enforcement of the Act. The SFMO has the power to initiate investigations based on the Act; the power to declare a building in noncompliance; the power to demand a response from the violator under penalty of perjury; and the power to refer the matter for prosecution. Indeed, the SFMO even has the power to move to replace a jurisdiction's friendly local regulators with harsher state-level ones, if it feels that those local regulators are failing to pursue violations of the Act. And, of course, the Act, unlike the wholly vestigial provision at issue in *California v. Texas*, actually carries criminal liability for a violator. Indeed, insofar as *California v. Texas* even presented what could be characterized as a close question—and the court notes that Tennessee was a party to that case and argued that there *was* standing[11]—then the question of whether standing exists here, where businesses are really at risk and noncompliance is actually criminal, would seem to present a much easier call.

In short, the defendants' argument on standing fails for at least three reasons. First, the defendants cannot overcome the well-established recognition of pre-enforcement challenges based on imminent enforcement as a not only permissible, but an indispensable, tool in protecting the right to freedom of speech under the First Amendment. A world in which a private person has to choose between complying with a controversial law or putting his business at risk, only *then* to be able to sue, is not a world in which the First Amendment is being adequately protected, and the caselaw recognizes as much. Second, the defendants ignore the large number of damaging enforcement-related steps that the defendants are empowered to take before

---

[11] *See* Brief for Respondent/Cross-Petitioner States 19–30, available at
https://www.supremecourt.gov/DocketPDF/19/19-840/146332/20200625125704552_Brief.pdf.

escalating to criminal prosecution as a last resort. The existence and purpose of those steps, however, were confirmed by the defendants' own Rule 30(b)(6) witness. Finally, the defendants' position rests on a faulty assumption for which they have failed to muster any meaningful factual support: that a Tennessee business can safely and without worry operate in open defiance of the state's building code, based solely on its assumption that the formal commencement of a criminal prosecution is hopefully unlikely and would be preceded by a warning. The court doubts that any Tennessee state official—let alone the state's Fire Marshall—would espouse such a position outside of the context of litigation. In any event, that line of reasoning is both implausible and unsupported by the facts or law. The state's building code is a direct command, backed by multiple enforcement mechanisms, that the defendants are expected to honor immediately, not only on the eve of criminal charges. Because a business that violates the Act suffers a concrete and particularized injury-in-fact based on the consequences of noncompliance, including but not limited to the risk of criminal prosecution, the plaintiffs have established standing.

**2. Ripeness.** "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). The ripeness requirement exists, in part, to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.*, 387 U.S. at 148. The Supreme Court has suggested that the analysis of whether a case is ripe for review is best conducted "in a twofold aspect, requiring the Court 'to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Magaw*, 132 F.3d at 285 (quoting *Abbott Labs.*, 387 U.S. at 149).

"The ripeness doctrine," as it has traditionally been understood, "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Beech v. City of Franklin, Tenn.*, 687 F. App'x 454, 457 (6th Cir. 2017) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). Recent cases have raised some doubt with regard to whether the latter, purely prudential aspects of ripeness continue to provide an independent basis for dismissing a case. *See Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 503 n.2 (6th Cir. 2017) (discussing questionable vitality of prudential ripeness in the wake of *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28 (2014)); *see also Driehaus*, 573 U.S. at 167 (same); *Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th Cir. 2018) (same); *but see Wyoming v. Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017) (treating prudential ripeness as an exception to *Lexmark*). As a practical matter, however, even if the prudential foundations of ripeness have been undermined, no party to this case has identified any substantive change in the law of ripeness corresponding to such developments.

As the Sixth Circuit has observed, "[t]he line between Article III standing and ripeness in preenforcement First Amendment challenges" is so slim that it has, in effect, "evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (citing *Driehaus*, 573 U.S. at 165–67). Even if there were some fine distinction between the two, moreover, the defendants have not identified any basis for the court's analysis on the constitutional aspects of ripeness to differ from its analysis regarding standing. The defendants point to the fact that neither the plaintiffs nor anyone else knows exactly how the Act will be enforced if it is permitted to go fully into effect, which, the defendants suggest, means that these claims need more factual development. But the fact that the Act puts businesses at the mercy of officials' enforcement discretion is part of the alleged problem with the Act in the first place, and no amount of waiting would fix that

26

problem. If the Act went into effect, and officials enforced it one way for the first month, that would be no guarantee of how it would be enforced the next month or the next. If anything, the uncertainty regarding the Act's enforcement sheds a light on the degree to which the Act functions as a trap that the state can spring at any time on a business that it considers too friendly to its transgender patrons. But a trap is a trap, even before it goes off. The plaintiffs' claims are ripe now, and the court can consider them on the merits.

## B. Merits

**1. The Act Compels Private Speech to Which the Plaintiffs Object.** "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citations omitted). When a law not only requires an individual to speak but also mandates *what* a person will say, then courts must treat the law as "target[ing] speech based on its communicative content" and therefore "presumptively unconstitutional," only to be upheld "if the government proves that [the law is] narrowly tailored to serve compelling state interests." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (quoting *NFILA*, 138 S. Ct. at 2371). That standard is typically known as "strict scrutiny." *Ams. for Prosperity Found. v. Bonta*, No. 19-251, 2021 WL 2690268, at *7 (U.S. July 1, 2021).

The caselaw on this subject could not be clearer in declaring the extreme constitutional disfavor afforded to laws requiring individuals to voice support for ideological viewpoints that they do not believe. For example, the Sixth Circuit has recognized that "compelling an individual 'to utter what is not in [her] mind' and indeed what she might find deeply offensive" is "the most aggressive form of viewpoint discrimination." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012). Particularly repugnant to the First Amendment is when the government forces a private party to

voice the government's compelled message, not merely in private or in direct dealings with government itself, but "in public," as an involuntary "instrument for fostering public adherence to an ideological point of view." *Wooley*, 430 U.S. at 715. The Supreme Court has even suggested that "such compulsion so plainly violates the Constitution" that it is rare for the courts to even have to step in to enforce the prohibition against it. *Janus*, 138 S. Ct. at 2464. When the government does attempt such a step, however, the caselaw is clear that "[c]ompelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command," unless justified by the strongest of rationales. *Id.* at 2463.

There can be no serious dispute that the Act involves compelled speech. The required signage must be posted on a business owner's premises. It is directed at the business's customers and purports to describe the business's own policy. The business owner is responsible for procuring the sign, adhering to the mandated design, and making sure it remains hanging and visible. In other words, while the message of the sign is one selected by the Tennessee General Assembly, the speaker is the business or other establishment subject to the Act. *See Shurtleff*, 2022 WL 1295700, at *5 (discussing distinction between government speech and private speech).

It is similarly beyond reasonable dispute that the plaintiffs object to the message required. "The First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 790–91 (1988) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 224 (1987)). There is no evidence that Bernstein or anyone else has lied about finding the signs objectionable. The plaintiffs, moreover, have provided a methodically detailed, coherent explanation for why they find the message of the signs objectionable. The defendants'

only response has been to state that they do not find the signs objectionable and do not think other people should either. That, though, is beside the point. The relevant constitutional question is not whether the plaintiffs *should* object to the signs on moral, political, or ideological grounds. The Constitution says nothing about how any private party *should* feel about anything. The relevant constitutional question is whether the Act compels the plaintiffs to voice a message to which they earnestly object, based upon their disagreement with its content. The undisputed evidence shows that it does.

**2. The Mandated Signage is Neither "Purely Factual" Nor Commercial.** Although the defendants passingly assert that the Act was "narrowly tailored" to serve a "compelling interest," they do not ultimately stake their defense of the Act on its surviving strict scrutiny. (Doc. No. 39 at 16.) As the court noted in its earlier opinion and will discuss again later in this one, that is a wise decision; there is no serious argument that this law could meet that demanding standard. (*See* Doc. No. 22 at 18–19.) Rather, the defendants argue that the Act is constitutional pursuant to an exception to the usual rule that strict scrutiny applies to laws mandating speech of a particular message. Specifically, the Supreme Court has recognized that a less demanding level of scrutiny applies to laws that merely compel commercial actors to disclose "purely factual and uncontroversial information about the terms under which [their] services will be available." *Zauderer*, 471 U.S. at 651. The defendants suggest that the Act is such a law.

The exception allowing greater leeway for compelled statements of true facts in a commercial setting plays an important role in First Amendment law, particularly with regard to the government's ability to foster transparency and accuracy in the interest of protecting consumers. That exception, for example, allows the government to require truthful warning labels on dangerous products, *Disc. Tobacco City & Lottery, Inc*, 674 F.3d at 527, and to require

certain businesses to disclose their fee structures to prevent hidden costs, *Zauderer*, 471 U.S. at 653. The Act, however, is a poor fit to that model of permissible regulation. For one thing, the Act applies to any "public or private entity or business that operates a building or facility open to the general public," regardless of the commercial nature of the facility involved. Act § 1(a). The Act, accordingly, is untethered to any particular commercial transaction. Moreover, even when the facility at issue is commercial in nature, like Bongo's are, the matters governed by the Act are, at best, tangentially related to the relevant commercial activity. Public restrooms exist for the convenience of a business's customers, not as the business's actual product. A restaurant sells food, not access to plumbing. Accordingly, even when the Act is applied in a commercial setting, the speech involved is not itself commercial in nature, at least not as that term has been used by the Supreme Court. *See NIFLA*, 138 S. Ct. at 2372 (holding that commercial speech standard did not apply to law requiring disclosure that "in no way relate[d] to the services that [the regulated businesses] provide[d]").

The even greater problem for the Act, however, is that the content of the required signage is not "purely factual." It is not difficult to imagine a law that did require purely factual disclosure of facilities' restroom policies. Such a law could, for example, simply require every qualifying facility to fully and accurately disclose its policies in language of its choosing. Whether that approach might ultimately salvage the constitutionality of the Act is not before the court, but it would, at the very least, be closer to the kind of factual transparency law typically upheld. The Act, however, does not simply require a facility to accurately disclose its policies; it requires the facility to voice the government's characterization of those policies. That characterization, moreover, is not itself simply some neutral, non-ideological statement.

30

Embedded in the language required by the Act are normative premises that, whether or not a person agrees with them, simply cannot plausibly be characterized as factual in nature.

First, it is not an assertion of fact that a facility with a trans-inclusive restroom policy necessarily allows individuals to use a restroom "regardless of the designation of the restroom." As the court has already noted, most restrooms do not expressly endorse any particular paradigm of thinking about sex or gender; they just say whether the restroom is for "Men" or "Women" without elaborating further. Accordingly, a restroom designated as for "Men" could be construed in at least two ways, depending on one's underlying assumptions. It could be interpreted as for both transgender and cisgender men, as the plaintiffs would suggest, or it could be construed as only for individuals who meet the defendants' preferred definition of "men," which relies on observed biology at birth. Only the latter of those two interpretations, however, would suggest that, when a transgender man uses a men's room, he does so "regardless of" its designation. The underlying disagreement is not one of fact; rather, it occurs on the shifting and continuously up-for-grabs level of language and norms. The warning mandated by the Act requires the plaintiffs to adopt and, by extension, endorse the government's preferred but unambiguously contested view of how gender works. It therefore goes far beyond merely requiring a purely factual disclosure.

The same issue arises out of the fact that the plaintiffs would be required to use the phrase "either biological sex." The evidence in this case plainly establishes that the question of whether humans should be organized into two binary and all-inclusive "biological sexes" involves contested ideological premises, not merely a statement of fact. The fact that the Act offers no alternative to using that phrase means that the Act requires a regulated establishment to take a position on those contested issues that may be against its will.

31

Indeed, insofar as the required signage does address questions of fact, it is, if anything, potentially misleading, or at least confusing, in relation to its own purpose. Despite the fact that the Act was, according to its own legislative history, plainly and expressly directed at establishments with trans-inclusive, but gender-segregated, restroom policies, the required signage does not actually describe such a policy. Rather, the clear implication of the required signage is that the regulated establishment permits any person to use any restroom—despite the fact that that is not actually what a trans-inclusive policy would necessarily entail. A business can allow a transgender man to use a men's restroom without opening that restroom to everyone. The Act, however, requires establishments that employ gender-segregated—but trans-inclusive—restrooms to post signage that plainly obfuscates that fact. The Act, in other words, does not actually require businesses with trans-inclusive policies to accurately disclose their own policies; rather, it forces them to endorse an inaccurate version of those policies that does not appear to exist much of anywhere outside of the imaginations of people who oppose the recognition of transgender identities altogether.

A list of ingredients is a statement of fact. A warning that smoking causes cancer is a statement of fact. A disclosure that the ostensible price of a service will be supplemented by a substantial transaction fee is a statement of fact. And a neutral description of who is permitted to use a restroom would be a statement of fact, even if a potentially unnecessary one. But the Act, by requiring private parties to speak as if they agree with contestable ideological premises that they in fact find highly objectionable, ventures far beyond the realm of pure facts, into the zone of values and judgments. Individuals—including public officials—are of course permitted to adopt whatever values and judgments they ultimately prefer. The bar for forcing a person to echo someone else's values and judgments, however, is high, and it cannot be lowered by comparing

the Act to factual disclosure obligations that are plainly inapposite. Strict scrutiny, therefore, applies.

**3. The Mandated Signage Expresses a Controversial Message.** Finally, insofar as the question of whether the required signage is purely factual is not determinative of the standard of review, the court holds that the plaintiffs have established that strict scrutiny applies because the underlying message is unambiguously controversial. The Supreme Court has recognized that, even if a regulation nominally requires only factual disclosures, the government can still wield that regulation in a way that improperly privileges one highly contestable viewpoint over another in violation of the First Amendment. In *NIFLA v. Becerra*, the Supreme Court considered a California law requiring facilities offering reproductive health-related services, including "crisis pregnancy centers," to "disseminate a government-drafted notice on site." 138 S. Ct. at 2369. The notice was purely factual, informing the recipient that "California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women." *Id.* The Supreme Court nevertheless held that the law violated the First Amendment because it, in effect, "co-opt[ed] the [regulated] facilities to deliver its message" on the highly controversial topics of contraception and abortion. *Id.* at 2376. That holding, moreover, did not depend on the underlying statute's requiring anyone to expressly endorse or decry abortion or contraception; it did no such thing. Rather, the Supreme Court recognized that, even if the required notices were technically factual in nature, their function and context made it inappropriate to judge them pursuant to a standard designed for "health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products." *Id.* at 2376.

33

The plaintiffs have offered overwhelming evidence confirming the controversial nature of these issues. Dr. Taylor's report and the sources on which he relies illustrate the struggles that transgender individuals have faced in American society, as do Bernstein's account of the experiences of his own employees and customers. The legislative history of the Act itself provides a number of examples of the kind of fear and derision that transgender individuals face. And, as is always the case, this court is permitted to "judicially notice [facts] that [are] not subject to reasonable dispute" and "generally known within the . . . court's territorial jurisdiction." F. R. Evid. 201(b). The ongoing controversies surrounding gender identity in America are there for anyone to see, and the court is not required to ignore that fact. *See Janus*, 138 S. Ct. at 2476 (recognizing controversial nature of issues surrounding gender identity). In fact, the defendants themselves concede that the plaintiffs' understanding of the concept of gender identity has been "popularized" through a process of considering the nature of sex and gender stretching back until at least "the 1950s." (Doc. No. 40 ¶ 63.) Such a characterization is incompatible with the contention that the Act only bears on settled issues of fact.

It bears noting, moreover, that there is a well-established recent history of controversy, not merely around gender identity generally, but specifically surrounding the issue of how gender identity relates to public restrooms. Indeed, the "message that gender identity protections create peril in bathrooms" is so commonplace that it even has a colloquial name: the "bathroom argument." Marie-Amélie George, *Framing Trans Rights*, 114 Nw. U. L. Rev. 555, 581 (2019). The practice of directing discussions of transgender identity back to an exaggerated specter of danger in public restrooms has been ongoing for over a decade and has surfaced across states and regions. *See id.* at 581–83. The plaintiffs find themselves on one side of this argument, with the defendants apparently on the other. The issue in this context is not who is right. Rather, what

matters under the Supreme Court's caselaw is the fact that the controversy exists, that it is hard-fought and substantial, that it is ideological in nature, and that it would be incompatible with the First Amendment to force a person on any one side of that disagreement to endorse the opposing position.

The defendants focus a substantial amount of their briefing on this point to arguing that the phrase "biological sex" is not inherently controversial. But the Act does not require the plaintiffs to simply utter the phrase "biological sex" into the wind. It requires them to post a specific statement, formatted in a specific way, in a specific context. And the potentially controversial nature of the mandated signs must be judged in that context, because that is how communication works. The phrase "It's green!" serves a different purpose and conveys different information whether the speaker is at a stoplight, shopping for a sweater, or trying to identify a snake in her garden. For the same reason, a law mandating a "KEEP OUT" sign at the entrance of an abandoned mine would pose a far different constitutional question than a law mandating the same sign at a church or a bookstore. The fact that context matters to the meaning of a statement is, to put it bluntly, so obviously true that it should not require pointing out.

There is, moreover, no formalistic legal rule that would require a court to ignore the role of context in understanding a message. To the contrary, the Supreme Court's First Amendment caselaw is rife with close readings of context. For example, in the recent opinion of *Shurtleff v. City of Bos., Massachusetts*, the Supreme Court devoted several paragraphs to exploring the ways in which "[n]ot just the content of a flag, but also its presence and position have long conveyed important messages about government."[12] *Shurtleff*, 2022 WL 1295700, at *5. The Supreme Court has similarly recognized that compelling a student to salute the flag, in context,

---

[12] For example, "[a] foreign flag outside Blair House, across the street from the White House, signals that a foreign leader is visiting," whereas the same flag in a different context would convey no such thing. *Shurtleff*, 2022 WL 1295700, at *5.

sends a message about "nationalism" and "national unity" that "is likely to include what some disapprove or to omit what others think essential." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). And the Sixth Circuit has recognized that the phrase "Choose Life," in context, refers to the controversial issue of abortion. *ACLU of Tenn. v. Bredesen*, 441 F.3d 370, 379 (6th Cir. 2006). It would be a foolish judiciary indeed that artificially rendered itself unable to acknowledge these obvious facts. Context matters, both in real life and under the Constitution.

The defendants therefore do themselves no favors by couching their arguments so aggressively in terms of whether the free-floating phrase "biological sex" is "controversial" in some abstract sense. Whether any particular mandated message is controversial must be ascertained by considering that message in the context of the society and setting in which the message is being required. Are the signs mandated by the Act controversial? Maybe not in a hypothetical world where everyone thought like the Act's authors. But in the actual world we live in, there are people who would welcome the signs and people who would find them repellant. That is the very definition of a controversy.

Ultimately, the best way to determine whether a topic is a controversial matter of public concern is simply to observe whether members of the public and other relevant actors "disagree sharply about" it. *Janus*, 138 S. Ct. at 2475. In this instance, the evidence overwhelmingly mandates a conclusion that people do, in fact, genuinely and sharply disagree about the topic addressed and characterized, in a non-neutral fashion, by the signs required by the Act. The Act, therefore, requires the plaintiffs to endorse a position they do not wish to endorse and falls well within the boundaries of laws subject to strict scrutiny.

**4. The Act Fails Strict Scrutiny.** Because the Act is subject to strict scrutiny, it must be narrowly tailored to further a compelling government interest, or else it violates and must be

superseded by the First Amendment. Although at least one key supporter of the Act in the General Assembly justified its requirements in relation to supposed risks of sexual assault and rape, there is (1) no evidence, in either the legislative record or the record of this case, that there is any significant problem of individuals' abusing trans-inclusive restroom policies for that purpose and (2) no reason to think that, if such a problem existed, the mandated signs would address it. Indeed, the defendants do not even attempt to argue that such fears are well-founded, let alone compelling. *See Janus*, 138 S. Ct. at 2465 (holding that, even assuming a compelling purpose, the law at issue would fail judicial review because there was "no evidence that the pandemonium . . . imagined would result if [the law] were not allowed").

Instead, the defendants argue that the Act furthers Tennessee's "compelling interest in ensuring that patrons are informed of the bathroom-use policy at businesses they frequent." (Doc. No. 39 at 16.) The defendants do not offer any meaningful evidence that would establish the "compelling" nature of such an interest, resting instead on their claim that that interest is "readily apparent." (*Id.*) That is debatable, to say the least, and the Supreme Court has frowned upon similar vague appeals to "common sense" to overcome "evidentiary shortcomings" of the government's stated rationale for a law restricting speech. *FEC v. Cruz*, No. 21-12, 2022 WL 1528348, at *12 (U.S. May 16, 2022). In any event, even if the interest that the defendants have identified is compelling, the Act does not even come close to satisfying the narrow tailoring requirement, as it is replete with provisions that could be narrower or even wholly omitted in favor of a less coercive and stigmatic alternative. The Act could, for example, merely require all businesses to disclose their policies upon request. It could permit businesses to choose their own factually accurate language for describing their policies. It could, at the very least, permit a business to design its signage without a cartoonishly alarmist color scheme. Whether or not those

alternatives would be constitutional, they would certainly be far more narrowly tailored than the Act is now. There is, moreover, no reason to think that such alternatives would be less effective than the Act. The Act therefore fails strict scrutiny and cannot be constitutionally enforced.

**5. The Act is Questionable Even Under Rational Basis Review.** Finally, the plaintiffs argue that, even if the Act were held to be subject to the most deferential standard of review possible—rational basis review—it would still fail. "Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government purpose. There is a strong presumption of constitutionality and the regulation will be upheld so long as its goal is permissible and the means by which it is designed to achieve that goal are rational." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 694 (6th Cir. 2014) (citing *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1050 (9th Cir. 2000)). The Supreme Court has made clear, however, that, "even in the ordinary . . . case calling for the most deferential of standards," a law may be struck down if its substance is "so discontinuous with the reasons offered for it" that any pretense of rationality cannot be sustained. *Romer v. Evans*, 517 U.S. 620, 632 (1996). That review includes considering whether, "in practical effect, the challenged [provision] simply does not operate so as rationally to further" the legitimate purpose professed. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973).

As the Supreme Court has recognized, applying rational basis review with at least some teeth is particularly appropriate when necessary to constrain the government from improperly singling out and punishing a "politically unpopular group" that, though vulnerable, has never been recognized by the Supreme Court's jurisprudence as a suspect class. *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (citing *Moreno*, 413 U.S. at 534). Rational basis review has, for example, been used to invalidate laws unfairly and irrationally targeting the intellectually

38

disabled, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985), people forced by poverty to live in group housing arrangements, *Moreno*, 413 U.S. at 537–38, and, perhaps most prominently in recent years, gays and lesbians, *Romer*, 517 U.S. at 635. The court sees little reason to doubt that a law addressing transgender people would raise similar red flags, even under rational basis review.

That said, the court ultimately declines to issue what would, in essence, be an advisory opinion regarding whether the Act would survive rational basis review, because that is simply not the standard that applies. It would do a disservice to the First Amendment to judge the Act for anything other than what it is: a brazen attempt to single out trans-inclusive establishments and force them to parrot a message that they reasonably believe would sow fear and misunderstanding about the very transgender Tennesseans whom those establishments are trying to provide with some semblance of a safe and welcoming environment. The Act fails the constitutional standard that actually applies to it, and the inquiry should end there.

The plaintiffs have explained, in detail and with evidence, why they do not wish to echo the government's preferred characterization of their trans-inclusive policies. In response, the defendants, rather than taking those objections seriously, have suggested that the plaintiffs have merely "imagined an idiosyncratic, hidden undertone to the [required] signage," which in reality requires only "a simple truthful statement of fact . . . aimed at informing the public." (Doc. No. 39 at 12.) The only thing that is imaginary in this case, though, is the imagined consensus on issues of sex and gender on which the defendants seek to rely. Transgender Tennesseans are real. The businesses and establishments that wish to welcome them are real. And the viewpoints that those individuals and businesses hold are real, even if they differ from the views of some legislators or government officials. While those government officials have considerable power,

they have no authority to wish those opposing viewpoints away. The plaintiffs, accordingly, are entitled to summary judgment.

## **V. CONCLUSION**

For the foregoing reasons, the plaintiffs' Motion for Motion for Summary Judgment (Doc. No. 35) will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge